UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF THE DISTRICT OF COLUMBIA

--------------------------------------------------------------------X

ESTATE OF YAEL BOTVIN, by Russell Ellis,
Administrator
P.O. Box 7396
Jerusalem, Israel 9107301;

JULIE GOLDBERG-BOTVIN
Masaryk Street 7
Jerusalem, Israel 93106;

TAMAR BOTVIN DAGAN
Yehudah Hamaccabi 1
Tel Aviv, Israel 620315; and

MICHAL BOTVIN,
Horkaniyah St. 22/13
Jerusalem, Israel 93305

                       Plaintiff,

                   -against-

HEIDEMAN, NUDELMAN & KALIK, P.C.
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015

THE HEIDEMAN LAW GROUP, P.C.
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015;

RICHARD HEIDEMAN
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015;

NOEL NUDELMAN,
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015; and

Case no.
21-cv-3186

**<u>COMPLAINT</u>**

Jury trial demanded

TRACY REICHMAN KALIK,
5335 Wisconsin Avenue, NW, Suite 440
Washington, DC 20015,

                              Defendants.

-------------------------------------------------------------------X


Plaintiffs, complaining of Defendants, by their attorneys, THE BERKMAN LAW

OFFICE, LLC, alleges for their complaint, upon information and belief, as follows:


## THE PARTIES

1.      On the afternoon of September 4, 1997, three suicide bombers entered the

crowded Ben Yehuda Street pedestrian mall in downtown Jerusalem and detonated bombs

packed with nails, screws, pieces of glass, and chemical poisons. *See Campuzano v. Islamic Rep.

of Iran,* 281 F. Supp. 2d 258, 261 (D.D.C. 2003).

2.      The explosion wounded nearly two hundred people, killing five.

3.      Tragically, fourteen-year-old YAEL BOTVIN, the daughter of Plaintiff JULIE

GOLDBERG-BOTVIN and the sister of plaintiffs Tamar and MICHAL BOTVIN, was among

those killed.

4.      At all times relevant to this complaint, RUSSELL ELLIS was duly appointed as

the Administrator of Plaintiff ESTATE OF YAEL BOTVIN, by order of the courts of the

Commonwealth of Pennsylvania, and brings this action in his capacity as Administrator of that

estate.

5.      At the time of her death, and at all times relevant to this Complaint, Plaintiffs'

decedent YAEL BOTVIN was a dual citizen of the United States and Israel, was a resident of

Jerusalem, Israel, and was not a citizen or resident of any state of the United States.

6.      At all times relevant to this complaint, Plaintiff JULIE GOLDBERG-BOTVIN is a dual citizen of the United States and Israel, is a resident of Jerusalem, Israel, and is not a citizen or resident of any state of the United States.

7.      At all times relevant to this complaint, Plaintiff TAMAR BOTVIN is a dual citizen of the United States and Israel, and is a resident of Jerusalem, Israel, and is not a citizen or resident of any state of the United States.

8.      At all times relevant to this complaint, Plaintiff MICHAL BOTVIN is a dual citizen of the United States and Israel, and is a resident of Jerusalem, Israel, and is not a citizen or resident of any state of the United States.

9.      Upon information and belief, at all times relevant to this complaint, Defendant RICHARD HEIDEMAN is a citizen and resident of the State of Maryland.

10.      Upon information and belief, at all times relevant to this complaint, Defendant NOEL NUDELMAN is a citizen and resident of the State of Maryland.

11.      Upon information and belief, at all times relevant to this complaint, Defendant TRACY REICHMAN KALIK is a citizen and resident of the State of Maryland.

12.      Upon information and belief, at all times relevant to this complaint, Defendant HEIDEMAN, NUDELMAN & KALIK, P.C. is a professional corporation organized and existing under the laws of a jurisdiction unknown to Plaintiffs. Although it holds itself out as a Washington, D.C. law firm, there is no such entity registered with the District of Columbia.

13.      Upon information and belief, at all times relevant to this complaint, Defendant THE HEIDEMAN LAW GROUP, P.C. is a professional corporation organized and existing under the laws of the District of Columbia.

14.     Upon information and belief, at all times relevant to this complaint Defendant THE HEIDEMAN LAW GROUP, P.C. does business under the name and style HEIDEMAN, NUDELMAN & KALIK, P.C.

15.     Upon information and belief, at all times relevant to this complaint, THE HEIDEMAN LAW GROUP, P.C. and/or Defendant HEIDEMAN, NUDELMAN & KALIK, P.C have also been known as HEIDEMAN LEZELL NUDELMAN & KALIK, P.C

16.     Upon information and belief, at all times relevant to this complaint Defendant THE HEIDEMAN LAW GROUP, P.C., HEIDEMAN, NUDELMAN & KALIK, P.C, and HEDEMAN LEZELL NUDELMAN & KALIK, P.C. are one and the same entity.

17.     Upon information and belief, at all times relevant to this complaint Defendant RICHARD HEIDEMAN holds himself out as an attorney licensed to practice law in the District of Columbia and other jurisdictions, and expert at handling cases on behalf of victims of international terrorism.

18.     Indeed, RICHARD HEIDEMAN promotes himself and his firm on his website, www.richardheideman.com, as possessing extreme experience and expertise in handling litigation on behalf of victims of terrorism:

> The firm serves as lead counsel representing American victims of terrorism in claims brought or pending against Libya, Syria, the Islamic Republic of Iran, the PLO and other organizations and financial institutions accused of providing material support for terrorism. The firm has been awarded Judgments against the Islamic Republic of Iran in the amounts of $1.27 billion and $813 million; and against the Syrian Arab Republic in the amounts of $601 million, $51 million and a landmark Judgment of $3.4 billion. The firm has represented numerous victims of terror before the US Foreign Claims Settlement Commission and is counsel to American Victims of terrorism against the Arab Bank, plc, which was pending in the Eastern District of New York.

www.richardheideman.com/about (last visited Nov. 30, 2021)

-4-

19.     Upon information and belief, at all times relevant to this complaint Defendant NOEL NUDELMAN holds himself out as an attorney licensed to practice law in the District of Columbia, the State of New York, the federal courts located in the State of New York, and other jurisdictions, and expert at handling cases on behalf of victims of international terrorism.

20.     Upon information and belief, at all times relevant to this complaint Defendant TRACY KALIK holds herself out as an attorney licensed to practice law in the District of Columbia, the State of New York, the federal courts located in the State of New York, and other jurisdictions, and expert at handling cases on behalf of victims of international terrorism.

## JURISDICTION

21.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332(a)(2), as this case presents a dispute between Plaintiffs, who are citizens and residents of a foreign state and who are not citizens of any state of the United States, and Defendants, who are citizens and residents of Maryland and Washington, D.C.

## THE UNDERLYING FACTS

22.     On September 4, 1997 Plaintiffs' decedent, 14-year-old YAEL BOTVIN, was murdered in a triple suicide bombing terror attack on the Ben Yehuda Street pedestrian mall in Jerusalem, Israel.

