**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **Estate of Yael Botvin, et al.** | **:** | |
| | **:** | |
| **Plaintiffs,** | **:** | |
| **v.** | **:** | **Civil Action No. 1:21-cv-03186 (RCL)** |
| | **:** | |
| **Heideman Nudelman & Kalik, P.C., et al.** | **:** | |
| | **:** | |
| **Defendants.** | **:** | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION
## TO DISMISS PLAINTIFFS' COMPLAINT

## TABLE OF CONTENTS

TABLE OF CONTENTS...................................................................................................ii

TABLE OF AUTHORITIES ..........................................................................................iii

INTRODUCTION ............................................................................................................1

    **I.**    UNDERYLING LITIGATION........................................................................ 3

        A.    Botvin I, Early Litigation under § 1605(a)(7), 2005-2008 ............................ 5

        B.    § 1605A Claim Denied, Governing Future Litigation, 2009-2011.............. 10

        C.    Entry of Judgments, 2012-2013 .................................................................. 13

    **II.**    PETERSON PLAINTIFFS' COLLECTION EFFORTS AND
SETTLEMENT AGREEMENT ................................................................... 15

LEGAL STANDARDS ................................................................................................. 19

    **I.**    DISMISSAL UNDER RULE 12(b)(6)......................................................... 19

    **II.**    LEGAL MALPRACTICE CLAIMS ........................................................... 22

ARGUMENT ................................................................................................................. 23

    **I.**    DEFENDANTS HAVE JUDGMENTAL IMMUNITY FOR THE
BOTVINS' LAWYERS' STRATEGIC DECISION TO PURSUE
THE PENDING § 1605(A)(7) ACTION ......................................... 23

    **II.**    PLAINTIFF'S COMPLAINT MUST BE DISMISSED WITH
PREJUDICE BASED UPON THE ABSENCE OF PROXIMATE
CAUSATION.................................................................................... 29

        A.    Potential Collection from Hidden Iranian Assets Via A Settlement
Agreement Was Not Foreseeable.................................................................. 31

        B.    Any Claim That the Botvin Family Would Have Fared Better by
Pursuing the Separate § 1605A Complaint in 2009 Is Wholly
Speculative .................................................................................................. 35

    **III.**    THE COMPLAINT MUST BE DISMISSED FOR FAILURE TO
JOIN ALL OF THE BOTVINS' LAWYERS AS PARTIES UNDER
RULE 19. ........................................................................................ 38

CONCLUSION.............................................................................................................. 43

# TABLE OF AUTHORITIES

## CASES

*16th & K Hotel, LP v. Commonwealth Land Title Ins. Co.*, 276 F.R.D. 8 (D.D.C. 2011) ........... 40

*Ali v. Carnegie Inst. of Wash.*, 306 F.R.D. 20 (D.D.C. 2014) ...................................... 39

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................... 19

*Atlanta Channel, Inc. v. Solomon*, Civil Action No. 15-1823 (RC), 2020 U.S. Dist. LEXIS 130282 (D.D.C. July 23, 2020) ......................................................................... 30

*Bank Markazi v. Peterson*, 578 U.S. 212 (2016) ............................................. 16, 17, 18

*Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................... 19, 20

*Belmar v. Garza (In re Belmar)*, 319 B.R. 748 (D.C. Bankr. 2004) ............................. 35

*Biomet Inc. v. Finnegan Henderson LLP*, 967 A.2d 662 (D.C. 2009) ........................ 22, 24, 25

*Bragg v. Owens-Corning Fiberglas Corp.*, 734 A.2d 643 (D.C. 1999) ......................... 22

*Campuzano v. Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003) ...................................... 4, 10

*Chase v. Gilbert,* 499 A.2d 1203 (D.C. 1985) ................................................. 22, 29, 30

*Cicippio-Puleo v. Iran*, 353 F.3d 1024 (D.C. Cir. 2004) ............................................ 5

*Covad Communs Co. v. Bell Atl. Corp.*, 407 F.3d 1220 (D.C. Cir. 2005) .................... 20

*Davis v. Damrell*, 119 Cal. App. 3d 883, 174 Cal. Rptr. 257 (Cal. App. 1st Dist. 1981) ........... 26

*Denzer v. Rouse*, 48 Wis. 2d 528, 180 N.W.2d 521 (Wis. 1970) ................................ 25

*Hudson v. Windholz*, 416 S.E.2d 120 (Ga. 1992) ..................................................... 24

*In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31 (D.D.C. 2009) ............. passim

*Jacobsen v. Oliver*, 451 F. Supp. 2d 181 (D.D.C. 2006) ............................................ 22

*James Pietrangelo, II v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697 (D.C. 2013) .......................................................................................................... 30

*Jovanovic v. US-Algeria Bus. Council*, 561 F. Supp. 2d 103 (D.D.C. 2008) .............. 21

*Judd Burstein, P.C. v. Long*, 797 F. App'x 585 (2d Cir. 2019) .................................. 36

*Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843 (11th Cir. 1999) ............... 41

*Macktal v. Garde*, 111 F. Supp. 2d 18 (D.D.C. 2000) ...................................... 20, 24, 35

*Maroulis v Sari M. Friedman, P.C.*, 153 A.D.3d 1250, 60 N.Y.S.3d 468 (2017) ....... 36

*Marshall County Health Care Auth. v. Shalala*, 988 F.2d 1221 (D.C. Cir. 1993) ......... 2, 21

*Mills v. Cooter*, 647 A.2d 1118 (D.C. 1994) ....................................................... 23, 25

*Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009) .................................................................................... 31

*O'Neil v. Bergan*, 452 A.2d 337 (D.C. 1982) .......................................................... 22

iii

*Oveissi v. Iran*, 498 F. Supp. 2d 268 (D.D.C. 2007)..................................................... 11

*Oveissi v. Islamic Republic of Iran*, 573 F.3d 835 (D.C. Cir. 2009) ........................... 12

*Peterson v. Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007) ................................................... 15

*Peterson v. Iran*, 563 F. Supp. 2d 268 (D.D.C. 2008) ................................................. 15

*Peterson v. Islamic Rep. of Iran*, 220 F. Supp. 3d 98 (D.D.C. 2016) .......................... 15

*Peterson v. Islamic Republic of Iran*, 561 F. App'x 9 (D.C. Cir. 2014)....................... 15

*Peterson v. Islamic Republic of Iran*, 627 F.3d 1117 (9th Cir. 2010) ......................... 15

*\*Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52 (D.D.C. 2015) .................... 24, 36

*Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*, 2013 U.S. Dist. LEXIS 93762, 2013 WL 3357921 (S.D.N.Y. July 2, 2013) ................................................................ 36

*Seed Co. v. Westerman*, 832 F.3d 325 (D.C. Cir. 2016) ............................................. 22

*Seed Co. v. Westerman, Hattori, Daniels & Adrian, LLP*, 961 F.3d 1190 (D.C. Cir. 2020)........ 30

*Simon v. Rep. of Iraq*, 529 F.3d 1187 (D.C. Cir. 2008) ............................................... 26

*Temple v. Synthes Corp.* 498 U.S. 5 (1990)................................................................. 41

*Truesdale v. U.S. Dep't of Justice*, 657 F. Supp. 2d 219 (D.D.C. 2009) ..................... 21

*United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80 (D.D.C. 2004).................. 21

*United States Telesis, Inc. v. Ende*, 64 F. Supp. 3d 65 (D.D.C. 2014) ......................... 20

*Veg-Mix Inc. v. U.S. Department of Agriculture*, 832 F.2d 601 (D.C. Cir. 1987)........ 21

*Venable LLP v. Overseas Lease Grp., Inc.*, No. 14-02010 (RJL), 2015 U.S. Dist. LEXIS 98650 (D.D.C. July 27, 2015)................................................................ 20, 35

*Waithe v. Arrowhead Clinic, Inc.*, 491 F. App'x 32 (11th Cir. 2012) ......................... 36

*Williams v. Callaghan*, 938 F. Supp. 46 (D.D.C. 1996) .............................................. 23

*Woodruff v. Tomlin*, 616 F.2d 924 (6th Cir. 1980) ...................................................... 24

*Zee Co. v. Williams, Mullen, Clark & Dobbins, P.C.*, 871 F. Supp. 2d 498 (E.D. Va. 2012)...... 36

## STATUTES

22 U.S.C. § 8772................................................................................................... 18

28 U.S.C. § 1605A................................................................................................... 8

34 U.S.C. § 20144................................................................................................. 15

iv

## OTHER AUTHORITIES

Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, 122 Stat. 3, passed January 21, 2008, codified at 28 U.S.C. § 1605A .......................................................... 8, 14, 26

Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. No. 112-158, passed August 10, 2012 ............................................................................................................................... 18

## RULES

D.C. Rule of Professional Conduct 1.5 .................................................................................. 40, 41

Federal Rule of Civil Procedure 12(b)(6) ............................................................................. 19, 21

Federal Rule of Civil Procedure 12(b)(7) ..................................................................................... 38

Federal Rule of Civil Procedure 19 ............................................................................................. 39

Federal Rule of Civil Procedure 55 ............................................................................................... 6

Federal Rule of Civil Procedure 8 .......................................................................................... 19, 20

## TREATISES

Mallen & Smith, *Legal Malpractice* ................................................................................. 24, 25, 29

## INTRODUCTION

Plaintiffs are the recipients of judgments exceeding $41 million ($11,704,457 in compensatory damages and $30,890,000 in punitive damages) against the Islamic Republic of Iran ("Iran") arising from the 1997 terrorist murder of Yael Botvin. Yet, they filed this legal malpractice claim against only one of the three law firms that represented them in their successful cases. Plaintiffs claim that their counsel failed to obtain their judgments fast enough to participate in a privately negotiated settlement agreement among various law firms on behalf of their clients who were creditors with judgments against Iran. Pursuant to that settlement agreement, those attorneys and judgment creditors agreed to share in a jointly pursued collection action that Plaintiffs claim would have allowed them to collect a portion of their judgments at an earlier time. Their legal malpractice complaint, however, imposes an absolute liability standard on attorneys that clearly contradicts the standard of care required of attorneys in the District of Columbia. Defendants respectfully submit that this Court should dismiss Plaintiffs' Complaint in its entirety.

Iran's liability for the attack and the resulting injuries and damages to Plaintiffs, the Botvin Family,[1] were the subjects of three complaints filed by Defendants and their co-counsel in this Court between 2005 and 2012: *Ellis, et al. v. Islamic Republic of Iran, et. al.*, 1:05-cv-00220-RCL ("*Botvin I*"); *Goldberg-Botvin, et al. v. Islamic Republic of Iran, et al.*, 1:08-cv-00503-RMU ("*Botvin II*"); and *Goldberg-Botvin, et al. v. Islamic Republic of Iran*, 1:12-cv-

---

[1] Plaintiffs ("the Botvin Family") include: Russell Ellis, the Administrator of the Estate of Yael Botvin; Yael's mother, Julie Goldberg-Botvin; and Yael's two sisters, Michal and Tamar. Mr. Ellis is also equal co-counsel with the Defendants in representing the Botvin Family.

01292-RCL ("*Botvin III*"). *See* Compl. at ¶¶ 33, 51, 95; Exhibits A-C.[2] Plaintiffs won judgments in *Botvin I* in 2012 and in *Botvin III* in 2013 with compensatory damages totaling $11,704,457 and punitive damages of $30.89 million. Exhibit A, *Botvin I* Doc. 31; Exhibit B, *Botvin III* Doc. 14. Defendants distilled the key events of the underlying litigation, as described in Sections I and II, *infra*, into a timeline included as an Appendix for the Court's ease of reference.