23.     Two hundred people were injured, and five people were killed in that attack.

24.     Among those killed in that attack was Plaintiff's decedent, 14 year old YAEL BOTVIN.

25.     Among those injured in that attack were American citizens Diana Campuzano, Avi Elishis, and Gregg Salzman, who were the plaintiffs in *Campuzano, et al. v. Islamic Rep. of Iran, et al.,* D.C. Dist. Docket no. 00-cv-2328.

26.     Among those injured in that attack were Jenny Rubin, Daniel Miller, Abraham Mendelson, Stuart Hersh, and Noam Rozenman, the plaintiffs in *Rubin v. Islamic Rep. of Iran*, DC Dist. Ct. Docket no. 01-CV-1655.

27.     The *Campuzano* case filed in September 2000 and the *Rubin* case filed in July 2001 were tried together in January 2003, resulting in substantial judgment awards being entered in September 2003 in favor of each of the plaintiffs in those cases, *Campuzano v. Islamic Rep. of Iran*, 281 F. Supp. 2d 258, 261 (D.D.C. 2003).

28.     A few months later, in February 2004 Plaintiffs retained Defendant Heideman, then operating via the entity Heideman Lezel Nudelman & Kalik, P.C. to bring an action for damages resulting from the suicide bombing at the Ben Yehuda Street mall in Jerusalem that murdered young Yael Botvin.

29.     Defendants continue representing Plaintiffs to this day with respect to their claim for damages resulting from the suicide bombing at the Ben Yehuda Street mall in Jerusalem that murdered young Yael Botvin.

30.     The lawsuit Defendants were retained to bring should have been extremely quick and easy, given that two other lawsuits arising out of the same events had already reached final judgment after a hearing on the merits at which expert testimony was offered and which resulted in a lengthy published opinion. It should have been a matter of filing a copycat complaint, serving it, waiting for Iran to default (as Iran always does in cases of this nature), then moving for a default judgment, presenting the same evidence as was presented in *Campuzano* and *Rubin*, and presenting evidence of the economic and emotional damages suffered by the Botvin family. The *Rubin* case progressed from initial filing to final judgment in just 16 months. Since the attorneys in *Campuzano* and *Rubin* had already done the work, the Botvins' case should have progressed even more quickly.

31.     To illustrate that the Botvin case should have proceeded rapidly, one need only look at the docket in *Salzman v. Islamic Rep. of Iran,* 17-cv-2475 (D.D.C.). In that case, relatives of the terror victim plaintiffs in the *Campuzano* case sued for their own solatium damages resulting from the same 1997 terror attack as was at issue in the *Campuzano* case, which is the same attack that resulted in the death of Yael Botvin. *Salzman* was filed on November 16, 2017, and resulted in final judgment 22 months later on September 25, 2019. *Salzman* relied on the same evidence as had been presented in *Campuzano* plus simple new declarations regarding damages. However, the *Salzman* case was stayed for nine of those months while the court waited for the Court of Appeals for the District of Columbia Circuit to decide an appeal regarding the statute of limitations, *Maalouf v. Islamic Republic of Iran*, (D.C. Cir. No. 18-7052) (*see Salzman* Dkt. 23, Aug. 5, 2018 staying the action, and *Salzman* unnumbered docket entry dated May 10, 2019 un-staying the action). Subtracting the nine months that the case was stayed, *Salzman* went from filing to final judgment in just 13 months. There is no reason the Botvins' case could not have proceeded on a similar trajectory.

32.     Inexplicably, Defendants delayed a full year after being retained to even file a lawsuit: it was not until January 31, 2005 that Defendants filed an action against Iran.

33.     That action, *Ellis v. Islamic Rep. of Iran,* 05-cv-00220 (D.D.C.) ("Action 1"), was filed under 28 USC § 1605(a)(7) ("Old Law"), a statute that provided an exception to sovereign immunity for claims of victims of state sponsored terrorism but which required the plaintiffs to establish a cause of action under the law of a relevant jurisdiction, rather than supplying a federal cause of action.

34.     Service in Action 1 was accomplished in June 2005 (*see* Dkt. 5 in that case).

35.     Defendants filed a motion for entry of a default in Action 1 in September 2005 (*see* Dkt. 5 in that case), which motion was signed by Defendant TRACY REICHMAN KALIK.

36.     That motion was denied, and the motion ordered stricken, in a terse minute order dated July 20, 2006 stating "Under Rule 55(a), an application for entry of default should be made to the Clerk, not the court."

37.     Thus, more than a year (from June 2005 – September 2006) was wasted by Defendants filing the wrong application to the court.

38.     Defendants failed to contemporaneously inform Plaintiffs of the court's decision, and at all times deceived Plaintiffs by telling them the case was proceeding splendidly and a judgment would soon be obtained.

39.     Defendants have tried to shift blame for the year they wasted by asserting that the problem was the court, which took 10 months to decide the motion, but in so doing they fail to grasp that they were the ones who had failed to read or understand Rule 55(a) and made the wrong application. Fed. R. Civ. P. could not be clearer: "When a party against whom a judgment for affirmative relief is sought has failed to plead or otherwise defend, and that failure is shown by affidavit or otherwise, the clerk must enter the party's default." *Id.* It is unseemly for Defendants, who filed the wrong motion, to blame the court for delay in deciding it, which of course ignores the heavy calendars that the court faces and the court's expectation that the attorneys who practice before it will read the rules and file the proper applications.

40.     Finally, on July 28, 2006 Defendants filed the proper application for a default in Action 1 (Dkt. 12 in that case), and just three days later on July 31, 2006 the Clerk noted Iran's default in that case (Dkt. 13 in that case).

41.     Had Defendants filed the proper application for a default back in September 2005, the default in Action 1 would have been entered in September 2005 instead of nine months later in July 2006, which delay is the result of Defendants' error.

42.     After having the defendant's default noted on the docket, the next step to obtaining a judgment in Action 1 was to file a motion for a judgment by default, presenting proof of liability and damages establishing plaintiff's "claim or right to relief by evidence satisfactory to the court," 28 U.S.C. § 1608(e), *see Roeder v. Islamic Rep. of Iran*, 195 F. Supp. 2d 140, 159 (DDC 2002).

43.     Rather than file a motion for a default judgment presenting evidence as required, on October 15, 2006 Defendants filed a bizarre motion asking the Court to take judicial notice of the orders in *Campuzano* and *Rubin* and to simply grant Plaintiffs a judgment on the basis of *Campuzano* and *Rubin*.