      The Botvin Family's judgments were the result of the diligent and professional representation throughout the underlying litigation by the Botvins' Lawyers: The Heideman Law Group, P.C., Perles Law Firm, PC; and Russell Ellis, Esq. Plaintiffs do not complain about the outcome of the underlying litigation. Nor could they realistically do so as the holders of more than $41 million in judgments. Notably, they have already recovered over 23.6% of their compensatory damages judgments through the efforts of Defendants and their co-counsel. Plaintiffs bring this malpractice action against only one-third of their counsel, challenging only how long it took to obtain their judgments. Plaintiffs now, with the benefit of hindsight, quibble with the legal tactics and strategies employed more than a decade ago at various points in the underlying litigation to speculate that certain different approaches would have resulted in the same judgments being entered, only at some unspecified earlier point in time. As Plaintiffs acknowledge in their Complaint, the strategic decision-making of the Botvins' Lawyers occurred amidst dramatic changes in decisional case law and groundbreaking legislation that created an unsettled legal framework for claims like the Botvin Family's. D.C. law does not require attorneys to possess supernatural prescience or predict the unpredictable. Plaintiffs' allegations

---

[2] For the Court's ease of reference, Defendants attach as Exhibits A, B, and C to this Motion the ECF filing dockets for *Botvin I*, *Botvin II*, and *Botvin III* and will cite to the filings therein using the relevant docket entries as "*Botvin I/II/III* Doc. ___." *See infra* at 21 fn. 15.

of malpractice are not permitted pursuant to the judgmental immunity doctrine, which is a complete bar to the Plaintiffs' claims.

As to causation, Plaintiffs impermissibly speculate about the potential outcomes of various alternative strategies to assert that they could have had their judgments earlier, which arguably would have allowed them to participate in an unforeseeable and unpredictable collection litigation, which gave rise to an unforeseeable privately negotiated settlement agreement, which itself was the subject of groundbreaking legislative developments, in order for the parties to the settlement agreement to recover portions of their judgments against Iran. The foreseeability and speculation problems with Plaintiffs' theory are each independent grounds to dismiss Plaintiffs' Complaint for failure to adequately allege causation. Together, they mandate dismissal.

If the Court finds Plaintiffs have stated a claim for malpractice, which the Defendants emphatically dispute, Defendants request the Court dismiss the Complaint for Plaintiffs' failure to join the two other law firms that Plaintiffs jointly engaged at the outset of the litigation and who served and worked together as Defendants' equal co-counsel, Perles Law Firm, PC, and Russell Ellis, Esq., both of whom are required parties under Federal Rule of Civil Procedure 19.

## I.   UNDERYLING LITIGATION

Three Hamas suicide bombers detonated explosives along the Ben Yehuda Street Mall in Jerusalem, Israel, on September 4, 1997. Compl. ¶ 1. They murdered four people, including Yael Botvin, a 14-year-old high school student living with her mother and two sisters in Jerusalem. *Id.* ¶¶ 3, 5. She was a dual citizen of the United States and Israel. *Id.* ¶ 5. Other victims of the same attack sued under the 1976 Foreign Sovereign Immunities Act, 28 U.S.C. § 1604 (FSIA),[3] in the

---

[3] Generally, foreign states are immune from lawsuits in U.S. courts under the FSIA, unless a statutory exception to immunity applies. 1996 legislation created 28 U.S.C. § 1605(a)(7) to

265186387v.10

U.S. District Court for the District of Columbia in 2000 and 2001. *Id.* ¶ 27. The Botvin Family was not a party in the initial Ben Yehuda Street Mall Attack lawsuit and did not retain Defendants and their co-counsel at that time. *Id.* ¶¶ 27-28. Hon. Ricardo Urbina took evidence for four days in September 2003 on Iran's providing terrorist training and economic assistance to Hamas. *Id.* ¶ 27. He found that Iran's provision of material support for Hamas made Iran liable for those plaintiffs' damages arising from the Ben Yehuda Street Mall bombing. *Id.* He awarded compensatory and punitive damages in a default judgment against Iran. *Id.*; *Campuzano v. Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003).

More than six years after Yael's murder and about three-and-a-half years after the *Campuzano* complaint, Yael's mother, Julie Goldberg-Botvin, executed a retainer agreement in February 2004 to engage the Botvins' Lawyers. Compl. ¶ 28; *see also* Retainer Agreement, Exhibit D.[4] The retainer agreement provides that, in addition to Defendant Heideman Nudelman & Kalik, P.C., Perles Law Firm, P.C. (headed by the highly-regarded FSIA terrorism claim practitioner, Steven R. Perles, Esq.) and Mr. Ellis would each serve as co-counsel in pursuing claims resulting from Yael Botvin's murder. Pursuant to the agreement, each of the Botvins' Lawyers agreed to "give equal services and effort" in exchange for each receiving an equal one-third of the attorneys' fees.

---

provide an additional exception to sovereign immunity as well as the "Flatow Amendment" creating a private right of action for terrorism victims under certain circumstances.

[4] To the extent the terms of the Retainer Agreement are outside the pleadings, despite the reference to the retention in the Complaint, Defendants state that they are not relying on these terms in connection with their Rule 12(b)(6) dismissal arguments. The retainer terms are, however, relevant to Defendants' Rule 12(b)(7) arguments in Section III *infra* at 38. These facts are included here for a cohesive chronology of events and do not convert this motion to one for summary judgment.

### A. *Botvin I*, Early Litigation under § 1605(a)(7), 2005-2008

Together, the Botvins' Lawyers filed their first complaint on behalf of the Botvin Family in the U.S. District Court for the District of Columbia in January 2005. Compl. ¶ 32; Exhibit A, *Botvin I* Doc. 1. The plaintiffs to the complaint were Yael's Estate, through its personal representative, Mr. Ellis, Yael's mother, Julie, and Yael's two sisters, Tamar and Michal. Exhibit A, *Botvin I* Doc. 1. The complaint asserted common law causes of action: wrongful death, survival, intentional infliction of emotional distress, solatium, and punitive damages. *Id.* The *Botvin I* complaint also cited 28 U.S.C. § 1605(a)(7) for jurisdiction, but the Botvins' Lawyers carefully drafted the *Botvin I* complaint to avoid relying exclusively on § 1605(a)(7) or the Flatow Amendment as the source of a cause of action against Iran. *Id.*

The Botvins' Lawyers drafted the *Botvin I* complaint to avoid problems arising from a D.C. Circuit opinion that changed numerous aspects of the law involving victims of terror, *Cicippio-Puleo v. Iran*, 353 F.3d 1024 (D.C. Cir. 2004). This decision, which the court issued between the time when Judge Urbina entered the *Campuzano* decision and when the Botvin Family engaged their lawyers,[5] held that there was no federal cause of action against foreign state sponsors of terrorism in the FSIA. This decision was a material change in the law, and it created serious new obstacles to victims seeking recovery. Following this appellate decision,

---

[5] There are many reasons the comparisons Plaintiffs attempt to make in their Complaint to other litigation, allegedly similar to theirs, are inappropriate attempts to "compare apples and oranges." In addition to the cases involving different parties and different facts and evidence, they were assigned to different judges and were litigated at different times in the changing legal landscape for FSIA terrorism cases. As noted above, *Campuzano* and *Rubin*, referenced by Plaintiffs in ¶ 30 of their Complaint, were filed and decided entirely before the landmark *Cicippio-Puleo* decision by the D.C. Circuit. At the other end of the spectrum, *Salzman*, referenced by Plaintiffs in ¶ 31 of their Complaint, was filed almost a decade after Congress passed legislation creating an entirely new federal cause of action that was intended as a legislative "fix" for fall out from the *Cicippio-Puleo* decision. As any seasoned litigator knows, the outcome in one case does not guarantee a similar outcome in another case.

plaintiffs in FSIA terrorism cases had to use § 1605(a)(7) as a "pass through" to causes of action in state tort law; usually under the law of the victim's domicile at the time of the terrorist attack. *See e.g.*, *In re Islamic Republic of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 60-61 (D.D.C. 2009) (describing FSIA terrorism litigation following *Cicippio-Puleo* as "cumbersome and tedious in practical application" and requiring additional steps for judicial resolution, including "choice of law problems" and "a lengthy analysis of tort claims under the laws of numerous different state jurisdictions"). At the time they filed suit for the Botvin Family, the Botvins' Lawyers' tactical approach reflected the challenges arising from the recent *Cicippio-Puleo* decision. There was no way at the time of filing *Botvin I* that the Botvins' Lawyers could foresee that Congress would pass legislation three years later to create a new federal cause of action for terrorism victims like the Botvin Family. Nor could they foresee how different judges might interpret and apply this new statute. And they could not foresee that there would be a novel collection action five years later giving rise, after years of additional litigation, to a privately negotiated settlement agreement among certain judgment creditors of Iran.

After filing the *Botvin* complaint, the Botvins' Lawyers properly served Iran, Compl. ¶ 34, which did not appear to defend the litigation. The Botvins' Lawyers filed a motion on September 13, 2005, seeking entry of default under Federal Rule of Civil Procedure 55(a), Compl. ¶ 35, Exhibit A, *Botvin I* Doc. 5. Rule 55(a) permits showing a defendant's failure to plead or otherwise defend "by affidavit or otherwise." The motion showed – citing statutes, case law, and exhibits – that the Botvins' Lawyers completed service on Iran, which failed to answer. Exhibit A, *Botvin I* Doc. 5. After ten months without default being entered, the Botvins' Lawyers filed a renewed motion for entry of default. Exhibit A, *Botvin I* Doc. 9. This motion respectfully renewed the prior pending request for entry of default and provided the court with numerous

6

examples of similar cases against Iran in which the court entered default after precisely the method of service the Botvins' Lawyers used in *Botvin I*. Exhibit A, *Botvin I* Doc. 9.

Judge Urbina entered a minute order striking both the original motion and the renewed motion and instructing that the request be made to the clerk, not the court. Compl. ¶ 36, Exhibit A, *Botvin I* at unnumbered 7/20/06 entry. The Botvins' Lawyers promptly filed the request, re-styled as an affidavit, and the clerk entered default in July 2006. Compl. ¶ 40, Exhibit A, *Botvin I* Docs. 11-13. The Botvins' Lawyers filed a motion for default judgment in October 2006. Compl. ¶ 42,[6] Exhibit A, *Botvin I* Doc. 14. The Botvins' Lawyers asked the court to take judicial notice of the findings in the *Campuzano* case and enter judgment on liability against Iran for the injuries to the Botvin Family. Exhibit A, *Botvin I* Doc. 14. They requested that, after entering a judgment on liability, the court set a hearing to take damages evidence and order a choice of law briefing. *Id.* at 3, Exhibit A, *Botvin I* Doc. 14-2.

Judge Urbina took over 11 months to issue his decision.[7] Exhibit A, *Botvin I* Doc. 16. He took judicial notice in his September 2007 order of his findings and conclusions in *Campuzano* and determined those findings were sufficient to establish Iran's liability to the Botvin Family. *Id.* Judge Urbina declined to enter a default liability judgment at that time. *Id.* Rather, he ordered the Botvin Family to submit evidence to establish the impact of the attack and Yael's death on each of them to prove their damages. *Id.*

---

[6] Plaintiffs' Complaint mis-numbers the motions filed on behalf of the Botvin Family to obtain default judgment, erroneously counting the September 2005 motion for entry of default as the first. Here, the motions for default judgment are appropriately referred to in sequence as numbers one through five, with the October 2006 motion being the first.

[7] Plaintiffs characterize references to the amount of time it took for the court to issue decisions on the motions filed in the underlying litigation as an attempt to "shift blame." Compl. ¶¶ 39, 116. It is well known by all attorneys who regularly practice before this Court, including Defendants, that the judges of this Court have a tremendous workload. The time to decision is an objective fact highly relevant to this lawsuit claiming that Plaintiffs could have obtained their judgments earlier.