44.     On September 24, 2007 the Court entered an order, *Estate of Botvin v. Iran,* 510 F. Supp. 2d 101 (D.D.C. 2007) (Ex. A) granting the unremarkable application to take judicial notice of findings entered in another case in the same courthouse, but denying the application for a default judgment based on nothing but such judicial notice. The court explained:

> Pursuant to FSIA, a court may not enter a default judgment against a foreign state "unless the claimant establishes his claim or right to relief by evidence satisfactory to the court." 28 U.S.C. § 1608(e); *Roeder v. Islamic Rep. of Iran*, 195 F. Supp. 2d 140, 159 (D.D.C. 2002) (requiring evidence on each element of claims). In evaluating the plaintiff's proof, a court contemplating entry of default judgment may accept as true the plaintiff's uncontroverted evidence, which may take the form of sworn affidavits or prior transcripts. *Greenbaum v. Islamic Rep. of Iran*, 451 F. Supp. 2d 90, 94-95 (D.D.C. 2006). Such evidence may include judicial notice of findings and conclusions of related proceedings in cases before the same court. *Estate of Heiser v. Islamic Rep. of Iran*, 466 F. Supp. 2d 229, 262-63 (D.D.C. 2006).
>
> The plaintiffs request a default judgment on liability despite having proffered no evidence other than the *Campuzano* findings and conclusions. See generally Pls.' Mot for Judicial Notice. Those findings and conclusions suffice to establish the defendants' guilt in perpetrating the attack in question, *see id.,* but, as the *Campuzano* case involves different plaintiffs, they do not suffice to establish the impact of the attack on the plaintiffs. The identity of the plaintiffs, their

relationship with the deceased and the impact of the bombing upon them goes not only to establishing damages but also liability. *See, e.g.,* Compl. at P 32, 35 (providing unsubstantiated allegations of Yael Botvin's death and the plaintiffs' status as her beneficiaries). The court will, therefore, take judicial notice of the *Campuzano* findings and conclusions per the plaintiffs' request, but it will not enter a default judgment at this time. In lieu thereof, the court will permit the plaintiffs to file competent written and documentary evidence with the court establishing each element of their particular claims as to both liability and damages.

*Estate of Botvin,* 510 F. Supp. 2d at 103 (Ex. A).

45.     Thus, the Court held that Defendants had filed a half-baked application that was insufficient for the actual entry of a judgment: while certain things could be established by the evidence and findings in the earlier case, Defendants' submission failed to connect those findings to these plaintiffs, and to make a showing of damages.

46.     This half-baked application further delayed Plaintiffs' case by 11 months.

47.     Defendants failed to contemporaneously inform Plaintiffs of the court's decision, and at all times deceived Plaintiffs by telling them the case was proceeding splendidly and a judgment would soon be obtained.

48.     Four months later, on January 28, 2008 Congress enacted 28 USC § 1605A ("New Law"), a new statute which remedied some issues in the Old Law making it easier for victims to prevail in in terrorism cases and obtain awards for solatium damages, particularly by negating the D.C. Circuit's holding in *Cicippio-Puleo v. Islamic Rep. of Iran,* 353 F.3d 1024, 1027 (D. C. Cir. 2004), which held that the § 1606(a)(7) Old Law provided jurisdiction but did not provide a cause of action, leaving plaintiffs to rely on the law of particular jurisdictions, some of which allowed such claims, and some of which did not. *See Simon v. Rep. of Iraq,* 529 F.3d 1187, 1190 (D.C. Cir. 2008) (describing § 1605A as "more advantageous to plaintiffs in several respects. For instance, it precludes a foreign state from filing an interlocutory appeal

under the "collateral order" doctrine, § 1605A(f), and permits a plaintiff to attach property in advance of judgment, § 1605A(g). In addition, § 1605A(c) abrogates *Cicippio-Puleo*…by creating a federal right of action against foreign states, for which punitive damages may be awarded."); *see also also Estate of Heiser v. Islamic Rep. of Iran*, 605 F. Supp. 2d 248, 249 (D.D.C. 2009) ("This new enactment is much more advantageous to plaintiffs than §1605(a)(7) in many significant respects. For instance, in actions under §1605A, plaintiffs may now seek an award of punitive damages against states sponsors of terrorism."); *Estate of Botvin v. Islamic Rep. of Iran,* 604 F. Supp. 2d 22, 25 (D.D.C. 2009); *Opati v. Rep. of Sudan,* 140 S. Ct. 1601, 1606 (2020).

49. Under the New Law, § 1605A, any plaintiff with a pending claim under the Old Law, § 1605(a)(7), was permitted to file a new action under 1605A as long as the action under § 1605(a)(7) was pending:

> Inasmuch as this provision expressly distinguishes between cases "filed under this section"—*i.e.*, § 1605A—and cases "filed under section 1605(a)(7)" of the pre-amendment Act, a pending case obviously cannot be said to have been "filed under" the new provision. Therefore, the plaintiff in a case pending under § 1605(a)(7) may not maintain that action based upon the jurisdiction conferred by § 1605A; in order to claim the benefits of § 1605A, the plaintiff must file a new action under that new provision.

*Simon v. Republic of Iraq,* 529 F.3d 1187, 1191-92 (D.C. Cir. 2008).

50. Defendants were fully aware of the enactment of § 1605A, as they themselves filed other cases relying on this new statute on behalf of other clients of theirs shortly after it went into effect, *e.g. Knowland v. Great Socialist People's Libyan Arab Jamahiriya,* 08-cv-1309 (DDC 2008) (filed July 30, 2008); *Pflug v. People's Libyan Arab Jamahiriya,* 08-cv-505 (DDC 2008) (replacing older action filed under § 1605(a)(7), filed March 24, 2008); *Brown v. Islamic Rep. of Iran,* 08-cv-531 (DDC 2008) (filed March 27, 2008).

51.     Indeed, on March 24, 2008, less than three months after Congress enacted the New Law, Defendants actually filed an action on behalf of Plaintiffs under the New Law, *Goldberg-Botvin v. Islamic Republic of Iran,* D.D.C. case no 08-cv-503 ("Action 2"). That complaint was signed by Defendant RICHARD HEIDEMAN.

52.     Unfortunately, Defendants took no steps to prosecute Action 2.

53.     Over a year Action 2 was filed, no proof of service had been docketed, and the court (Urbina, *J.*) issued a minute order "directing the plaintiffs to SHOW CAUSE on or before April 3, 2009 why the court should not dismiss this suit for failure to prosecute." (D.D.C. case no. 08-cv-503, unnumbered docket entry dated Mar. 27, 2009).

54.     Defendants failed to contemporaneously inform Plaintiffs of the court's decision, and at all times deceived Plaintiffs by telling them the case was proceeding splendidly and a judgment would soon be obtained.

55.     Despite Judge Urbina's order to show cause, Defendants still took no steps to prosecute Action 2.

56.     There is no indication that Defendants ever served the summons and complaint in Action 2.

57.     Defendants failed to file any response to the court's order to show cause.

58.     Eleven months later, on April 23, 2010, the Court issued an order dismissing Action 2 for lack of prosecution (Ex. B).