7

While the Botvins' Lawyers were assembling the requested damages evidence, Congress passed an amendment to the FSIA, creating 28 U.S.C. § 1605A, a federal cause of action for claims like the Botvin Family's in direct abrogation of the *Cicippio-Puleo* decision. Compl. ¶ 48. The law creating §1605A[8] described how pending and prior actions under the post-*Cicippio-Puleo* "pass through" framework using § 1605(a)(7) became eligible for retroactive treatment under § 1605A. Pub. L. No. 110-181, § 1083(c)(2) and § 1083 (c)(3). § 1083(c)(2) outlined the criteria for a pending case to proceed under § 1605A. Specifically, it must rely on § 1605(a)(7) or the Flatow Amendment as creating a cause of action, and the case must have been adversely affected insofar as these provisions failed to create a cause of action against the foreign state. If a pending case met these criteria, then, on the plaintiffs' motion, the court had to treat the action as one originally filed under § 1605A. Alternatively, under § 1083 (c)(3), a plaintiff could file a § 1605A action, within 60 days of the enactment of § 1605A or within 60 days of obtaining a judgment on a § 1605(a)(7) "pass through" claim.

Amidst this sea change, the Botvins' Lawyers timely completed and submitted another motion for default judgment as to the Botvin Family's damages in March 2008. Compl. ¶ 62, Exhibit A, *Botvin I* Docs. 17-18. The Botvins' Lawyers submitted the Botvin Family was entitled to damages under California law as the last place of their residence in the United States. Exhibit A, *Botvin I* Doc. 17. This motion included deposition testimony from Yael's family. *Id.* The Botvins' Lawyers also provided documentation showing the medical intervention Yael received, which suggested that she survived the bombing for some period of time. *Id.* The Botvins' Lawyers also provided an expert report on Yael's lost earning capacity. *Id.* Importantly, the

---

[8] Defense Authorization Act for Fiscal Year 2008, Pub. L. No. 110-181, § 1083, 122 Stat. 3, passed January 21, 2008, codified at 28 U.S.C. § 1605A.

motion also specifically sought, pursuant to § 1083(c)(2), that the Botvins' action proceed under the new § 1605A. *Id.*; Compl. ¶ 63.

As an additional measure to obtain the benefits of § 1605A, and out of an abundance of caution considering the novelty of the law, the Botvins' Lawyers also timely filed a new complaint under this new cause of action. Compl. ¶ 51, Exhibit B, *Botvin II*, Doc. 1. The Botvins' Lawyers timely took both the actions of (i) moving to convert the pending action and (ii) filing a new action fully within the limited 60-day window of opportunity allowed under the statute to elect the benefits of § 1605A. Exhibit A, *Botvin I* Doc. 17 (March 21, 2008); Exhibit B, *Botvin II*, Doc. 1 (March 24, 2008). As this Court later described, in the time period following enactment of § 1605A, there was "a good deal of confusion regarding how parties should avail themselves of the benefits of the new statute." *In re Terrorism Litig.*, 659 F. Supp. 2d at 67. The approach of the Botvins' Lawyers of both filing a motion to convert the case from § 1605(a)(7) to § 1605A in a pending case and also filing a new complaint was considered the "'belt and suspenders' approach… taken out of an abundance of caution" to take advantage of the new law. *Id.* at 66.

Judge Urbina took more than a year to decide the second motion.[9] Compl. ¶ 64; Exhibit A, *Botvin I* Doc. 21. He denied the motion in March 2009 without prejudice and requested a renewed motion within two months that included briefing on the applicable law governing the Botvins' claims. *Id.* Notably, when deciding the *Campuzano* case prior to the *Cicippio-Puleo* decision, Judge Urbina had not engaged in a choice of law analysis. Rather, his *Campuzano* decision relied on the FSIA – specifically, the Flatow Amendment – as the basis for liability,

---

[9] When 11 months had passed with no decision, the Botvins' Lawyers requested a status hearing, hoping to move the case forward. Exhibit A, *Botvin I* Doc. 19. Judge Urbina denied the request for a status hearing the same day it was filed. Exhibit A, *Botvin I* unnumbered entry on 2/26/09.

while briefly noting Iran was also liable for some common law claims without analysis, "considering it to be redundant with the FSIA liability analysis." *Campuzano*, 281 F. Supp. 2d at 271. Judge Urbina applied a different standard to the Botvins' claims than he had in *Campuzano*, considering the intervening emergence of confusing issues in the law. The Botvin Family's case proceeded in unsettled legal territory and required a different strategy and tactics. This is yet another reason, *see supra* at 5, fn. 5, why Plaintiffs' frequent comparisons to the litigation process and timeline in *Campuzano* in their Complaint are speculative and inapposite.

**B.  § 1605A Claim Denied, Governing Future Litigation, 2009-2011**

Importantly, Judge Urbina's March 2009 order denied the Botvins' motion to convert the case to one under § 1605A. Compl. ¶ 65; Exhibit A, *Botvin I* Doc. 21. He ruled the statutory requirements for retroactive application of § 1605A were not met as the *Botvin I* complaint did not rely on the 1996 Amendments to the FSIA as creating a cause of action. *Id.* Being the diligent lawyers in this field that they are, and with knowledge of the *Cicippio-Puleo* decision, the Botvins' Lawyers drafted the *Botvin I* complaint to avoid relying exclusively on § 1605(a)(7) or the Flatow amendment. Consequently, Judge Urbina did not think the case had been adversely affected on the grounds that these provisions did not create a cause of action. *Id.*

The same day he issued his decision denying the second motion for default judgment, Judge Urbina issued a minute order in *Botvin II*, directing plaintiffs to show cause within one week why the court should not dismiss the second suit for failure to prosecute. Compl. ¶ 53; Exhibit B, *Botvin II*, unnumbered entry dated 3/27/09. As this Court described, the option for filing a new § 1605A complaint "is the appropriate avenue for relief in those cases that reached final judgment sometime prior to the enactment of [§ 1605A] and which were not 'before the court in any form,'" as required for a motion to convert the case to one under § 1605A. *In re*

*Terrorism Litig.*, 659 F. Supp. 2d at 92. Thus, the Botvins' Lawyers concluded that pursuing the new complaint they had filed out of an abundance of caution was a path that contradicted Judge Urbina's decision and intention to proceed under § 1605(a)(7). At this time, the Botvins' Lawyers made a professional judgment about the best and most expedient course forward to obtain a final monetary judgment for the Botvin Family considering Judge Urbina's decision that the Botvin Family's claims should proceed under § 1605(a)(7) rather than under § 1605A. *See* Argument, Section I, *infra* at 22.

In light of Judge Urbina's decision rejecting the Botvins' Lawyers attempts to convert the case a § 1605A claim, and believing that the best and most expedient route to secure and maximize a monetary award for the Botvin Family was to continue the original litigation, *Botvin I*, the Botvins' Lawyers timely filed a third motion for default judgment in May 2009 to address the issues Judge Urbina raised in his most recent opinion. Compl. ¶ 71; Exhibit A, *Botvin I* Doc 22. In the motion, the Botvins' Lawyers advocated that D.C. choice of law principles warranted application of California law to the Botvins' claims on the grounds that Yael was born in California and, prior to their move to Israel, California was the Botvins' last residence in the United States. *Id.* at 5-13. California also provided favorable law to maximize the potential damages the Botvins could recover in a default judgment and did not differ significantly from the compensatory damages recoverable in a § 1605A action.[10] The motion cited an on-point 2007 district court decision in an FSIA terrorism exception case, *Oveissi v. Iran*, 498 F. Supp. 2d 268 (D.D.C. 2007), in which the court applied California law based on the plaintiff's place of birth

---

[10] Defendants acknowledge that there is a difference in availability of punitive damages under § 1605(a)(7) as compared to § 1605A. However, Plaintiffs' malpractice claims raise no issues about their punitive damages judgments, and there remains no mechanism to collect punitive damages awards against Iran.

and short-term residence in California, prior to moving abroad to France, where the terrorist act occurred. Exhibit A, *Botvin I* Doc 22 at 10.

After eight months, in February 2010, Judge Urbina ruled on the third default motion, finding both subject matter and personal jurisdiction established, but rejecting the efforts to apply California law. Compl. ¶ 79, Exhibit A, *Botvin I* Docs 23-24. Instead, he ruled that Israeli law applied to the Botvins' claims because the bombing took place in Israel, where the Botvins were domiciled at the time. Exhibit A, *Botvin I* Docs 24. For his decision that Israeli law applied, he wrote that he was "constrained" by the D.C. Circuit opinion overturning the *Oveissi* decision and holding French law rather than California law applied in that case. *Id.* at 2. The Circuit Court issued the *Oveissi* appellate decision two months after the Botvins filed their third motion for default judgment, *see Oveissi v. Islamic Republic of Iran*, 573 F.3d 835 (D.C. Cir. 2009). Judge Urbina explained, "the Circuit's recent decision . . . cast[s] significant doubt on" the choice of law analysis favoring California law. Exhibit A, *Botvin I* Docs 24 at 8. Judge Urbina again declined to enter default judgment and required Plaintiffs to renew their motion addressing the elements of each claim and the Botvins' entitlement to judgment under Israeli law. *Id.* at 12

The Botvins' Lawyers then retained two Israeli legal experts who provided affidavits outlining the Botvins' entitlement to judgment and damages under Israeli law. Exhibit A, *Botvin I* Doc. 26 at 2 and Exhibit 1. They filed a fourth motion for default judgment in July 2010 providing the court with the analysis requested under Israeli law. Compl. ¶ 81, Exhibit A, *Botvin I* Doc. 26. In addition, the Botvins' lawyers also urged the court to reconsider its choice of law ruling and again argued that California law or blended California and Israeli or D.C. law applied, particularly to the damages analysis. Exhibit A, *Botvin I* Doc. 26 at 5-11. In so doing, they

distinguished the recent D.C. Circuit authority in *Oveissi* on which Judge Urbina relied for his choice of law ruling.[11] *Id.* at 8-10.

Over eight months later, in March 2011, Judge Urbina denied the fourth motion to enter default judgment. Compl. ¶ 82; Exhibit A, *Botvin I* Docs 27-28. Again, he rejected the arguments to apply California or D.C. law and confirmed his conclusion that Israeli law applied to the Botvins' claims. Exhibit A, *Botvin I* Doc 28 at 6-12. Notwithstanding the experts' affidavits on many aspects of Israeli law on the claims before him, including authority for vicarious liability under Israeli law, *see* Exhibit A, *Botvin I* Doc. 26 at 12, Judge Urbina denied the motion because he wanted more evidence of Israel's vicarious liability doctrine. Exhibit A, *Botvin I* Doc 28 at 15-19. Specifically, he requested additional briefing on whether Iran was vicariously liable for the bombing under Israeli law without any evidence that Iran had expressly authorized or ratified the specific attack. *Id.* This effectively reversed his decision of three and a half years earlier, *see* Exhibit A, *Botvin I* Doc. 16 at 2, that his 2003 findings and conclusions in *Campuzano* were sufficient to establish Iran's guilt in perpetrating the bombing that killed Yael.

### C. Entry of Judgments, 2012-2013

Within six months, the Botvins' lawyers filed their fifth motion for default judgment. Compl. ¶ 88; Exhibit A, *Botvin I* Doc. 30. To prepare this motion, they retained another Israeli legal expert to prepare a report addressing Judge Urbina's most recent questions as to Israel's vicarious liability doctrine. Exhibit A, *Botvin I* Doc. 30. As the fifth motion was pending, the court reassigned the *Botvin* case from Judge Urbina, who denied the Botvin Family's four prior motions for default judgment and planned to retire. Exhibit A, *Botvin I* unnumbered 4/25/12 entry. In July 2012, this Court entered default judgment for compensatory damages to Yael's

---

[11] The Botvins' Lawyers had not had a prior opportunity to address *Oveissi* because the appellate decision was issued <u>after</u> they filed the third motion for default judgment.

estate for $1,704,457 in lost income. Compl. ¶ 89, Exhibit A, *Botvin I* Docs. 31-32. It did not award any emotional distress or solatium damages to Yael's family because the Court did not find Israeli legal authority supported such an award.  Exhibit A, *Botvin I* Doc. 32 at 19-20.