59.     Defendants failed to contemporaneously inform Plaintiffs of the court's decision, and at all times deceived Plaintiffs by telling them the case was proceeding splendidly and a judgment would soon be obtained.

60.     Defendants thus wasted 25 months between when Action 2 was filed and when it was ignominiously dismissed for non-prosecution, delaying Plaintiffs' claims under the New Law.

61.     Instead of diligently pursuing Plaintiff's claims under the New Law in Action 2, Defendants senselessly continued trying to prosecute Action 1 under the Old Law.

62.     On March 21, 2008, Defendants filed a third motion for a default judgment in Action 1 (Dkt. 17 and 18 in that case). By this point more than three years had elapsed since Action 1 was filed, more than four years had elapsed since Defendants were retained, more than five years had elapsed since the *Campuzano* and *Rubin* plaintiffs had obtained their judgment arising out of the same event, and almost eleven years had elapsed since the terrorist murder of Yael Botvin. That third motion for a default judgment in Action 1 was signed and e-filed by Defendant TRACY REICHMAN KALIK.

63.     This motion also asked the court to amend the complaint to assert a cause of action under the New Law.

64.     On March 27, 2009 the court entered an order deciding the third motion for a default judgment in Action 1, *Estate of Botvin v. Islamic Rep. of Iran,* 604 F. Supp. 2d 22 (D.D.C. 2009) (Ex. C). The Court's order was not kind in its assessment of the legal representation provided by Defendants. The Court observed that the motion papers contained "weighty deposition testimony and a bevy of *unsworn* statements, pictures and newspaper articles," *Botvin,* 604 F. Supp. 2d at 24 (D.D.C. 2009) (emphasis in original), but did "not explain how these documents are relevant to or aid in the satisfaction of each element of their particular claims as the court directed." *Id.* As an example, the Court recounted that "the plaintiffs' motion states that the plaintiffs are U.S. citizens and cites to a portion of plaintiff Julie Goldberg-Botvin's deposition that has nothing to do with citizenship." *Id.*, citing *Potter v.*

*District of Columbia*, 558 F.3d 542, 2009 U.S. App. LEXIS 4540, 2009 WL 564630, at *10 (D.C. Cir. Mar. 6, 2009) (Williams, *J.,* concurring) (stating that "judges 'are not like pigs, hunting for truffles buried in briefs' or the record" (quoting *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir. 1991)), the Court observed that it was "not inclined to independently search through volumes of deposition transcripts to determine whether the plaintiffs have stated a claim." *Id.* The Court also noted that "the plaintiffs cite a medical report for the proposition that Yael survived the explosion for a short time," *id.,* whereas "[t]he author of the report, however, makes no such determination that Yael received medical attention after the attack." *Id.* And the Court noted that "the plaintiffs fail to explain why the methodology employed by their enlisted economist and the amount requested in damages is consistent with case law in this district." *Id.*

65. Regarding the prong of the third default motion in Action 1 which asked the court to amend the complaint to assert a cause of action under the New Law, the court found the motion failed to explain why the New Law should be applicable to the case, and so denied that prong of the motion. *Id.,* 604 F. Supp. 2d at 25-26.

66. Defendants failed to contemporaneously inform Plaintiffs of the court's decision, and at all times deceived Plaintiffs by telling them the case was proceeding splendidly and a judgment would soon be obtained.

67. Defendants' having asked the court to amend the complaint in Action 2 to assert their claim under § 1605A rather than pursuing the § 1605A claim in Action 2, the new action they had commenced under § 1605A, makes no sense and ignores the teachings of *Simon* that "in order to claim the benefits of § 1605A, the plaintiff must file a new action under that new provision." *Simon,* 529 F.3d at 1191-92.

68. Thus, despite the New Law, § 1605A, having permitted plaintiffs with pending claims under the Old Law to file a new complaint asserting a cause of action under the New

Law, § 1605A—which would plainly have been the correct path—Defendants decided to ask the Court to follow a path of their own invention that the D.C. Circuit in *Simon* had already held was wrong: moving to amend the existing complaint to add a claim under § 1605A.

69.    Defendants' failure to proceed as *Simon* said is all the more perverse given that Defendants had actually filed a new action under the New Law, § 1605A, but for no good reason failed to serve the summons and complaint, ignored the court's order to show cause, and allowed the case to be dismissed for lack of prosecution.

70.    Defendants' failure to proceed as *Simon* said is even more bizarre since at the same time as they filed their ill-advised motion to amend in the *Botivn* case, they followed the correct path and filed and pursued new actions under § 1605A for their other clients, such as the plaintiffs in *Estate of Brown v. Islamic Rep. of Iran,* 08-cv-531 (D.D.C. 2008) (filed March 27, 2008, replacing actions filed under the old laws under case numbers 01-cv-2094, 05-cv-2124, 06-cv-750, 06-cv-596, 07-cv-1302, 06-cv-690, and 06-cv-516), or the plaintiffs in *Pflug v. Great Socialist People's Libyan Arab Jamahiriya*, 08-cv-505 (D.D.C. 2008) (filed March 24, 2008, replacing actions filed under the old laws under case number 03-cv-749).

71.    On May 28, 2009, Action 2 was languishing due to Defendants' failure to prosecute it, Defendants filed a "renewed" motion for a default judgment in Action 1, essentially a fourth motion for the same relief, which they termed on the docket a "Supplemental Motion for a Default Judgment." (Action 1, Dkt. # 22). That motion was signed and efiled by Defendant TRACY REICHMAN KALIK. This time, the motion asked the Court to grant a judgment under the Old Law, 28 U.S.C. § 1605(a)(7); in other words, Defendants continued their stubborn refusal to do what the statute said and pursue a new action under the New Law. Because courts had held that the Old Law, § 1605(a)(7), created only jurisdiction and not a cause of action, and therefore a cause of action brought under § 1605(a)(7) had to be based on some applicable local

law, that motion argued at length that Plaintiffs' claims should be decided under California law, resting the assertion of California law on the thin reed that Plaintiffs' decedent Yael Botvin had been born in California, though she had emigrated to Israel many years earlier and had not returned to California.

72.     Meanwhile, other terror victims with similar claims were being industrious rather than inept and lackadaisical like Defendants. One such group, of plaintiffs, comprised of 241 deceased service members and injured survivors of the October 23, 1983 suicide bombing attack of a Marine barracks in Beirut, Lebanon, had also filed an action against Iran. That action was *Peterson v. Islamic Rep. of Iran,* 01-2094 and 01-2684 (D.D.C.). Due to the large number of plaintiffs, the judgment in that case, entered September 7, 2007, was enormous, collectively totaling $2,656,944,877.

73.     After obtaining their judgment, the *Peterson* Plaintiffs took measures to enforce it. Among other things, they registered their judgment in the Southern District of New York and served writs of garnishment on banks and financial institutions that potentially held assets of Iran. They discovered that Citibank held an account referred to as the "Clearstream" account, which contained a vast trove of Iranian assets—over $1.8 billion. On or about June 13, 2008 the *Peterson* Plaintiffs served a writ of execution on Citibank.