One month after this Court entered judgment for Yael's estate, the Botvins' Lawyers filed another complaint on behalf of the Botvins asserting a claim under § 1605A arguing that the federal cause of action recognized solatium damages for near-family members and punitive damages. Compl. ¶ 95, Exhibit C, *Botvin III* Doc. 1. Such a filing following the *Botvin I* judgment was permitted by Pub. L. No. 110-181, § 1083(c)(3), which limits separate § 1605A complaints when related actions were commenced under § 1605(a)(7) to those brought within 60 days of the 2008 enactment of § 1605A or within 60 days of the date of the entry of judgment in the original § 1605(a)(7) action. Again, Plaintiffs served Iran, which failed to appear. Exhibit C, *Botvin III* Doc. 10. The Botvin Family moved for default judgment against Iran in March 2013, and this Court granted the motion. Compl. ¶ 96, Exhibit C, *Botvin III* Docs 13-15. Under the § 1605A federal cause of action, the Court awarded $10 million in solatium damages: $5 million to Yael's mother and $2.5 million to each of her two sisters. Exhibit C, *Botvin III* Doc. 15 at 12. The Court also awarded $30.89 million in punitive damages based on the compensatory to punitive damages ratio in the *Campuzano* case. Exhibit C, *Botvin III* Doc. 15 at 12-14. This Court entered a default judgment in *Botvin III* against Iran on April 4, 2013. Compl. ¶ 96, Exhibit C, *Botvin III* Doc. 14.

The Botvins' Lawyers obtained recovery of a portion of their clients' judgments, $2,772,785.80 from the U.S. Victims of State Sponsored Terrorism Fund.[12] *See* Exhibit A,

---

[12] Notably, if Plaintiffs had been part of the *Peterson* settlement agreement and collected a portion of their judgments from that action, as they are now alleging they should have been, they would have been ineligible for the recovery from the USVSST Fund that they have now

265186387v.10

*Botvin I* Doc. 47; Exhibit C, *Botvin III* Doc. 28.[13] In addition, the Botvin Family remains eligible for future distributions from the USVSST Fund, 34 U.S.C. § 20144(c)(4), and therefore it is possible they may be able collect their entire compensatory judgment from the USVSST Fund or other sources.

## II. *PETERSON* PLAINTIFFS' COLLECTION EFFORTS AND SETTLEMENT AGREEMENT

In 2007, this Court awarded more than $2.6 billion against Iran to family members of deceased servicemen and injured survivors of the 1983 suicide bombing attack on the U.S. Marine Barracks in Beirut, Lebanon in *Peterson v. Iran*, 515 F. Supp. 2d 25 (D.D.C. 2007); Compl. ¶ 72. Defendants were not counsel in *Peterson. See generally Peterson v. Islamic Rep. of Iran*, 220 F. Supp. 3d 98, 101 (D.D.C. 2016) (describing counsel and their contingency agreement). Counsel for the *Peterson* plaintiffs made several unsuccessful attempts at post-judgment enforcement, seeking to locate and attach Iranian assets. *See, e.g.*, *Peterson v. Iran*, 563 F. Supp. 2d 268 (D.D.C. 2008) (quashing writs of attachment on three foreign banks that allegedly possessed Iranian assets and denying motions for the appointment of receivers); *Peterson v. Islamic Republic of Iran*, 627 F.3d 1117 (9th Cir. 2010) (affirming 2008 denial of motion to assign Iran's rights to payment from third-party defendant shipping company); *Peterson v. Islamic Republic of Iran*, 561 F. App'x 9 (D.C. Cir. 2014) (describing 2008 writs of attachment on another foreign bank and subsequent unsuccessful efforts to obtain sanctions).

---

received. *See* 34 U.S. Code § 20144(e)(2)(B)(iii) (only permitting *Peterson* judgment creditors to participate in the USVSST Fund if they irrevocably assign to the Fund all of their rights, title, and interest in their claims to the *Peterson* assets).

[13] The cited motions each describe, at paragraph 4, that a portion of Plaintiffs' judgments was recovered from the USVSST Fund, and, at paragraphs 4, 5, and 7, that the $693,200.49 at issue in that motion was 25% of the amount paid from the USVSST Fund. *See* Exhibit A, *Botvin I* Doc. 47; Exhibit C, *Botvin III* Doc. 28. From this, the Court may take judicial notice that the USVSST Fund recovery amount was over $2.77 million ($693,200.49 ÷ .25).

In another effort to collect their judgments, the *Peterson* plaintiffs pursued litigation in the U.S. District Court for the Southern District of New York to attach the assets in a Citibank account that Bank Markazi, the Central Bank of Iran, allegedly owned. Compl. ¶ 73; *Peterson v. Islamic Republic of Iran*, 1:10-cv-04518-LAP (S.D.N.Y) (hereinafter "*Peterson* litigation"). The *Peterson* plaintiffs ultimately succeeded in this effort to secure turnover of the Clearstream assets, but only after years of contested litigation and the 2012 passage of legislation to eliminate many of the hurdles that otherwise existed. Through the *Peterson* litigation, it was eventually established that Bank Markazi, the Central Bank of Iran, owned over $2 billion in U.S. bonds held with Clearstream S.A., a Luxembourg-based financial intermediary for transactions between banks. *Bank Markazi v. Peterson*, 578 U.S. 212, 222 (2016). Clearstream maintained an account at Citibank in New York, and the proceeds of the Markazi Bonds (the last of which matured in 2012) were credited to Clearstream's Citibank account. *Id.* Whenever Clearstream's Citibank account was credited, Clearstream would credit Bank Markazi's Clearstream account accordingly. *Id.* In 2008, Bank Markazi added another layer of insulation by involving an Italian bank with a Clearstream account as an intermediary in these transactions and making the Italian bank the owner, in name, of the Markazi Bond proceeds. *Id.*

The *Peterson* plaintiffs registered their judgments in New York and obtained a writ of execution, levied on Citibank on June 13, 2008, restraining the proceeds from the Markazi Bonds in Clearstream's Citibank account. Compl. ¶ 73. The assets in the account, which Plaintiffs allege to be a "vast trove" of over $1.8 billion, Compl. ¶ 73, would not be sufficient to satisfy the *Peterson* plaintiffs' more than $2.6 billion in judgments against Iran, even if they could win the uphill battle to recover the assets.

On June 8, 2010, the *Peterson* plaintiffs filed their complaint seeking turnover of the blocked assets. Bank Markazi and Clearstream, the defendants in the *Peterson* litigation, fought turnover of the bond assets and "filled the proverbial kitchen sink with arguments." *Bank Markazi*, 578 U.S. at 223. Meanwhile, other claimants with judgments against Iran joined in the *Peterson* litigation through a variety of procedural mechanisms, including motions to intervene and interpleader motions. Compl. ¶¶ 74-76; *Bank Markazi*, 578 U.S. at 221 fn.9. Notably, some of the joined claimants were dismissed because they had not yet obtained judgments against Iran. *Id.* at 219 fn.5. In total, there were at least 16 different groups of judgment creditors (many of the groups representing hundreds of individual plaintiffs) against Iran in the *Peterson* litigation who held judgments for compensatory damages exceeding a total of $3.745 billion fighting for distribution of any recovery of the limited Clearstream assets. Compl. ¶¶ 75, 93; *Bank Markazi*, 578 U.S. at 219 & fn.5. If they were able to succeed in obtaining recovery of the blocked assets, these thousands of plaintiffs could expect extensive infighting amongst themselves with challenges to the amount, validity, or priority of the judgments or their right to execute on their judgment against the blocked assets.

The *Peterson* plaintiffs filed for partial summary judgment in April 2012, which Clearstream and Bank Markazi opposed. *Bank Markazi*, 578 U.S. at 223. While the motion was pending, on June 1, 2012, the *Peterson* plaintiffs entered into a privately negotiated settlement agreement with the other judgment creditors who had joined in the *Peterson* litigation to govern the distribution of any assets that may ultimately be recovered in the *Peterson* litigation. Compl. ¶ 91. Per the settlement agreement, percentages were calculated based on the *pro rata* share of each group's compensatory damages award against the total $3.745 billion in judgments for

compensatory damages obtained for all parties to the agreement. Compl. ¶ 93. No judgment creditors without a judgment were included in the settlement agreement. Compl. ¶ 113.

When the settlement agreement was executed, it was not certain, or even predictable, whether the efforts to obtain a turnover order and recover any funds would succeed; or, if so, when that might occur. *See* Argument, Section II.A, *infra* at 31. While the motion for partial summary judgment was pending, and after the settlement agreement was reached, on August 10, 2012, Congress passed legislation crucial to the *Peterson* plaintiffs' success, which specifically referenced the blocked assets at Citibank at issue in the *Peterson* litigation by docket number and with dates of the relevant court orders. 22 U.S.C. § 8772(b); Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. No. 112-158, passed August 10, 2012. This Act expressly subjected the Bank Markazi Citibank accounts to execution or attachment to satisfy a compensatory damages award against Iran for terrorist acts it sponsored with a judicial determination that Iran alone held equitable title or beneficial interest in the assets. 22 U.S.C. § 8772(a)(2). The *Peterson* plaintiffs supplemented their pending motion for partial summary judgment with this additional authority. *Bank Markazi*, 578 U.S. at 221-22.

In accordance with the newly enacted statute and finding no triable issue of fact as to whether Bank Markazi owned the blocked assets, the district court in *Peterson* ordered in March 2013 that the assets be turned over. *Id.* at 224. As the district court described it, the legislation swept away "any federal or state law impediments that might otherwise exist." *Id.* at 223. The next three years saw appellate litigation in which Bank Markazi challenged the validity of § 8722. The Second Circuit and the U.S. Supreme Court affirmed the district court's turnover order, and distribution of the Clearstream assets to the parties to the settlement agreement began in 2016. Compl. ¶ 107. Having waited more than ten years to complain, and despite their receipt

18

of payments from the USVSST Fund, Plaintiffs now allege that Defendants should have taken certain actions in 2008 and 2009 in anticipation of this unpredictable 2016 litigation outcome, which was the result of a privately negotiated settlement agreement reached, years later, in 2012. As shown below, these allegations made in retrospect fail to adequately state a claim for legal malpractice and are otherwise barred.

## LEGAL STANDARDS

### I. DISMISSAL UNDER RULE 12(b)(6)

As the United States Supreme Court has held in two rulings that strengthened the hand of district courts in weeding out tenuous claims at the pleading stage—especially claims that promise to require highly intrusive, time-consuming discovery and other pretrial proceedings—to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a complaint must set forth a "'claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The "plausibility standard" established by the Supreme Court "asks for more than a sheer possibility that a defendant has acted unlawfully," and "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" *Id.* (quoting *Twombly*, 550 U.S. at 557).

The Supreme Court has also instructed that a "pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do,'" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555). Hence, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555 (internal quotations omitted); *see also Iqbal*, 556 U.S. at 678 ("the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions"). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'shown' – 'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (internal editing omitted).[14]

Even under the "generous" standard afforded under Rule 12(b)(6), Plaintiffs' Complaint fails to set forth a legal theory upon which relief can be granted against Defendants. For the myriad reasons enumerated below, the pleadings do not set forth a "claim for relief that is plausible on its face" against Defendants and therefore the Complaint must be dismissed with prejudice.