74.     The *Peterson* Plaintiffs were not the only lawyers being diligent. The *Rubin* plaintiffs were also not asleep at the switch. On or about October 10, 2008 the *Rubin* plaintiffs, who had obtained their judgment against Iran back in 2003, delivered a writ of execution to the U.S. Marshal for service upon Citibank seeking to enforce their judgment against the assets in the Clearstream account. It must be recalled that the *Rubin* plaintiffs were injured in the same terrorist attack that killed Yael Botvin.

75.     Other terror victims who had obtained judgment against Iran did likewise, serving executions and other forms of creditor process on Citibank seeking turnover of the Clearstream assets. Ultimately, the numerous judgment-creditors named in 16 judgments, all of which had multiple plaintiff / judgment-creditors, served executions. The 16 judgments included: *Estate of Bland v. Islamic Rep. of Iran*, No. 1:05– cv–02124 (D.D.C., Dec. 6, 2006); *Wultz v. Islamic Rep. of Iran*, 864 F. Supp. 2d 24 (D.D.C. 2012); *Murphy v. Islamic Rep. of Iran*, 740 F. Supp. 2d 51 (D.D.C. 2010); *Valore v. Islamic Rep. of Iran*, 700 F. Supp. 2d 52 (D.D.C. 2010) (granting judgment in consolidation of four actions at issue here: *Valore*, No. 1:03–cv–01959; *Bonk v. Islamic Rep. of Iran*, No. 1:08–cv–01273; *Spencer v. Islamic Rep. of Iran*, No. 1:06–cv–00750; and *Arnold v. Islamic Rep. of Iran*, No. 1:06–cv–00516); *Estate of Brown v. Islamic Rep. of Iran*, No. 1:08–cv–00531 (D.D.C., Feb. 1, 2010); *Acosta v. Islamic Rep. of Iran*, 574 F. Supp. 2d 15 (D.D.C. 2008); *Beer v. Islamic Rep. of Iran*, 574 F. Supp. 2d 1 (D.D.C. 2008); *Kirschenbaum v. Islamic Rep. of Iran*, 572 F. Supp. 2d 200 (D.D.C. 2008); *Levin v. Islamic Rep. of Iran*, 529 F. Supp. 2d 1 (D.D.C. 2007); *Estate of Heiser v. Islamic Rep. of Iran*, 466 F. Supp. 2d 229 (D.D.C. 2006); *Greenbaum v. Islamic Rep. of Iran*, 451 F. Supp. 2d 90 (D.D.C. 2006); *Campuzano v. Islamic Rep. of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) (awarding judgment in *Rubin v. Islamic Rep. of Iran*, No. 1:01–cv–01655); and *Peterson v. Islamic Rep. of Iran*, 264 F. Supp. 2d 46 (D.D.C. 2003).

76.     The plaintiffs in *Bland v. Islamic Rep. of Iran*, No. 1:05– cv–02124 (D.D.C., Dec. 6, 2006), which is among the cases listed in the previous paragraph as having filed liens on the Clearstream assets, were represented by Defendants. Thus Defendants by having been diligent in their representation of their clients in the *Bland* case were able to get their *Bland* clients a lien on the Clearstream assets, while Defendants were still floundering around for years trying to get the Plaintiffs' case in gear.

77.     Defendants did not file any process seeking to recover any of the Clearstream assets for Plaintiffs, as due to their bumbling they had not yet obtained a judgment against Iran for Plaintiffs, although they would have done so years before but for their inattentiveness and procrastination.

78.     Defendants failed to inform Plaintiffs of the existence of the Clearstream assets or of the possibility of recovering some of those assets.

79.     On or about February 16, 2010, the Court entered an order deciding the fourth motion for a default judgment made by Defendants, *Estate of Botvin v. Islamic Rep. of Iran*, 684 F. Supp. 2d 34 (D.D.C. 2010) (Ex. D). Although the Court found jurisdiction to exist, it held that under the choice of law analysis most recently reaffirmed by the D.C. Circuit in *Oveissi v. Islamic Rep. of Iran*, 573 F.3d 835 (D.D.C. Mar. 12, 2009), it would be Israeli law, not California law, that governed the claim, since Yael Botvin was a long-time resident of Israel and was killed in Israel, and had only a tangential connection to California. The Court concluded:

> Although the plaintiffs' motion acknowledges the possibility that Israeli law may apply, it fails to establish their entitlement to a judgment in their favor under Israeli law. *See generally* Pls.' Mot. For example, the plaintiffs evaluate their IIED [intentional infliction of emotional distress] claim solely under California law without mentioning Israeli law concerning IIED. *See* Pls.' Mot. at 18-22. Likewise, although the plaintiffs have established that the victim survived for approximately four hours after the infliction of her injuries in the terrorist attack, *see id.* at 15-17, they have not established the defendants' underlying tort liability for assault, battery and IIED under Israeli law as required to succeed on their survival claim, *see id.* at 14-18. The plaintiffs also evaluate their wrongful death claim solely under California law. *See id.* at 14. Similarly, the plaintiffs fail to establish vicarious liability under Israeli law, as they rely on the *Campuzano* conclusions of law, which found vicarious liability under D.C. law only. *See id.* at 13. Furthermore, the plaintiffs have failed to establish that their calculation of damages comports with Israeli law. *See id.* at 22-26.
>
> Therefore, the court denies without prejudice the plaintiffs' renewed motion for default judgment. The court grants the plaintiffs leave to submit additional

briefing demonstrating their entitlement to a judgment in their favor under Israeli law.

*Id.,* 684 F. Supp. 2d at 41-42.

80.    Defendants failed to contemporaneously inform Plaintiffs of the court's decision, and at all times deceived Plaintiffs by telling them the case was proceeding splendidly and a judgment would soon be obtained.

81.    On or about July 9, 2010, Defendants filed yet another motion for a default judgment—their fifth motion seeking that relief (Action 1, Dkt. # 26). That motion was signed and e-filed by Defendant TRACY REICHMAN KALIK. Defendants still failed to remedy what the Court said was lacking in their presentation under the Old Law. And they still failed to pursue Action 2 under the New Law. This fifth motion in Action 1 sought to reargue the previous decision and convince the Court to apply California law, and also made a half-hearted presentation under Israeli law.

82.    On or about March 25, 2011, the Court decided Defendants' fifth motion for a default judgment, *Estate of Botvin v. Islamic Rep. of Iran*, 772 F. Supp. 2d 218 (D.D.C. 2011) (Ex. E). The Court again rejected the request to apply California law, and further denied the motion to enter judgment under Israeli law, finding that Plaintiffs had failed to demonstrate that their claim was viable under Israeli law. *Id.*

83.    Defendants' ongoing efforts to shoehorn Plaintiffs' claims into California law or Israeli law made no sense, since the New Law, § 1605A, created its own federal cause of action and it was no longer necessary to prove a claim under the law of California, Israel, or any other particular jurisdiction. Defendants continued their stubborn and inept refusal to pursue Action 2 under the new law.