In connection with this Motion, Defendants attach and cite several documents that this Court may consider under Rule 12(b)(6) without converting the motion to one for summary judgment because Plaintiffs' Complaint specifically references and incorporates these matters, such as the Court's docket, filings, and legal rulings in the underlying cases, which constitute matters of public record. *See, e.g.*, Compl. ¶¶ 33, 40, 44, 51, 95; *see Covad Comm. Co. v. Bell Atl. Corp.,* 407 F.3d 1220, 1222 (D.C. Cir. 2005) (a "court may look to [the] record of another

---

[14] This Court has relied on *Iqbal* and *Twombly* to dismiss legal malpractice complaints that fail to state a claim. *See, e.g., United States Telesis, Inc. v. Ende*, 64 F. Supp. 3d 65 (D.D.C. 2014) (dismissing legal malpractice complaint for failure to adequately allege attorney's conduct caused damages); *Venable LLP v. Overseas Lease Grp., Inc.*, No. 14-02010 (RJL), 2015 U.S. Dist. LEXIS 98650, at *10 (D.D.C. July 27, 2015) (dismissing as speculative legal malpractice claim on 12(b)(6) motion); *Macktal v. Garde*, 111 F. Supp. 2d 18, 22 (D.D.C. 2000) (dismissing legal malpractice complaint for lost settlement value and denying leave to amend complaint).

proceeding 'to avoid unnecessary proceedings when an undisputed fact on the public record makes it clear that the plaintiff does not state a claim upon which relief could be granted.'").[15]

Thus, for example, in assessing whether the chronology of the underlying litigation supports the exercise of professional judgment in an unsettled legal landscape, the Court should take into account the multiple developments in the law that created the complicated context for the Botvin Family's claims. The fluctuations in the law necessarily affected the various strategies the Botvins' Lawyers reasonably employed to comprehend, analyze, and advocate to the Court in a timely manner, as did Judge Urbina's various orders for supplemental briefing and legal analysis, with which Defendants complied in a timely manner at every stage of the proceedings. The context for the Plaintiffs' speculative claims with respect to collection of judgments against Iran as a state sponsor of terror is also critical because it demonstrates the absence of proximate causation and the lack of the required "but for" connection between Defendants' legal representation and any alleged injury.

---

[15] It is well-established that the Court may, in granting a Rule 12(b)(6) motion, take judicial notice of procedural developments as well as pleadings and exhibits in related cases without converting a motion to dismiss into a motion for summary judgment. *See Jovanovic v. US-Algeria Bus. Council*, 561 F. Supp. 2d 103, 107 n.1 (D.D.C. 2008) (a court may rely on exhibits that were "public record information" from a party's filing in another matter without converting a motion to dismiss into a motion for summary judgment). Accordingly, in ruling on the motion to dismiss here, this Court may take judicial notice of developments, filings and exhibits admitted into evidence in the underlying *Botvin I*, *II*, and *III* cases without converting the motion into one for summary judgment. *See also Veg-Mix, Inc. v. U.S. Dep't of Agric.*, 832 F.2d 601, 607 (D.C. Cir. 1987) ("It is settled law that the court may take judicial notice of other cases including the same subject matter or questions of a related nature between the same parties."); *Truesdale v. U.S. Dep't of Justice*, 657 F. Supp. 2d 219, 224 n.2 (D.D.C. 2009) ("The Court may take judicial notice of the records of another court."); *United States ex rel. New v. Rumsfeld*, 350 F. Supp. 2d 80, 88 (D.D.C. 2004) ("The Court may, however, take judicial notice of matters of a general public nature, such as court records, without converting the motion to dismiss into one for summary judgment.").

## II. <u>LEGAL MALPRACTICE CLAIMS</u>

The District of Columbia does not impose an absolute liability standard on attorneys. To prevail in their legal malpractice claim, Plaintiffs must prove by a preponderance of evidence the applicable standard of care; that this standard was violated; and that there was a causal relationship between the violation and the harm alleged. *O'Neil v. Bergan*, 452 A.2d 337, 341 (D.C. 1982). Critically, matters of professional judgment are subject to the "judgmental immunity doctrine." This doctrine recognizes that "an informed professional judgment made with reasonable care and skill cannot be the basis of a legal malpractice claim." *Biomet Inc. v. Finnegan Henderson LLP*, 967 A.2d 662, 666 (D.C. 2009). "Professional judgment" refers to when a lawyer makes a strategic choice between two options, each of which has costs and benefits. *Seed Co. v. Westerman*, 832 F.3d 325, 337 (D.C. Cir. 2016).

Moreover, an essential element of a legal malpractice claim is that the attorney's negligence resulted in and was the proximate cause of a loss to the client. In this context, proximate cause requires proof that the "case within the case" would have succeeded. *Jacobsen v. Oliver*, 451 F. Supp. 2d 181, 187 (D.D.C. 2006). A legal malpractice plaintiff is said to have multiple burdens of proof and must present two cases: (1) "one showing that his attorney performed negligently"; and (2) a second or underlying predicate case, "showing that [plaintiff] had a meritorious claim that he lost due to his attorney's negligence." *Id*. If the plaintiff cannot establish that he or she would have "fared better" in the absence of the attorney's negligence, then the plaintiff cannot prevail. *See, e.g., Chase v. Gilbert*, 499 A.2d 1203, 1212 (D.C. 1985). When "there are absolutely no facts or circumstances from which a jury could reasonably find . . . negligence was the proximate cause of injury, the matter would be a question of law for the court." *Bragg v. Owens-Corning Fiberglas Corp.*, 734 A.2d 643, 648 (D.C. 1999).

## ARGUMENT

**I.    DEFENDANTS HAVE JUDGMENTAL IMMUNITY FOR THE BOTVINS' LAWYERS' STRATEGIC DECISION TO PURSUE THE PENDING § 1605(A)(7) ACTION**

The pleadings correctly aver that Defendants have extensive experience and expertise in handling litigation on behalf of victims of terrorism. Compl. ¶¶ 17-20. Plaintiffs complain about the length of time it took to obtain their judgments, but lengthy litigation is not unusual in this area. This Court has acknowledged about FSIA terrorism cases: "As plaintiffs well know, these cases can go on for quite some time and often require the assistance of special masters to assist the Court in culling through voluminous data" on the terrorism victims' losses. *In re Terrorism Litig.*, 659 F. Supp. 2d at 104. The gravamen of the Complaint is that Defendants failed to pursue § 1605A claims early enough to obtain judgments for Plaintiffs to theoretically recover a portion of those judgments from a privately negotiated settlement agreement in a separate enforcement action. Compl. ¶ 115. This argument is offered as the focal point of a malpractice claim notwithstanding the fact that Judge Urbina denied specific attempts by the Botvins' Lawyers in the underlying litigation to convert the case to a § 1605A claim, forcing the Botvins' Lawyers to exercise professional judgment about the best way to proceed against a backdrop of new and untested legislation and other changing legal authority.

Under D.C. law, Defendants' assessment and evaluation of the § 1605A issues are matters of professional judgment and for which they are entitled to immunity. *Williams v. Callaghan*, 938 F. Supp. 46, 50-51 (D.D.C. 1996); *Applegate v. Dobrovir, Oakes and Gebhardt*, 628 F. Supp. 378, 384 (D.D.C. 1985) (strategy with respect to trial tactics generally held to be within attorneys' discretion); *Mills v. Cooter*, 647 A.2d 1118, 1121-22 (D.C. 1994) (acknowledging the general principle that the conduct of litigation generally rests within the discretion of the attorney and finding that "the second-guessing after the fact of [trial lawyer's]

23

professional judgment was not a sufficient foundation for a legal malpractice claim").[16] The well-established principle that "an attorney is not liable for mistakes made in the honest exercise of professional judgment" has given rise to the development of judgmental immunity for lawyers, and the D.C. Court of Appeals accepted this rule as a "sound doctrine that is consistent with District of Columbia law" in *Biomet Inc.*, 967 A.2d at 665-66. In the context of legal malpractice claims, the courts consistently recognize that attorneys should not be liable for a mistake of judgment, when the proper course is open to reasonable doubt. In that regard, litigation counsel has broad discretion concerning case strategy, which theories to plead, what defenses to raise, litigation tactics, what evidence to present, just to name a few. Mallen & Smith, *Legal Malpractice*, The Litigation Attorney §31:8 at 420-21 (2008).

The judgmental immunity doctrine "prohibits hindsight attacks that are based on unsettled legal questions 'about which reasonable attorneys could disagree.'" *Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52, 77 (D.D.C. 2015) (finding judgmental immunity applied to bar legal malpractice claim based on forum selection decision); *see also Macktal v. Garde*, 111 F. Supp. 2d 18, 22 (D.D.C. 2000) ("hindsight challenges" to "a protected judgment call in which the attorney has broad discretion" must fail; granting motion to dismiss legal malpractice complaint). Plaintiffs' claim is the epitome of a hindsight attack, made only after knowledge of how Judge Urbina saw the choice of law analysis, which was significantly impacted by the intervening D.C. Circuit opinion in *Oveissi*, issued after the Botvins' Lawyers elected to proceed, as Judge Urbina ordered, under § 1605(a)(7). Had the Botvins' Lawyers possessed a crystal ball

---

[16] *See also Woodruff v. Tomlin*, 616 F.2d 924, 930 (6th Cir. 1980) ("Neither counsel nor [the Court] have found an American decision holding an attorney liable for the choice of trial tactics or the good faith exercise of professional judgment."); *Hudson v. Windholz*, 416 S.E.2d 120, 124 (Ga. 1992) ("Tactical decisions made during the course of litigation require, by their nature, that the attorney be given a great deal of discretion.").

and perfect ability to predict the future, perhaps they would have employed a different strategy in the underlying litigation. But this is not the standard Defendants must meet under D.C. law. *Mills*, 647 A.2d at 1123 ("[R]etrospective disagreement cannot be the predicate for a finding of legal malpractice.").[17] The relevant question is "whether that professional judgment was reasonable at the time it was made, not whether a different strategy may have resulted in a more favorable judgment" for the client. *Biomet*, 967 A.2d at 667.

It is undeniable that, in 2022, with the benefit of 14 years of litigation on § 1605A claims, terrorism victims and the lawyers who represent them have additional and better understanding of the potential under these claims, and the legal authority governing them has developed and become more settled. But this case does not involve recent litigation. Instead, Plaintiffs here belatedly challenge in hindsight decisions made in 2008 to 2010. Those decisions are precisely the type of strategic choice that the judgmental immunity doctrine protects. Against the backdrop of uncertainty in the wake of § 1605A, application of the judgmental immunity doctrine is especially appropriate in this case because "no claim of legal malpractice will be actionable for an attorney's reasoned exercise of informed judgment on an unsettled proposition of law." *Biomet Inc.*, 967 A.2d at 668. In the District of Columbia, and indeed universally, "an attorney is not expected, much less required, to accurately predict developments in the law," which is ever-evolving and changing. *Id.* (citing Mallen & Smith).[18]

---

[17] *See also Denzer v. Rouse*, 48 Wis. 2d 528, 180 N.W.2d 521, 525 (Wis. 1970) ("A successfully asserted claim of legal malpractice needs more than the fact, standing alone, that a trial or appellate court interpreted a document differently than the lawyer or his client presumed they would. A lawyer would need a crystal ball, along with his library, to be able to guarantee that no judge, anytime, anywhere, would disagree with his judgment or evaluation of a situation.").

[18] *See also* MALLEN & SMITH, *Legal Malpractice* § 17.1, at 497 (4th ed. 1996) ("[T]he law is not an exact science. What an attorney thinks the law is today may not be what a court decides tomorrow[.]"); *see also Davis v. Damrell*, 119 Cal. App. 3d 883, 174 Cal. Rptr. 257, 261 (Cal.