84.     Defendants failed to contemporaneously inform Plaintiffs of the court's decision, and at all times deceived Plaintiffs by telling them the case was proceeding splendidly and a judgment would soon be obtained.

85.     Meanwhile, other plaintiffs in other cases who were not waylaid by this error were forging ahead with their collection efforts.

86.     On or about August 11, 2011 Citibank filed an interpleader complaint naming as parties all holders of judgments against Iran who had moved to intervene in the *Peterson* action, who had served writs of execution against Citibank, or who had served a *lis pendens* on Citibank with respect to Iranian assets. *Citibank, N.A. v. Owens, et al,* 10-Civ.-4518 (S.D.N.Y.) (third party action).

87.     Sadly, Plaintiffs were not named in the Citibank interpleader complaint because they did not have a judgment against Iran due to Defendants' bumbling and ineptness. Defendants' other clients, the plaintiffs in *Bland,* were part of the interpleader complaint; Plaintiffs were not since they still had no judgment. Defendants had been retained by Plaintiffs in 2004 (!!), but had still not been able to get a motion for default judgment right despite five attempts, and had filed but then failed to prosecute an action under the New Law—which by this point was not so new anymore, as it had been enacted three and a half years earlier.

88.     On or about September 15, 2011 Defendants filed a sixth motion seeking a default judgment under the Old Law, this time beefing up the presentation of Israeli law. (Action 1, Dkt. # 30). That motion was signed by Defendant RICHARD HEIDEMAN and Matthew S. Apfel, Esq., who signed on behalf of Defendant HEIDEMAN NUDELMAN & KALIK, P.C., and was, upon information and belief, an associate of that firm, and was e-filed by Mr. Apfel.

89.     On or about July 3, 2012 the Court decided that motion, *Estate of Botvin v. Islamic Rep. of Iran*, 873 F. Supp. 2d 232 (D.D.C. 2012) (Ex. F). In that decision, the Court

found that the defendants in that case were liable for the terror attack that killed Plaintiffs' decedent Yael Botvin, and awarded damages to the Estate of Yael Botvin under Israeli law, but found that Plaintiffs had not demonstrated that the other plaintiffs, the family members of Yael Botvin, were entitled to damages under Israeli law, nor were any of the plaintiffs entitled to punitive damages. *Id.* The Court noted that:

> this decision was decision is another sad example of the inconsistent results arising from this defunct regime: the family members of Yael Botvin receive no solatium compensation while family members of victims in the earlier *Campuzano* decision received millions of dollars in solatium compensation.

*Id.*, 873 F. Supp. 2d at 246. However, the Court continued: "thankfully, since the creation of the federal cause of action contained in 28 U.S.C. § 1605A, these cases are becoming less common." *Id.*

90.     Defendants informed Plaintiffs that an award had been made to the Estate of Yael Botvin, and presented it as a big victory, conspicuously omitting to mention that the case had been severely delayed by their negligence, that the claims on behalf of the other plaintiffs had been denied, and that they had allowed the claim under the New Law in Action 2 to be dismissed for lack of prosecution.

91.     During these four plus years that Defendants were dithering, the Peterson/Citibank was proceeding. Indeed, on or about June 1, 2012, a settlement agreement was entered into in the Peterson/Citibank case dividing the Iranian assets at Citibank (about $1.9 billion, plus interest accruing) among the judgment creditors who had filed creditor process against those funds, dividing the money *pro rata* according to their judgment amount, assuming plaintiffs prevailed.

92.     That settlement agreement was signed by Defendant RICHARD HEIDEMAN on behalf of his clients in the *Bland* case.

93.    According to that settlement agreement, the Peterson/Citibank money was to be divided as follows:

| **Case name** | **Judgment Amount ($)** | **Pro rata percentage** | **Share of Peterson/ Citibank funds ($)** |
|---|---|---|---|
| Peterson | 2,656,944,877.00 | 70.944% | 1,347,075,046.40 |
| Greenbaum | 19,879,023.00 | 0.531% | 10,078,694.54 |
| Acosta | 50,172,000.00 | 1.340% | 25,437,279.42 |
| Rubin | 71,500,000.00 | 1.909% | 36,250,607.47 |
| Heiser | 291,089,966.00 | 7.773% | 147,583,050.31 |
| Levin | 28,807,719.00 | 0.769% | 14,605,556.84 |
| Valore | 290,291,092.00 | 7.751% | 147,178,019.99 |
| Kirshenbaum | 13,750,000.00 | 0.367% | 6,971,270.67 |
| Beer | 13,000,000.00 | 0.347% | 6,591,019.54 |
| Murphy | 31,865,570.00 | 0.851% | 16,155,891.89 |
| Bland | 277,805,908.00 | 7.418% | 140,848,012.94 |
| | | | |
| | 3,745,106,155.00 | 100.00% | 1,898,774,450.00 |

94.    Apparently when the judge in the July 3, 2012 decision remarked about the tragedy of this case having proceeded under the Old Law, 28 U.S.C. § 1605(a)(7), and how the need for each plaintiff to establish a claim under the law of some particular jurisdiction had been obviated by the New Law, 28 U.S.C. § 1605A, which also clearly allowed solatium damages for family members, Defendants finally got the message that they needed to file a new action for Plaintiffs under the New Law to replace not only Action 1 under the Old Law but Action 2, which they had filed under the New Law in 2008 but had allowed to be dismissed 25 months later for failure to prosecute. Defendants should have prosecuted Action 2, rather than allowing it to be dismissed, just as Defendants had done for their other clients, and which would have avoided the series of go-nowhere motions filed by Defendants and the Defendants' failure to

obtain judgments for each of the Plaintiffs, including solatium for the family member plaintiffs, over a crucial period of four years.

95.    On or about August 3, 2012 Defendants finally filed a replacement action on behalf of Plaintiffs making a claim under the New Law, 28 U.S.C. § 1605A. That new action was captioned *Goldberg-Botvin, et al. v. Islamic Rep. of Iran*, D.D.C. case no. 12-cv-1292 (Action 3).

96.    After Action 3 was filed and the summons and complaint were served, on March 19, 2013 Defendants filed a motion for default judgment and that motion was granted like clockwork on April 4, 2013. *Goldberg-Botvin v. Islamic Rep. of Iran*, 938 F. Supp. 2d 1 (D.D.C. 2013) (Ex. G). The Court's order granted solatium damages to the decedent's mother Julie Goldberg-Botvin in the amount of $5 million, to the decedent's sister Tamar Botvin in the amount of $2.5 million, and to the decedent's sister Michal Botvin in the amount of $2.5 million. The Court also granted punitive damages to all plaintiffs, including the Estate of Yael Botvin, in the amount of $30.89 million. Thus an additional $10 million of compensatory damages were awarded, plus punitive damages, over and above the $1.7 million that had been awarded to the estate at long last in the earlier case.