The history of the underlying litigation, *see supra* at 5-15, shows that the Botvins' Lawyers, including both the Defendants and their co-counsel, acted conscientiously at each step to take advantage of the existing legal regime, navigate the confusion arising from Congress's creation of § 1605A, and maximize their clients' potential judgment. Plaintiffs are highly critical of the March 2008 decision to move in *Botvin I* to convert the claim from one under § 1605(a)(7) to be under § 1605A. Far from "mak[ing] no sense" or being "a path of their own invention" as alleged by Plaintiffs, Compl. ¶¶ 67-68,[19] the efforts of the Botvins' Lawyers to convert the pending case to a § 1605A case by motion was an approach specifically sanctioned by the law creating §1605A, and, although rejected in *Botvin I* by Judge Urbina, was one utilized in numerous other cases. *See* Pub. L. No. 110-181, § 1083(c)(2). Indeed, in other FSIA terrorism cases Defendants litigated with Mr. Perles and Perles Law Firm, P.C., as co-counsel – *Bland v. Islamic Rep. of Iran,* No. 1:05-cv-02124 and *Spencer v. Islamic Rep. of Iran*, No. 1:06-cv-750 – Defendants used the exact same "belt and suspenders" approach employed in the Botvin Family's claims. Defendants and Mr. Perles moved to convert both of those pending § 1605(a)(7) actions to § 1605A actions in March 2008 and filed a new action on behalf of each

---

App. 1st Dist. 1981) ("[T]he exercise of sound professional judgment rests upon considerations of legal perception and not prescience.").

[19] Strangely, Plaintiffs falsely allege that the Botvin Family's March 21, 2008, motion to convert "ignores the teachings of *Simon*" *v. Rep. of Iraq*, 529 F.3d 1187 (D.C. Cir. 2008) and was a path "*Simon* had already held was wrong." *Simon* was a D.C. Circuit opinion issued in June 2008, three months <u>after</u> the Botvins' Lawyers filed the motion. Thus, the teachings and holdings of *Simon* were not available to the Botvins' Lawyers in March 2008 when decisions had to be made in the 60-day window following the creation of § 1605A. *See In re Terrorism Litig.*, 659 F. Supp. 2d at 108 ("During those first two critical months of the statute's existence, there was not sufficient opportunity for the courts of this Circuit to examine § 1083 in written opinions that counsel might have looked to in an effort to better understand the statute. Indeed, the leading decision on this matter, *Simon v. Iraq*, was not decided until June 2008, nearly three months after the 60 day window of opportunity had passed for most plaintiffs."). Plaintiffs' failure to understand the timeline or appropriate context for their litigation further illustrates the dangers of claims that rely on hindsight.

265186387v.10

of those plaintiffs. *See In re Terrorism Litig.*, 659 F. Supp. 2d at 96-98; Compl. ¶ 50. Interestingly, Plaintiffs cite *Bland* as an example of a case in which Defendants were "diligent in their representation of their clients." Compl. ¶ 76.

Unlike the Botvin Family's case before Judge Urbina, in *Bland* and *Spencer*, this Court granted Defendants' motions to convert the cases to § 1605A claims. *In re Terrorism Litig.*, 659 F. Supp. 2d at 96-98. In this Court's opinion, apparently not shared by Judge Urbina at the time of the Botvins' motion, judges should interpret the adverse-effect requirement of § 1083(c)(2) liberally when considering whether to convert pending actions in view of the "broad remedial purposes Congress sought to achieve" with § 1605A. *Id.* at 63-64. This Court considered the rationale behind Judge Urbina's decision to be "a crabbed reading of the statute." *Id.* The inconsistent approaches between judges of the same court further underscores the unsettled legal landscape at the time the Botvin Family's claims were pending. Unfortunately, different judges ruled differently in different cases. Right or wrong, Judge Urbina's decision denied *Botvin I* retroactive treatment under § 1605A and governed future proceedings. Therefore, *Botvin I* proceeded as filed, in accordance with Judge Urbina's ruling, as a pass-through case with jurisdiction based on the earlier statute, § 1605(a)(7), and relying on state common law causes of action, as *Cicippio-Puleo* required. *See In re Terrorism Litig.*, 659 F. Supp. 2d at 37 ("terrorism cases that were filed prior to the enactment of [§ 1605A], and which do not qualify for retroactive treatment under the new exception are governed by the prior statute, § 1605(a)(7).").

In the wake of Judge Urbina's decision, the Botvins' Lawyers needed to decide whether to proceed with *Botvin I* or *Botvin II*. In *Botvin I*, they had accomplished service on Iran, secured entry of default, and won a finding of "defendants' guilt in perpetrating the attack in question." *See* Exhibit A, *Botvin I* Doc. 16. At this point, the *Botvin I* litigation seemingly required only an

additional round of briefing on the applicable law for Judge Urbina to award damages and enter judgment. *See* Exhibit A, *Botvin I* Doc 21 at 5 (directing "the plaintiffs to provide further briefing regarding the applicable law in this case under D.C. choice of law provisions and how the facts in this case satisfy each of the elements of the plaintiffs' purported causes of action" within two months). Moreover, on the basis of the recent *Oveissi* district court decision—on all fours with the Botvin Family's case—applying California law to FSIA terrorism claims of a victim domiciled abroad where the terrorist attack had occurred, the Botvins' Lawyers reasonably believed the court would award judgment in *Botvin I* under California law using § 1605(a)(7) as a basis for jurisdiction.

*Botvin II*, on the other hand, would have required the attorneys to essentially start over. Faced with this strategic choice, the Botvins' Lawyers made a reasonable professional judgment to continue the original litigation, *Botvin I*, believing it to be the most expedient route to secure and maximize a monetary award for the Botvin Family. Yet, after each motion and many months of deliberation as to each of Defendants' filings,[20] Judge Urbina found additional legal issues that repeatedly postponed entry of final judgment for the Plaintiffs. Defendants are not liable in malpractice for the deliberations of a conscientious federal judge or for not perfectly predicting his decisions, which were markedly different in *Botvin I* than they were in *Campuzano*. Nor may Defendants be liable when Judge Urbina's decisions diverged from other judges' positions in this District on interpretation of motions to convert pending actions to § 1605A claims and choice of law analyses. Plaintiffs' claims should be dismissed with prejudice pursuant to the judgmental immunity doctrine.

---

[20] In a case alleging Defendants' delay, it is important to note that, of the 7.5 years *Botvin I* was pending from when the Complaint was filed in January 2005 to when judgment was entered in July 2012, Defendants were awaiting judicial action on the Botvins' Lawyers pending motions for more than 5.5 years (2,076 days). Exhibit A, *Botvin I*; Timeline Appendix.

## II.     **PLAINTIFF'S COMPLAINT MUST BE DISMISSED WITH PREJUDICE BASED UPON THE ABSENCE OF PROXIMATE CAUSATION.**

Plaintiffs' malpractice claims against one law firm, but not all of the lawyers that obtained $41 million in judgments for them, fail as a matter of law because proximate causation is lacking. It is pure speculation whether the Botvin Family could have collected a portion of their judgment from then-unknown and concealed Iranian assets resulting in an unforeseeable settlement agreement in an uncertain, first-of-its-kind action. Try as Plaintiffs might to blame Defendants, the fact that the Botvin Family has not yet collected more of their judgments against Iran is not due to any malpractice by the Botvins' Lawyers. Rather, it is the result of the fact that Iran never voluntarily pays judgments against it, and there are insufficient Iranian assets in the United States to satisfy the huge awards owed to American victims of Iranian-sponsored terrorism.

For these reasons, Plaintiffs cannot prove proximate cause for their speculative and novel claim that they would have collected more of their judgments than they already have if the Botvins' Lawyers had made different professional judgments on their behalf, notwithstanding Judge Urbina's denial of the Botvins' Lawyers' motion to convert the § 1605(a)(7) claim to a § 1605A case. Any alleged injuries were not foreseeable, and it is speculative to say they were proximately caused by any alleged act or omission of Defendants or their handling of the underlying litigation.

The law is clear that Plaintiffs must show that, *but for* Defendant's negligence, they sustained a legally cognizable injury. *Chase*, 499 A.2d at 1212. "This means that plaintiff must establish not only the attorney's negligence, but also that there should have been a better result in the underlying lawsuit or matter." Mallen & Smith, *Legal Malpractice,* §33.10, at 1035. In addition, proving proximate cause requires Plaintiffs to prove that their allegedly injury was "a

foreseeable result" of Defendants' alleged negligence. *Seed Co. v. Westerman, Hattori, Daniels & Adrian, LLP*, 961 F.3d 1190, 1196 (D.C. Cir. 2020) (legal malpractice claim failed because loss of claim was not foreseeable result of attorney's advice); *Atlanta Channel, Inc. v. Solomon*, Civil Action No. 15-1823 (RC), 2020 U.S. Dist. LEXIS 130282, at *20-22 (D.D.C. July 23, 2020) ("Reasonable foreseeability also relates to proximate cause; if the harm is not foreseeable, if it is so attenuated from the allegedly harmful action or inaction that a reasonable person could not foresee it, the Court can rule as a matter of law that proximate cause cannot be established.").

In a legal malpractice case under D.C. law, dismissal is appropriate when proximate cause is lacking or speculative on the face of the pleadings. *James Pietrangelo, II v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 709-10 (D.C. 2013) (factual allegations regarding "but for" proximate causation must be enough to raise a right to relief above the speculative level). In *Pietrangelo*, the D.C. Court of Appeals affirmed the dismissal of a legal malpractice complaint when allegations of the "but for" outcome of the underlying case depended on "mere speculation." 68 A.3d at 709-10. There, allegations of misconduct in filing a brief, even if true, did not proximately cause injury since the alleged outcome required compound speculation. Specifically, the claim speculated that the Supreme Court would have granted *certiorari*, found in plaintiff's favor on the merits, remanded the case to the district court, and issued an order granting plaintiff's reinstatement or striking federal legislation regulating treatment of homosexuals in the military. *Id*. As the Court stated:

> We have declined to find proximate cause where we would have to speculate about a legal result. *See e.g. Chase v. Gilbert*, 499 A.2d 1203, 1211-12 (D.C. 1985). Such compound speculation is insufficient as a matter of law to support a claim for breach of fiduciary duty, and dismissal of Count 1 was proper.

68 A.3d at 710; *Chase v. Gilbert*, 499 A.2d 1203, 1212 (D.C. 1985) ("more is required than speculation" to establish that an "attorney's negligence caused a legally cognizable injury").

**A.** *Potential Collection from Hidden Iranian Assets Via A Settlement Agreement Was Not Foreseeable*

Even more significant than the hurdles victims of state-sponsored terrorism have encountered while obtaining judgments against Iran are the numerous obstacles they face in trying to collect on their awards. It is well known that "the plaintiffs in these actions face continuous roadblocks and setbacks in what has been an increasingly futile exercise to hold Iran accountable for unspeakable acts of terrorist violence." *In re Terrorism Litig.*, 659 F. Supp. 2d at 36. At the time of this September 2009 opinion,[21] virtually all judgments against Iran (more than $9 billion, at that time) "ha[d] gone unsatisfied," despite best efforts of these plaintiffs to execute on their judgments. *Id.* This is because there were, and still are, insufficient Iranian assets in the United States that are amenable to attachment or execution. *Id.* at 41. In addition, there are significant political and legal obstacles to attaching property belonging to a foreign nation. *Id.* at 49-58. Moreover, while Iran routinely does not appear to defend itself in U.S. civil litigation under the FSIA terrorism exception, it or its agencies have at times appeared to defend against collection efforts. For example, in *Ministry of Defense and Support for the Armed Forces of the Islamic Republic of Iran v. Elahi*, 556 U.S. 366 (2009), Iran prevailed in preventing the attachment of one of its assets in the United States.

Consequently, at the time the Botvin Family's claims proceeded, "the prospects for recovery upon judgments entered in these cases [we]re extremely remote," *In re Terrorism Litig.*, 659 F. Supp. 2d at 37, and it was "virtually impossible for the victims in these terrorism cases to

---

[21] Even with the resources being dedicated to this problem in the intervening decade, most notably the establishment of the USVSST Fund in 2015, recovery of these judgments remains incomplete. *See, e.g.*, USVSST Fund, Payment Calculation Explanation for Non-9/11-Related Claims, Aug. 2020, *available at* http://www.usvsst.com/docs/USVSST%20Fund%20Round%20Three%20Payment%20Calculation%20NON-9-11_Aug%202020.pdf (last accessed Jan. 20, 2022) at p. 4 (noting non-9/11-related claimants have only been paid 23.69% of their compensatory damages from the USVSST Fund after three rounds of payments).