97.    Had Defendants not dropped the ball on Action 2, meaning had they diligently prosecuted Action 2 rather than allowing it to be dismissed after 25 months for lack of prosecution, that action would have resulted in a judgment against Iran on behalf of the entire Botvin family, including the Estate of Yael Botvin, in 2008 or 2009, and there would have been plenty of time for Defendants to file a lien on the Clearstream assets, just like they did for their clients in the *Bland* case.

98.    On February 25, 2013 another group of victims of terrorism holding a judgment against Iran, the plaintiffs in *Wultz v. Islamic Republic of Iran,* D.D.C. Case No. 08-cv-1460

(RCL) filed a motion to intervene in the Peterson case. *See Peterson v. Islamic Republic of Iran,* S.D.N.Y. Case No. 10-cv-4518, Dkt. ## 329-331.

99.     On May 22, 2013 the parties in *Peterson* informed the *Peterson* court that a settlement had been reached with the *Wultz* plaintiffs, pursuant to which the *Wultz* plaintiffs would receive a portion of the Clearstream assets. *See Peterson v. Islamic Republic of Iran,* S.D.N.Y. Case No. 10-cv-4518, Dkt. # 407.

100.    A settlement agreement between the parties to the *Peterson* case was entered into, dated May 24, 2013, and signed on behalf of the *Bland* plaintiffs by Defendant NOEL NUDELMAN, a partner of the other Defendants.

101.    At the time Defendant NUDELMAN signed the settlement agreement resolving the Wultz' claims against the Clearstream assets, NUDELMAN and the rest of the Defendants were representing the Plaintiffs.

102.    Defendants failed to make a similar motion to intervene in the *Peterson* case on behalf of the Plaintiffs, either after the July 3, 2012 judgment was entered on behalf of the ESTATE OF YAEL BOTVIN, or after April 4, 2013 judgment on behalf of JULIE BOTVIN, MICHAL BOTVIN, or TAMAR BOTVIN.

103.    Defendants also never disclosed to any of Plaintiffs the existence of the Peterson case, the settlement agreement they had entered into on behalf of their clients the *Bland* plaintiffs, or the settlement agreement they entered with respect to the *Wultz* plaintiffs' claim.

104.    Defendants never informed Plaintiffs that they should retain other counsel to represent them with respect to the Clearstream assets.

105.    At all relevant times Plaintiffs had no knowledge of the existence of the Clearstream assets or the Peterson case, or Defendants' involvement in that case, that Defendants also represented the *Bland* plaintiffs who had a conflicting claim to the Clearstream assets, or

that other terror victims, the *Wultz* plaintiffs, had been able to intervene in the *Peterson* case and obtain a portion of the Clearstream assets.

106.    Following entry of judgment in the *Goldberg-Botvin* case, Defendants took no measures to obtain a portion of the Peterson/Citibank money for the Goldberg-Botvin plaintiffs.

107.    On or about April 10, 2016, an appeal in the Peterson/Citibank case was decided by the US Supreme Court, *Bank Markazi v. Peterson*, 136 S. Ct. 1310 (2016) in favor of the plaintiffs, and all the settling parties got their share of the Peterson/Citibank money. Unfortunately, due to Defendants' ineptness and bungling, Plaintiffs did not even have a seat at that table and got none of that money.

108.    Had Plaintiffs been included in the Peterson/Citibank case, under the *pro rata* formula of the settlement in that case they would have received $5,913,443.53 total, consisting of $859,218.29 for the Estate of Yael Botvin, $2,527,112.62 for Julie Goldberg-Botvin, $1,263,556.31 for Tamar Botvin, and $1,263,556.31 for Michal Botvin. A chart showing what the *pro rata* calculation in Peterson/Citibank would have looked like had the Botvins been included is as follows:

| Case name | Judgment Amount ($) | Pro rata percentage | Share of Peterson/ Citibank funds ($) |
|---|---|---|---|
| Peterson | 2,656,944,877.00 | 70.724% | 1,342,879,786.54 |
| Greenbaum | 19,879,023.00 | 0.529% | 10,047,305.98 |
| Acosta | 50,172,000.00 | 1.335% | 25,358,058.89 |
| Rubin | 71,500,000.00 | 1.903% | 36,137,710.48 |
| Heiser | 291,089,966.00 | 7.748% | 147,123,425.40 |
| Levin | 28,807,719.00 | 0.767% | 14,560,070.06 |
| Valore | 290,291,092.00 | 7.727% | 146,719,656.49 |
| Kirshenbaum | 13,750,000.00 | 0.366% | 6,949,559.71 |
| Beer | 13,000,000.00 | 0.346% | 6,570,492.82 |
| Murphy | 31,865,570.00 | 0.848% | 16,105,576.83 |
| Bland | 277,805,908.00 | 7.395% | 140,409,363.27 |
| **Estate of Yael Botvin** | **1,700,000.00** | **0.045%** | **859,218.29** |

| | | | |
|---|---|---|---|
| **Julie Goldberg-Botvin** | **5,000,000.00** | **0.133%** | **2,527,112.62** |
| **Tamar Botvin** | **2,500,000.00** | **0.067%** | **1,263,556.31** |
| **Michal Botvin** | **2,500,000.00** | **0.067%** | **1,263,556.31** |
| | | | |
| | 3,756,806,155.00 | 100.000% | 1,898,774,450.00 |

109.     The only reason why Plaintiffs did not have their judgment in time to serve creditor process on Citibank and get themselves included in the Peterson/Citibank case was because Defendants bungled their case by delaying filing it after being retained for no valid reason, then filing a mindboggling series of inept and half-baked motions, then filing a claim under the New Law but failing to prosecute it for 25 months, resulting it being dismissed for failure to prosecute, and then not filing a replacement action under the New Law until four-and-a-half years after that New Law was enacted.

110.     Defendants' procrastination and negligence cost Plaintiffs $5,913,443.53 that they could have recovered in the Peterson/Citibank case had Defendants not been asleep at the switch, plus pre- and post-judgment interest.

111.     It is particularly galling that the *Rubin* plaintiffs—whose claim arose from the same 1997 bombing on Ben Yehuda Street in Jerusalem as Plaintiffs'—recovered $36 million from the Peterson/Citibank case, because their attorneys did not drop the ball for years, like Defendants did.

112.     Defendants' other clients, the *Bland* plaintiffs recovered in excess of $140 million from the Clearstream assets.