265186387v.10

collect on the civil judgments entered against Iran in this Court." *Id.* at 128. It is in this important context that the Court must review the adequacy of Plaintiffs' allegations of proximate cause. Plaintiffs allege that by proceeding with *Botvin I* after Judge Urbina ruled in March 2009 that the § 1605(a)(7) claim could not be converted to a § 1605A claim – instead of abandoning *Botvin I* to pursue *Botvin II* – Defendants lost the Botvin Family's recovery based on a privately negotiated settlement agreement several years later, in 2012, that did not include any parties who did not already hold judgments against Iran.

The relevant question for the proximate cause analysis is whether Defendants could have foreseen in March 2009 that pursuing *Botvin II* could have permitted the Botvin Family to participate in a then-non-existent settlement agreement in an as-yet unfiled judgment collection action against deliberately-concealed assets. The answer, based on the pleadings and publicly available court records, is a resounding "No." Plaintiffs' fail to allege anything about the negotiations of this settlement agreement or Defendants' knowledge of this settlement agreement before it was entered on June 1, 2012. They fail to allege when success with turnover of the Clearstream assets was reasonably foreseeable or what specific actions Defendants allegedly should, or even could, have taken at that point to attempt to include the Botvin Family as a party.[22] When the settlement agreement was reached, it was one month <u>before</u> the default judgment in *Botvin I* and ten months before the default judgment in *Botvin III*. Because the Botvins had not yet received either of their judgments, they were unable to be parties to the

---

[22] Plaintiffs repeatedly reference that Defendants did represent a group of clients, the *Bland* plaintiffs, who were joined in the *Peterson* litigation and became party to the settlement agreement. Compl. ¶¶ 76, 87, 92. Again, Plaintiffs completely ignore the key differences between distinct litigation. In the *Bland* case, judgment on all liability issues had already been entered in 2006, the case was converted by motion to one under § 1605A in 2008, and judgment was entered in 2011, all occurring in that case <u>before</u> the settlement agreement was reached, *In re: Terrorism Litig.*, 659 F. Supp. at 96, Compl. ¶ 113, and each of these facts distinguish the *Bland* case from the underlying litigation for the Botvin Family.

settlement agreement, and there was no known mechanism to add them to the group of claimants who would share any potential recovery.

Apparently realizing the foreseeability problem with their claims, Plaintiffs propose that the Botvins' Lawyers could have followed the same path as the plaintiffs in *Wultz v. Islamic Republic of Iran.* Specifically, they claim that Defendants should have filed a post-settlement-agreement motion to intervene in the *Peterson* litigation to secure a portion of the Clearstream assets for the Botvins. Compl. ¶¶ 98-102. The Court will notice that the table in Plaintiffs' Complaint showing the shares various plaintiffs recovered from the *Peterson* litigation omits the *Wultz* plaintiffs. Compl. ¶ 108. This is because the *Wultz* plaintiffs' settlement and ultimate recovery from the *Peterson* litigation was $1 million.[23] *See e.g.*, 1:10-cv-04518-LAP at ECF # 1096, p. 23 ("Pursuant to a Settlement Agreement dated as of May 24, 2013 and entered into between Sheryl Wultz and certain other plaintiffs (collectively, "Wultz") and counsel for each of the Plaintiffs, the Fund remitted payment to Wultz of $1 million in full settlement of Wultz's claims to share in the Fund's distributions."). Though it is entirely speculative to suggest the Botvin Family could have had a similar result as the *Wultz* plaintiffs by making a similar motion to intervene,[24] Plaintiffs would not be better off than they are today with their over $2.7 million

---

[23] The *Wultz* plaintiffs obtained a compensatory damages judgment of over $32 million, *see Wultz v. Islamic Republic of Iran*, 864 F. Supp. 2d 24, 44 (D.D.C. 2012), more than $20 million more than the Botvin Family. Their judgment was entered May 10, 2012, *i.e.*, <u>before</u> the *Peterson* settlement agreement. *Id.*

[24] To the contrary, statements by the judge presiding over the *Peterson* litigation strongly suggest that the Botvins could <u>not</u> have had success with the same course that the *Wultz* plaintiffs pursued. In granting the *Wultz* plaintiffs' motion to intervene, she cautioned:

> This conclusion should not give undue encouragement to other nonparty judgment creditors, however; the Intervenors here have threaded a very narrow needle. The Intervenors assert a good-faith position that they could not have moved to intervene any earlier. They filed for intervention prior to any merits decision or

recovery from the USVSST Fund if they had received $1 million from the *Peterson* litigation because that would have made them ineligible for payments from the USVSST Fund. *See supra* at 13, fn. 12-13. This theory cannot save Plaintiffs' Complaint from the failure to state a claim.

Ultimately, the pleadings and court records show that the Botvins' Lawyers made their decision about how to proceed in light of Judge Urbina's denial of the motion to convert the case to one under § 1605A at a time when practically no one had succeeded in collecting any FSIA terrorism judgments against Iran. While the victims' bar pursued multiple avenues to enforce judgments and obtain legislative fixes to various legal obstacles, given the little progress made by 2009, one could hardly say that it was foreseeable that simply obtaining a judgment under § 1605A would make it quickly collectible or that steps should or even could have been taken at that time to take advantage of an enforcement action that did not yet exist. Defendants had no way to foresee at the time of the alleged negligence that assets in a New York bank account, not held in Iran's name but with at least two intermediaries involved, would be determined years later to be Iranian assets. Defendants had no way to foresee in 2009 that more than a thousand individuals with judgments against Iran would come together to privately negotiate a settlement agreement in 2012 in lieu of litigating priority positions to govern distribution of any potential recovery. They could not have predicted in 2009 how long it would take Judge Urbina to decide various issues the court identified during the proceedings or that it would be important to have a judgment entered before June 1, 2012, in order to participate in a settlement agreement that no one had ever contemplated at that point. Defendants had no way to foresee in 2009 that, later in 2012, Congress would pass an unusual statute specifically identifying the Clearstream assets and

---

entry of judgment. Given these unique facts, it is highly unlikely that any other proposed parties could intervene in this action.

*See*, 1:10-cv-04518-LAP at ECF # 398, p. 10.

rendering them available to satisfy judgments. Plaintiffs' allegations of proximate cause are legally insufficient to state a claim as the alleged injury of not recovering from the *Peterson* litigation was not a foreseeable result of the strategic decision, made in the professional judgment of the highly experienced Botvins' Lawyers to continue *Botvin I* in 2009. Plaintiffs' legal malpractice theory fails for want of a crystal ball.

> **B.   *Any Claim That the Botvin Family Would Have Fared Better by Pursuing the Separate § 1605A Complaint in 2009 Is Wholly Speculative***

As a general matter, the courts routinely reject as wholly speculative legal malpractice claims arising out of alleged 'inadequate' settlements or lost settlement opportunities that depended on a theory that a client would have obtained a 'better settlement.' In *Macktal v. Garde*, 111 F. Supp. 2d 18, 222 (D.D.C. 2000), the district court dismissed such a claim on a 12(b)(6) motion and aptly observed that:

> Settlements necessarily involve compromise, as well as considerations evaluated in the thick of litigation, and *so hindsight challenges to recommended settlements as being inadequate must fail if they are based only on speculation about what alternative results could have been achieved*.

Conclusory allegations that reflect a subsequent dissatisfaction with a settlement or lack thereof, without more, do not make out a legal malpractice cause of action. *See e.g. Venable LLP v. Overseas Lease Grp., Inc.*, 2015 U.S. Dist. LEXIS 98650, *10 (D.D.C. July 27, 2015) (dismissing on Rule 12(b)(6) motion as speculative a legal malpractice claim asserting that, but for law firm's alleged negligence, plaintiff would have recovered the $10 million it believed it was entitled to instead of the $4 million settlement it voluntarily entered into); *Belmar v. Garza (In re Belmar)*, 319 B.R. 748, 758-759 (D.C. Bankr. 2004) (rejecting legal malpractice theory as "pure speculation" as to "what might have happened" had plaintiffs retained greater settlement

265186387v.10

"leverage," and observing that alleged impact that loss of leverage had on negotiations or on subsequent events related to the bankruptcy proceedings was "grossly speculative.").[25]

Plaintiffs do not plausibly allege proximately caused damages because their claim concerning a lost opportunity to recover by not participating in an unforeseeable multi-party settlement agreement is wholly speculative, warranting dismissal with prejudice. *See Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d at 77) (in legal malpractice case where plaintiff alleged that the outcome of her case would have been different had it been filed in Maryland, court agreed that "it is at best an issue of pure guess-work requiring the impermissible use of both hindsight and speculation as to different legal results a court might reach.").

Plaintiffs' malpractice claim cannot survive dismissal because proximate cause is lacking as a matter of law. As in the long line of legal authority, any claim that the Botvin Family would have recovered more from Iranian assets and be in a better position than they are today is pure guess-work based on multiple hypothetical outcomes, which is impermissible compound speculation. Even had the Botvins' Lawyers handled the underlying litigation differently and

---

[25] Numerous other jurisdictions have concluded that claims of this nature are simply too speculative and tenuous to support a malpractice action and the cases so holding are legion. *See e.g. Judd Burstein, P.C. v. Long*, 797 F. App'x 585, 588 (2d Cir. 2019) (legal malpractice counterclaim properly dismissed because former client did not plausibly allege proximately caused damages because allegations concerning lost value of "wished-for settlement award" are wholly speculative); *Zee Co. v. Williams, Mullen, Clark & Dobbins, P.C.*, 871 F. Supp. 2d 498, 512 (E.D. Va. 2012) (legal malpractice claim fails for want of proof when a "jury would be left to speculate whether any settlement, much less a specific settlement, would have resulted" absent the alleged negligence); *Schutz v. Kagan Lubic Lepper Finkelstein & Gold, LLP*, 2013 U.S. Dist. LEXIS 93762, *25-26, 2013 WL 3357921 (S.D.N.Y. July 2, 2013) (dismissing as "too conjectural" and "speculative" legal malpractice claim that does not offer any concrete factual allegations to support assertion that clients would have fared better had lawyers conducted settlement negotiations differently); *Maroulis v Sari M. Friedman, P.C.*, 153 A.D.3d 1250, 1252, 60 N.Y.S.3d 468, 470-471 (2017) (lawyers entitled to dismissal of malpractice claim because plaintiff failed to plead that he would have obtained a more favorable divorce settlement); *Waithe v. Arrowhead Clinic, Inc.*, 491 F. App'x 32, 41 (11th Cir. 2012) (former clients could not show that they would have obtained a better settlement if they had been represented by a different lawyer).

elected to pursue *Botvin II* after Judge Urbina denied the motion to convert *Botvin I* to a § 1605A claim in March 2009, Plaintiffs offer nothing more than speculation to allege the Botvin Family would have received judgments from Judge Urbina "in 2008 or 2009." Compl. ¶ 97. As can be seen from the timeline of the underlying litigation, litigants and their attorneys have little control over the speed at which the court rules on pending motions, and judicial action in this case took at least eight months and up to a year for decisions each time the Botvin Family filed a motion. Efforts along the way to encourage expeditious rulings from Judge Urbina fell flat. *See, e.g.*, Exhibit A, *Botvin I* Doc. 9, 19.