113.     It is equally galling that most of the judgment-creditors who received a share of the Peterson/Citibank case proceeds commenced their cases after Plaintiffs, yet they were diligent and obtained their judgments years before Defendants finally managed to bungle their way to obtaining a judgment for Plaintiffs. For example, the *Heiser* plaintiffs commenced their

action in 2007 and had a judgment in 2009. The *Valore* case had a 2006 docket number and had

a judgment in 2009; the *Bland* case had a 2005 docket number and had a judgment in 2011; the

*Levin* case, had a 2005 docket number and had a judgment in 2008; and the *Greenbaum, Acosta,*

*Beer* and *Kirshenbaum,* cases had docket numbers of 2002, 2006 and 2008, and 2003, and had

judgments in 2006, 2008, 2011, and 2008, respectively.

## AS AND FOR A FIRST CLAIM FOR RELIEF

114.    Plaintiffs repeat and re-allege each of the foregoing allegations with the same

force and effect as if more fully set forth herein.

115.    The defendants were reckless, careless, and negligent in their representation of the

Plaintiffs in that they failed to pursue enforcement of Plaintiffs' claim in a timely and diligent

manner; filed but failed prosecute for 25 months, and allowed to be dismissed, an action under

the New Law, 28 U.S.C. § 1605A, and did not file another action under the New Law that they

did prosecute for four-and-a-half years after the New Law's enactment; persisted in pursuing a

claim under the Old Law, despite the limitations of the Old Law that made most of Plaintiffs'

claim non-viable; persisted in filing half-baked and insufficient papers, and irrelevant and

deficient motions, resulting in a delay of many years in Plaintiffs obtaining their judgment, for

no valid reason at all and not due to any reasonable strategy or professional judgment call; failed

to diligently obtain a judgment for Plaintiffs so that they could pursue enforcement of such a

judgment against Iranian assets in the United States, including the Peterson/Citibank assets;

failed to intervene in the *Peterson* case or otherwise try to obtain some of the Clearstream assets

for Plaintiffs; failed to inform Plaintiffs of their lack of diligence or the damage that resulted to

them by virtue thereof; failed to inform Plaintiffs that they had a conflict of interest with respect

to their representation of other plaintiffs whose claims they were pursuing against the

Clearstream assets; failed to inform Plaintiffs that they were acting outside their competence zone; failed to properly conduct due diligence; failed to inform Plaintiffs that they should seek advice of other counsel; failed to comply with applicable statutes, laws, rules and regulations; failed to have efficient and sufficient personnel; failed to comport themselves reasonably and prudently; failed to warn plaintiff of the dangers and perils; and the defendants were otherwise reckless, careless and negligent.

116.    In communicating with Plaintiffs, Defendants have sought to blame the court for the delays in obtaining a judgment for the Plaintiffs, but this claim is fatuous and disingenuous. Courts sometimes take time to decide matters. But when a matter is decided against a plaintiff because the plaintiff's lawyer presented the wrong papers, made the wrong arguments, or proceeded under the wrong law, the cause of the delay is the plaintiff's lawyer errors, not the court.

117.    Defendants' negligence caused plaintiff to be damaged in that their judgment came too late for them to execute their judgment against the Peterson/Citibank assets.

118.    But for Defendants' negligence, Plaintiffs would have been included in the Peterson/Citibank case and would have received a share of the recovery therein prorated against the compensatory damages awards of the other judgment creditors who participated in that case, which would have resulted in a recovery of $5,913,443.53, plus a prorated share of the interest that accumulated on the Peterson/Citibank assets.

119.    By reason of the foregoing, Plaintiffs are entitled to recover the full extent of their damages as alleged herein.

### AS AND FOR A SECOND CLAIM FOR RELIEF

120.    Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

121.    If Defendants are found to have committed malpractice in their representation of Plaintiffs, then they are not entitled to receive legal fees from Plaintiffs. *See Hendry v. Pelland,* 73 F.3d 397 (D.C. Cir. 1996); *Winter v. Brown,* 365 A.2d 381 (D.C. Court of Appeals 1976).

122.    Plaintiffs demand a declaratory judgment declaring that Defendants are not entitled to any legal fees from Plaintiff, and that if they have received any legal fees from Plaintiff they must refund such fees to Plaintiffs.

### AS AND FOR A THIRD CLAIM FOR RELIEF

123.    Plaintiffs repeat and re-allege each of the foregoing allegations with the same force and effect as if more fully set forth herein.

124.    Defendants have sought to charge Plaintiffs for disbursements that were occasioned by their inattentiveness and negligence, including all the expenses incurred trying to prove Israeli law, and the expenses incurred by virtue of having two judgments in two separate actions, Action 1 and Action 3, that needed to be served, whereas if Defendants had simply prosecuted Action 2 they would have gotten a single judgment for all Plaintiffs and only one service of judgment would have had to be served.

125.    These expenses that should not have been incurred included $4,500 on January 25, 2013 for serving the order and judgment in Action 1; $3,898 on July 22, 2010 as an expert fee to Israel law expert Michael Dvorin, and $7,000 on June 15, 2011 as an expert fee to Israel law expert Boaz Shnoor, for opinions on Israeli law.

126.    Additionally, Defendants incurred expensive and pointless expenses for videotaping the deposition of Plaintiff JULIE BOTVIN and MICHAL BOTVIN. First, there was

-29-

no need for Plaintiffs to depose themselves. There was no defendant to conduct a cross examination, so taking the deposition was pointless. Declarations would have sufficed. Moreover, since the depositions were unnecessary, so too was the videotaping of the depositions unnecessary.

127.    The needless costs incurred by these depositions included $272.50 on February 28, 2008 for videotaping the deposition of Julie Botvin; $545 on March 10, 2008 for video production services for the deposition of Julie and Michal Botvin; $35.63 for DVD duplication of the deposition of Julie and Michal Botvin; and $738.50 on March 25, 2008 to Carmelita Lee, court reporter for the depositions of Julie and Michal Botvin.

128.    Plaintiffs demand a declaratory judgment declaring that these charges need not be paid by Plaintiffs, and that if Plaintiffs have paid these charges, in whole or in part, including via the $5,000 advance towards the expenses of the case that Defendants received when they were originally retained, then such payment should be refunded to Plaintiffs.

## **DEMAND FOR JURY TRIAL**

129.    Plaintiffs demand a trial by jury for all issues as to which a jury trial is permitted by law.

**WHEREFORE**, Plaintiffs demand judgment against the defendants in the amounts and for the relief requested herein, plus such preliminary and injunctive relief as may be permitted by law and/or equity or the court's inherent powers, all in addition to such attorney's fees as may be recovered by law, plus pre-judgment and post-judgment interest.

Dated:   Brooklyn, New York
         December 6, 2021

Yours,

THE BERKMAN LAW OFFICE, LLC
*Attorneys for Plaintiffs*


by:   ___/s/ Robert J. Tolchin_____
         Robert J. Tolchin

111 Livingston Street, Suite 1928
Brooklyn, New York 11201
(718) 855-3627
rtolchin@berkmanlaw.com