Plaintiffs also offer nothing more than speculation to allege that each of the Plaintiff's hypothetical earlier judgments would have been entered in the same exact amounts they were each awarded in 2012 and 2013. Compl. ¶ 108. If earlier judgments were possible, Judge Urbina would have issued such rulings before the court transferred the case in April 2012. Based on Judge Urbina's various rulings, it is sheer speculation for Plaintiffs to presume he would have seen the damages the same way. Moreover, considering the developing changes in the law, it is rank speculation for Plaintiffs to claim they know how or when a judge would respond to a particular argument.

In addition, Plaintiffs only speculate that with an earlier judgment Plaintiffs necessarily would have been a party to the settlement agreement of June 1, 2012, with the terms alleged. Settlement agreements are the result of compromise and negotiation among those who are at the negotiating table; and one cannot guess in retrospect what would have happened if another party had participated. Would all of the other parties—at least 11 different groups with more than 1,000 total individuals with judgments—have agreed to include the Botvin Family as parties to the privately negotiated settlement agreement? Would they have agreed on the same terms of *pro*

*rata* sharing as reached without the Botvins' involvement? Speculation is the only way to answer these questions about the outcome of negotiations that never happened.

As in *Pietrangelo*, Plaintiffs' case is based upon compound speculation which is legally insufficient, even at the initial Complaint stage, to make out "but for" proximate causation. In the absence of a plausible allegation, let alone adequate factual support, that Plaintiffs claim that they would have 'fared better' if the Botvins' Lawyers had pursued different claims in a different timeline is simply specious. Dismissal with prejudice is warranted as a matter of law.[26]

## III.   THE COMPLAINT MUST BE DISMISSED FOR FAILURE TO JOIN ALL OF THE BOTVINS' LAWYERS AS PARTIES UNDER RULE 19.

The inadequacy of Plaintiffs' claims and their inability to state a malpractice claim on the facts in context of the underlying representation raises questions about the motives of the malpractice suit. If Plaintiffs truly believed there was actionable malpractice, why would they choose to sue only one law firm and some of the lawyers who represented them? This is especially curious considering that all of the lawyers and law firms were on the retainer agreement, shared equal responsibility for the representation, played a role in pursuing the Botvin Family's claims, and agreed to share equally in the fees. *See* Exhibit D. Regardless of their motivations, Plaintiffs' chose to sue only the Defendants, while omitting Perles Law Firm, P.C., and Mr. Ellis.

If the Court allows any of Plaintiffs' claims to survive, Defendants submit this lawsuit should be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(7), which provides for the dismissal of a complaint for failure to join a party under Rule 19:

---

[26] This motion applies equally to all three claims asserted in the Complaint: negligence (legal malpractice), declaratory judgment relating to legal fees, and declaratory judgment relating to expenses. The declaratory judgment claims are premised on the same allegations as the legal malpractice claim, and the failure to state a claim for malpractice is fatal to the declaratory judgment claims.

**(a) Persons Required To Be Joined If Feasible**.

(1) *Required Party.* A person who is subject to service of process and whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if: (A) in that person's absence, the court cannot accord complete relief among existing parties; or (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may: (i) as a practical matter impair or impede the person's ability to protect the interest; or (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest ….

**(b) When Joinder Is Not Feasible.** If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include: (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties; (2) the extent to which any prejudice could be lessened or avoided by: (A) protective provisions in the judgment; (B) shaping of relief; or (C) other measures; (3) whether a judgment rendered in the person's absence would be adequate; and (4) whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder.

Federal Rule of Civil Procedure 19.

This Circuit employs a three-step analysis in order to determine when "an action must be dismissed because of the absence of a party required for a just adjudication: the court must determine (1) whether the absent party is 'required' for the litigation according to the factors enumerated in Rule 19(a); (2) whether the required party can be joined; and (3) if joinder is not feasible, whether the action can nevertheless proceed in 'equity and good conscience' under Rule 19(b). *Ali v. Carnegie Inst. of Wash.*, 306 F.R.D. 20, 25 (D.D.C. 2014).

Analysis of the factors of Rule 19(a) here confirms that all of the Botvins' Lawyers are required parties for this litigation under Rule 19(a). The parties' retainer agreement dated

February 2004, Compl. ¶ 28; *see also* Exhibit D,[27] makes clear that Defendants were only one-third of the attorneys hired to represent the Botvin family. The retainer agreement reflects that Perles Law Firm, P.C., and Mr. Ellis would each serve as co-counsel with Defendants in pursuing claims resulting from Yael Botvin's murder. Exhibit D. The retainer agreement provides that all counsel "will give equal services and effort and will each receive 1/3 of attorneys' fees," which are contingent on the amount recovered. Exhibit D.

In addition to the express contractual language that each of the Botvins' Lawyers would give equal services in representation of the Botvins, by equally dividing the attorneys' fees, the Botvins' Lawyers each assumed joint responsibility for the representation. *See* D.C. Rule of Prof. Conduct 1.5(e)(1) ("A division of a fee between lawyers who are not in the same firm may be made only if the division is in proportion to the services performed by each lawyer or each lawyer assumes joint responsibility for the representation."). By maintaining this joint responsibility, the Perles Law Firm, P.C., and Mr. Ellis each have full responsibility to the Botvin family and are each equally accountable for the alleged malpractice:

> The concept of joint responsibility is not, however, merely a technicality or incantation. The lawyer who refers the client to another lawyer, or affiliates another lawyer in the representation, remains fully responsible to the client, and is accountable to the client for deficiencies in the discharge of the representation by the lawyer who has been brought into the representation.

D.C. Rule of Prof. Conduct 1.5, cmt. 11.

Because of this joint responsibility for the underlying litigation, the Botvins' Lawyers who were not joined in this action are required parties under Rule 19(a). The engagement agreement obligated Perles Law Firm, P.C., and Mr. Ellis to be engaged in all aspects of the

---

[27] The Court may consider materials outside the pleadings on a Rule 12(b)(7) motion without converting it into a motion for summary judgment. *16th & K Hotel, LP v. Commonwealth Land Title Ins. Co.*, 276 F.R.D. 8, 12-13 (D.D.C. 2011). Thus, a party arguing dismissal for failure to join a party under Rule 19 is permitted to provide "relevant extra-pleading evidence." *Id.*

representation, including drafting the pleadings and subsequent filings, collection of evidence, and strategy and professional decision-making. Based on the common obligations they had for the representation, Perles Law Firm, P.C., and Mr. Ellis are required parties under Rule 19.

Without the other lawyers' participation in this lawsuit, the Court will not be able to accord complete relief between the parties. *See* Rule 19(a)(1)(A). Although at times it is considered "not necessary for all joint tortfeasors to be named as defendants in a single lawsuit," *see Temple v. Synthes Corp*. 498 U.S. 5, 7 (1990), "a joint tortfeasor will be considered a necessary party when the absent party 'emerges as an active participant' in the allegations made in the complaint that are 'critical to the disposition of the important issues in the litigation,'" *Laker Airways, Inc. v. British Airways, PLC*, 182 F.3d 843, 848 (11th Cir. 1999). Here, given their common obligations to the Botvin Family, all of the Botvins' Lawyers are active participants in the conduct that gives rise to Plaintiffs' Complaint.[28]

In addition, pursuant to the retainer agreement, all of the Botvins' Lawyers share an interest in any recovery of Plaintiffs' judgments because they are entitled to a contingent fee on any such recovery. Exhibit D. Plaintiffs also seek disgorgement of the Defendants' portion of the contingency fee, Compl. ¶¶ 121-22, and challenge a number of expenses that were incurred

---

[28] Because of the joint responsibility for the representation by the terms of the retainer agreement and by virtue of the shared fee agreement, any liability finding as to one of the Botvins' Lawyers would apply to all, no matter what their actual role in the underlying litigation was. Comment 12 of D.C. Rule of Professional Conduct 1.5 makes this clear:

> The concept of joint responsibility does not require the referring lawyer to perform any minimum portion of the total legal services rendered. The referring lawyer may agree that the lawyer to whom the referral is made will perform substantially all of the services to be rendered in connection with the representation, without review by the referring lawyer. Thus, the referring lawyer is not required to review pleadings or other documents, attend hearings or depositions, or otherwise participate in a significant and continuing manner. The referring lawyer does not, however, escape the implications of joint responsibility, *see* Comment [11], by avoiding direct participation.

265186387v.10

during the representation, Compl. ¶¶ 124-28. Moreover, pursuant to their retainer agreement, each of the law firms recently received in December 2021 one-third of the legal fees earned pursuant to disbursements the USVSST Fund made to the Botvin Family, *see supra* at 15 fn. 13, which is further evidence of each of the law firms' obligation to have provided joint representation and each's joint responsibility to the Botvin Family. *See* Exhibit D.

Disposing of the spurious and frivolous allegations in Plaintiffs' Complaint without Perles Law Firm, P.C., or Mr. Ellis's involvement in this action would practically impair or impede the ability of each to protect their interest in recovery of the contingency fee and expenses from the underlying judgments. *See* Rule 19(a)(1)(B)(i). Resolving the malpractice action in the absence of Perles Law Firm, P.C., or Mr. Ellis would also leave Defendants subject to a substantial risk of double, multiple, or inconsistent obligations with respect to any liability for the alleged malpractice, because without the absent attorneys in the case, any judgment in this case would be unfairly borne by Defendants alone. *See* Rule 19(a)(1)(B)(ii).

On knowledge, information, and belief, Perles Law Firm, P.C., with whom Defendants have a long-standing relationship in working together on behalf of numerous American victims of terror, is a D.C. corporation with individual attorneys barred in this Court. The firm's joinder in this action may be feasible, albeit regrettable, as Defendants have no desire to be at odds with their long-standing and ongoing case partner and joint counsel. However, as Perles Law Firm, P.C., is a required party, its joinder is required, and the failure of the Plaintiffs to name the Perles Law Firm, P.C., as a defendant violates the rules of the Court and the interests of justice. Mr. Ellis, however, lives in Jerusalem, Israel. He, too, is a required party who should be before this Court in this action, although it may not be feasible to order joinder with regard to Mr. Ellis in his individual capacity due to his personal circumstances and foreign domicile. Thus, with

respect to any claims regarding malpractice, Defendants submit that this action should be dismissed because a judgment rendered in Perles Law Firm, P.C.'s and Mr. Ellis's absence will prejudice Defendants, who shared joint responsibility for the underlying representation.

If Defendants' co-counsel cannot be joined, this malpractice action cannot proceed in "equity and good conscience" considering the prejudice to Defendants in the absence of all of the Botvins' Lawyers. Analyzing the factors enumerated under Rule 19(b), there can be no lessening or avoiding the prejudice through protective provisions or other measures, and Defendants would be irreparably prejudiced if the action were allowed to proceed without all of the Botvins' Lawyers as parties, each being required in the interest of justice, judicial economy, and in accordance with Rule 19. Therefore, the failure to join Perles Law Firm, P.C., and Mr. Ellis must be deemed irreparably prejudicial, and the Complaint should be dismissed for the Plaintiffs conscious non-joinder of necessary and required parties.

## <u>CONCLUSION</u>

For these reasons, coupled with those appearing to the court, Defendants The Heideman Law Group, P.C. d/b/a Heideman Nudelman & Kalik, P.C., Richard Heideman, Noel Nudelman, and Tracy Reichman Kalik, respectfully request the instant Motion be granted and that Plaintiffs' Complaint be dismissed in its entirety and with prejudice, with an award of costs as may be appropriate.

265186387v.10

Respectfully submitted,

**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP**

*/s/ Jason R. Waters*
Jason R. Waters (#491066)
Callyson T. Grove (#1015612)
1500 K Street, N.W., Suite 330
Washington, D.C. 20005
(202) 626-7660
(202) 628-3606 facsimile
Jason.Waters@wilsonelser.com
Callyson.Grove@wilsonelser.com
*Counsel for Defendants The Heideman Law Group,
P.C. d/b/a Heideman Nudelman & Kalik, P.C.;
Richard Heideman; Noel Nudelman; and Tracy
Reichman Kalik*

44