## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

ESTATE OF YAEL BOTVIN, *et al.*,

    *Plaintiffs,*

v.

HEIDEMAN NUDELMAN & KALIK,
P.C., *et al.*,

    *Defendants.*

Case No. 1:21-cv-3186-RCL

## <u>MEMORANDUM OPINION</u>

    This case concerns a legal malpractice claim stemming from lengthy Foreign Sovereign Immunities Act ("FSIA") litigation before multiple courts in this District. Plaintiffs are Julie Goldberg-Botvin, Tamar Botvin Dagan, Michal Botvin, and the Estate of Yael Botvin (together, "Botvin Family"), recipients of two judgments against the Islamic Republic of Iran ("Iran") totaling more than $42 million in damages. Defendants are The Heideman Law Group, P.C.— doing business as Heideman Nudelman & Kalik, P.C.—Richard Heideman, Noel Nudelman, and Tracy Reichman Kalik (together, "Heideman defendants"), plaintiffs' counsel in their FSIA litigation. The Botvin Family claims that the Heideman defendants committed legal malpractice by moving too slowly and making strategic errors during the course of their litigation, causing a delay in the Botvin Family's receipt of their judgments and forfeiting the Botvin Family's opportunity to participate in a privately-negotiated settlement and disbursement of U.S.-based Iranian assets. The Heideman defendants filed a motion to dismiss, denying the Botvin Family's allegations and arguing that plaintiffs failed to meet the causation requirements for legal malpractice claims, among other arguments.

After considering the motion, the applicable law, and the parties' briefing, this Court agrees with the Heideman defendants and will therefore **GRANT** the Heideman defendants' motion and **DISMISS WITH PREJUDICE** the plaintiffs' present lawsuit.

## I.    BACKGROUND

The Botvin Family's legal malpractice claim relates to litigation spanning more than a decade and occurring amidst monumental changes in the scope and function of the FSIA—precipitated by both congressional and judicial developments—as well as unprecedented action by private parties.  Therefore, in order to properly contextualize the current case, the Court will provide a brief overview of these events along with a summary of the Botvin Family's litigation.

### A. Brief Background on the Evolution of the FSIA

The FSIA, which now guarantees a private cause of action for victims of state-sponsored terrorism, *see* 28 U.S.C. § 1605A(c), was not always such a robust tool.  The FSIA established a default presumption that foreign states are immune from suit unless one of several enumerated exceptions applies.  *See Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488–89, (1983); *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 87 (D.C. Cir. 2002).  Congress amended the FSIA in 1996 to include an exception for injuries caused by state sponsors of terrorism.  *See* Mandatory Victims Restitution Act, Pub. L. No. 104-132, § 221(a)(1)(C), 110 Stat. 1214, 1241 (1996).  This exception was codified at 28 U.S.C. § 1605(a)(7).  *See In Re Islamic Repub. of Iran Terrorism Litig.*, 659 F. Supp. 2d 31, 39 (D.D.C. 2009).  While it was clear that § 1605(a)(7) abrogated the presumption of sovereign immunity in state-sponsored terrorism cases, "it was far from clear whether that statute, § 1605(a)(7), in and of itself, served as a basis for an independent federal cause of action against foreign state sponsors of terrorism." *Id.* at 42.  Moreover, "questions remained regarding whether any civil claims or money damages were available by virtue of that enactment." *Id.* at 43.  The next year, Congress attempted to clarify the

confusion through the so-called "Flatow Amendment," which stated that "courts of the United States may maintain jurisdiction under section 1605(a)(7)" and that "money damages which may include solatium, pain, and suffering, and punitive damages" were available for plaintiffs in § 1605(a)(7) actions. *See* Omnibus Consolidated Appropriations Act, 1997, Pub. L. 104–208, § 589, 110 (1996), 110 Stat. 3009–1, 3009–172 (codified at 28 U.S.C. § 1605 note).

Yet the state of the law soon became unsettled. In 2004, the Circuit held that "[p]lainly neither § 1605(a)(7) nor the Flatow Amendment, separately or together, establishes a cause of action against foreign state sponsors of terrorism." *Cicippio-Puleo v. Islamic Repub. of Iran*, 353 F.3d 1024, 1027 (D.C. Cir. 2004). Thus, § 1605(a)(7) became merely a jurisdiction-conferring statute offering litigants a pass-through to causes of actions that may exist under state law. *See Bodoff v. Islamic Repub. of Iran*, 424 F. Supp. 2d 74, 83 (D.D.C. 2006). In the wake of the Circuit's decision, plaintiffs in § 1605(a)(7) actions were required rely on state tort law as the source of substantive law for their causes of action. *See, e.g.*, *Peterson v. Islamic Repub. of Iran*, 515 F. Supp. 2d 25, 41–60 (D.D.C. 2007) (applying laws from 34 different state jurisdictions, the District of Columbia, and the Philippines).

In 2008, Congress again amended the FSIA. *See* 2008 National Defense Appropriations Act for Fiscal Year 2008 ("2008 NDAA"), Pub. L. No. 110–181, § 1083, 122 Stat. 3, 338–44. That further amendment, codified at 28 U.S.C. § 1605A, made several notable changes: (1) it furnished a private cause of action against state sponsors of terrorism; (2) it expressly authorized punitive damages in these actions; (3) it permitted compensation for special masters; and (4) it added more provisions to assist plaintiffs with recovering assets to satisfy their judgments. *See id.* at § 1605A; *In Re Islamic Repub. of Iran Terrorism Litig.*, 659 F. Supp. 2d at 79.

The 2008 NDAA also provided two avenues for 28 U.S.C. § 1605A to be applied retroactively to cases previously filed under 28 U.S.C. § 1605(a)(7).  The first, § 1083(c)(2), required courts, upon a plaintiff's motion, to treat § 1605(a)(7) motions as § 1605A motions if the original motions: (1) relied on § 1605(a)(7) or the Flatow Amendment to create a cause of action, (2) were adversely affected by the Circuit's determination that those provisions failed to create a cause of action, and (3) were pending before a court as of the date of the 2008 NDAA's enactment. *See In Re Islamic Repub. of Iran Terrorism Litig.*, 659 F. Supp. 2d at 63–64; 2008 NDAA, § 1083(c)(2)(A)(ii)-(iv).  The second, § 1083(c)(3), afforded plaintiffs the opportunity to file a new § 1605A action within sixty days of the enactment of § 1605A or sixty days of a judgment on a § 1605(a)(7) pass-through claim.  *See In Re Islamic Repub. of Iran Terrorism Litig.*, 659 F. Supp. 2d at 64; 2008 NDAA, § 1083(c)(3)(A)–(B).

With this new provision on the books, litigants had a choice: continue their lawsuits under § 1605(a)(7) or refile their cases under § 1605A.  This case concerns counsel's choice to do both.

**B. Botvin Family's FSIA Litigation**

The court has previously detailed the factual background of the litigation underpinning plaintiffs' claims several times.  *See Estate of Botvin v. Islamic Repub. of Iran*, 510 F. Supp. 2d 101, 102–03 (D.D.C. 2007) ("*Botvin I*"); *Estate of Botvin v. Islamic Repub. of Iran*, 604 F. Supp. 2d 22, 23–24 (D.D.C. 2009) ("*Botvin II*"); *Estate of Botvin v. Islamic Repub. of Iran*, 684 F. Supp. 2d 34, 36–37 (D.D.C. 2010) ("*Botvin III*"); *Estate of Botvin v. Islamic Repub. of Iran*, 772 F. Supp. 2d 218, 221–22 (D.D.C. 2011) ("*Botvin IV*"); *Estate of Botvin v. Islamic Repub. of Iran*, 873 F. Supp. 2d 232, 234–36 (D.D.C. 2012) ("*Botvin V*"); *Goldberg-Botvin v. Islamic Repub. of Iran*, 938 F. Supp. 2d 1, 4 (D.D.C. 2013).  However, given the lengthy nature of the litigation, the various proceedings involved, and the specific facts at issue in this case, the Court will briefly reiterate the most salient factual points below.

1. ***Botvin I***: 2005–2007

Plaintiffs' current claims arise from litigation originally filed more than fifteen years ago related to a terrorist bombing committed in Israel.  On September 4, 1997, three suicide bombers entered the Ben Yehuda Street pedestrian mall in Jerusalem and "detonated bombs packed with nails, screws, pieces of glass, and chemical poisons."  Compl. ECF No. 1, ¶ 1.  The explosion killed five people and wounded nearly two hundred more.  *See id.* ¶ 2.  Fourteen-year-old Yael Botvin, the daughter of plaintiff Julie Goldberg-Botvin and the sister of plaintiffs Tamar Botvin Dagan and Michal Botvin, was among those killed.  *See id.* ¶ 3; *Botvin I*, 510 F. Supp. 2d at 102.  Yael Botvin's estate, represented by administrator Russell Ellis, is also a plaintiff in this action.  *See* Compl. ¶ 4.  Members of the Hamas terrorist organization later claimed responsibility for the bombing.  *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258, 262 (D.D.C. 2003).

In February 2004, one month after the *Cicippio-Puleo* decision and nearly seven years after the attack, the Botvin Family retained the Heideman defendants as one-third of a legal team to represent the Botvin Family in a potential lawsuit against Iran.  *See* Compl. ¶ 28; Defs.' Mem., ECF No. 5-1, at 7; Retainer Agreement, Ex. D to Defs.' Mot., ECF No. 5-6.

On January 31, 2005, the Heideman defendants filed, on behalf of the Botvin Family and other plaintiffs, a complaint against Iran seeking damages resulting from the bombing.  *See* Compl. *Estate of Botvin v. Islamic Repub. of Iran*, No. 05-cv-22 (RMU) [hereinafter "*Botvin v. Iran*"], ECF No. 1.  According to the Heideman defendants, the complaint "was carefully drafted" in order "to avoid relying exclusively on § 1605(a)(7) or the Flatow Amendment as the source of a cause of action against Iran" because *Cicippio-Puleo* had recently held that neither statutory provision created a cause of action.  Defs.' Mem. at 10.  The complaint cited 28 U.S.C.

§ 1605(a)(7) for jurisdiction[1] though it clearly asserted the common law causes of action of wrongful death, survival, intentional infliction of emotional distress, solatium, and punitive damages. *See* Defs.' Mem. at 10; Compl., *Botvin v. Iran*, ¶¶ 31–49.

In March 2005, the Heideman defendants attempted service on Iran via diplomatic channels pursuant to 28 U.S.C. § 1608(a)(4). *See* Letter Requesting Foreign Mailing, *Botvin v. Iran*, ECF No. 4. In July 2005, the Heideman defendants learned that they had successfully served Iran in June 2005. *See* Dep't of State Letter, Ex. A to Pls.' Mot. for Entry of Default, *Botvin v. Iran*, ECF No. 5-2; Certs. of Transmission, Ex. B–D to Pls.' Mot. for Entry of Default, *Botvin v. Iran*, ECF No. 5-3–5-5. In September 2005, following Iran's failure to answer the complaint or appear, the Heideman defendants filed a motion for entry of default. *See* Mot. for Entry of Default, *Botvin v. Iran*, ECF No. 5. The memorandum in support stated that "[w]hen a defendant fails to plead or otherwise defend, *the Court* shall enter a default," citing Federal Rule of Civil Procedure 55(a) for that proposition. Pls.' Mem., *Botvin v. Iran*, ECF No. 5-1, at 4 (emphasis added).

In July 2006, the district court denied the Heideman defendants' motion and directed that the application for entry of default made to the clerk, not the court, in accordance with the cited federal rule. *See* Min. Order, July 20, 2006, *Botvin v. Iran*; Fed. R. Civ. P. 55(a) ("*the clerk* must enter the party's default" (emphasis added)). Approximately one week after the court's order, the

---

[1] The complaint in *Botvin v. Iran* referenced § 1605(a)(7)'s jurisdictional authority several times. *See* Compl. ¶ 2 ("Defendants Islamic Republic of Iran[,] the Iranian Ministry of Information and Security ["MOIS"], and the Iranian Revolutionary Guard ("IRG") are subject to suit in the courts of the United States as sponsors of the terrorist group Hamas pursuant to the Foreign Sovereign Immunities Act ("FSIA"), as amended, 28 U.S.C. § 1605(a)(7), and related statutes"); *id.* ¶ 6 (Yael Botvin suffered personal injuries and died, while in Israel, as a result of an extrajudicial killing, to wit, the September 4, 1997 suicide bombing at Jerusalem's Ben Yehudah Mall, being an act within the Foreign Sovereign Immunities Act, 28 U.S.C. § 1605(a)(7)); *id.* ¶ 10 ("Iran provided material support and resources to Hamas within the meaning of 28 U.S.C. §§ 1605(a) and 1605 note in the form of funding, direction, and training for its terrorist activities, including the terrorist attack at issue here"); *id.* ¶ 13 ("MOIS acted as an agent of Iran and performed acts within the scope of its agency as contemplated by 28 U.S.C. § 1605(a)(7), which resulted in the extrajudicial killing described below"); *id.* ¶ 14 ("IRG acts as an agent of Iran and performed acts within the scope of its agency as contemplated by 28 U.S.C. §1605(a)(7), which resulted in the extrajudicial killing described below").

Heideman defendants filed an affidavit in support of default, *Botvin v. Iran*, ECF No. 12, and the Clerk of the Court entered default against Iran three days later. Entry of Default, *Botvin v. Iran*, ECF No. 13.

In October 2006, the Heideman defendants filed what was effectively their first motion for default judgment. Pls.' Mot. for Jud. Notice, *Botvin v. Iran*, ECF No. 14. In their motion, the Heideman defendants requested that the court: (1) take judicial notice of the findings of fact and conclusions of law in *Campuzano v. Islamic Republic*; (2) adopt the *Campuzano* court's findings and conclusions; and (3) "direct that this matter be assigned for the taking of damages evidence by the Court." *Id.* at 1; Defs.' Mem. at 12. In describing the plaintiffs, the motion simply stated: "All of the Plaintiffs in this matter (the "Botvin Plaintiffs") are similarly situated to their counterparts in *Campuzano*, such that the Plaintiffs in both actions were injured and/killed or are family members of those who were injured and/or killed in the September 4, 1997 triple suicide bombing carried out by the terrorist organization, Hamas, at the Ben Yehuda Mall in Jerusalem, Israel." Pls.' Mot. for Jud. Notice, ¶ 1.

In September 2007, the court granted the request to take judicial notice of the *Campuzano* findings but declined to enter default judgment. *See Botvin I*, 510 F. Supp. 2d 101. The court found that the motion's reliance on *Campuzano* was enough to "establish the defendants' guilt in perpetrating the attack in question" but because the Botvin Family were not plaintiffs to the *Campuzano* action, the factual findings and legal conclusions from that case were decidedly not enough to entitle the Botvin Family to default judgment. *Id.* at 103. As the court explained, "[t]he identity of the plaintiffs, their relationship with the deceased and the impact of the bombing upon them goes not only to establishing damages but also liability." *Id.* Therefore, the court requested

additional evidence of the impact of the attack and Yael's death on the Botvin Family. *See id.*;
Defs' Mem. at 12.

### 2. *Botvin II*: 2008–2009

Four months after the *Botvin I* decision, Congress enacted 28 U.S.C. § 1605A. *See* Compl.
¶ 48; Defs.' Mem. at 13. Thus, the Heideman defendants faced a choice on behalf of their clients:
proceed with their § 1605(a)(7) case or refile their case under § 1605A. The Heideman defendants
chose to do both.

In March 2008, continuing with *Botvin I*, the Heideman defendants filed a second motion
for default judgment. *See* Pls.' Mot. for Final J., *Botvin v. Iran*, ECF No. 17. The second motion
both attempted to present the missing damages evidence and requested that the court allow the
case to proceed under the new cause of action, § 1605A. *See id.* In support of their argument, the
Heideman defendants submitted approximately 200 pages of evidence, including deposition
testimony from the Botvin Family, a report detailing medical treatment Yael received after the
bombing, and an expert report calculating Yael's lost earning capacity, as well as other statements,
pictures, and newspaper articles about the attack and the family. *See generally* App., Ex. A, Part
I–VII to Pls.' Mot. for Final J., *Botvin v. Iran*, ECF No. 17-1–17-9; App., Ex. B–K to Pls.' Mot.
for Final J., *Botvin v. Iran*, ECF No. 18-1–18-2; Defs.' Mem. at 13–14.

The court was not satisfied with Heideman defendants' evidence—particularly the "bevy
of *unsworn* statements" submissions—nor apparent mistakes in the motion's citations. *Botvin II*,
604 F. Supp. 2d at 24 (emphasis in original); *see id.* (noting that "[t]he plaintiffs do not explain
how these documents are relevant to or aid in the satisfaction of each element of their particular
claims as the court directed" and pointing out examples of incorrect citations such as "plaintiffs'
motion states that the plaintiffs are U.S. citizens and cites to a portion of plaintiff Julie Goldberg–
Botvin's deposition that has nothing to do with citizenship."). Additionally, the court requested

"further briefing regarding the applicable law in this case under D.C. choice of law provisions and how the facts in this case satisfy each of the elements of the plaintiffs' purported causes of action."[2] *Id.* at 26.

The court also rejected the request to proceed under § 1605A.  The court found that the original § 1605(a)(7) claim had not relied on § 1605(a)(7) or the Flatow Amendment to provide a cause of action and thus had not been adversely affected by the Circuit's ruling in *Cicippio-Puleo*. *See id.* at 25–26.

### 3. First § 1605A Action: 2008–2010

In March 2008, the Heideman defendants also filed a separate § 1605A action, "[a]s an additional measure to obtain the benefits of § 1605A, and out of an abundance of caution considering the novelty of the law." Defs.' Mem. at 14; Compl., *Goldberg-Botvin v. Islamic Republic of Iran*, No. 08-cv-503 (RMU) ("*Goldberg-Botvin I*"), ECF No. 1 [hereinafter "First § 1605A action"].  However, the Heideman defendants "took no steps to prosecute" this action. Compl. ¶ 52.  On the same day as the *Botvin II* ruling, the court issued an order to show cause why the court should not dismiss the First § 1605A action for failure to prosecute. *See* Min. Order, Mar. 27, 2009, *Goldberg-Botvin I*.  As this Court has previously noted, "[i]nexplicably, plaintiffs failed to respond to an order to show cause in their 2008 case and it was dismissed for failure to prosecute [in April 2010]." *Botvin V*, 873 F. Supp. 3d at 235 n.4.  The Heideman defendants now explain their decision to abandon the First § 1605A case by saying that they "concluded that pursuing the new complaint they had filed out of an abundance of caution was a path that contradicted [the judge's] decision and intention to proceed under § 1605(a)(7)" and that, in their

---

[2] Recall that after *Cicippio-Puleo*, § 1605(a)(7) became a pass-through statute, requiring claimants to base actions in state tort law, an approach that "proved cumbersome and tedious in practical application" and resulted in "unfairness caused by a lack of uniformity in the underlying state sources of law." *See In Re Islamic Repub. of Iran Terrorism Litig.*, 659 F. Supp. 2d at 48.

professional judgment, "the best and most expedient course forward to obtain a final monetary judgment for the Botvin Family considering Judge Urbina's decision [was] that the Botvin Family's claims [ ] proceed under § 1605(a)(7) rather than under § 1605A." Defs.' Mem. at 16.

### 4. *Botvin III*: 2009–2010

Continuing with the original § 1605(a)(7) claim, in May 2009, the Heideman defendants filed a third motion for default judgment. Pls.' Supp. Mot. for Default J., *Botvin v. Iran*, ECF. No. 22. In addition to providing the requested damages evidence, the Heideman defendants advocated that California law should apply to the claims. *See* Defs.' Mem. at 16. The Botvin Family claims that the "assertion of California law" rested on a "thin reed." Compl. ¶ 71. The Heideman defendants insist that California law was appropriate for several reasons: it was Yael's birthplace and the Botvin Family's last place of residence in the United States, California law provided the maximum amount of potential damages among the available state laws, and, most importantly, the choice of California law was consistent with then-existing precedent in the District, particularly *Oveissi v. Islamic Repub. of Iran*, 498 F. Supp. 2d 268 (D.D.C. 2007) ("*Oveissi I*"). *See* Defs.' Mem. at 16–17. In *Oveissi*, this Court held that, under D.C. choice of law principles, California law should apply to a § 1605(a)(7) claim when the plaintiff was born and lived a short time in California before moving to France, where he was the victim of a terrorist attack. *See Oveissi I*, 498 F. Supp. 2d at 281.

In July 2009, two months after the Heideman defendants filed the third motion for default judgment, the Circuit reversed and remanded the *Oveissi I* decision, disagreeing with this Court's interpretation of D.C. choice of law principles and concluding that French law should apply. *See generally Oveissi v. Islamic Republic of Iran*, 573 F.3d 835 (D.C. Cir. 2009) ("*Oveissi II*").

In February 2010, the court ruled on the Heideman defendants' third motion for default judgment, finding subject matter and personal jurisdiction under the FSIA but determining that

Israeli law, not California law, applied to the case. *See Botvin III*, 684 F. Supp. 2d 34, 38–42 (D.D.C. 2010). The choice of law portion of the court's *Botvin III* decision relied heavily on the Circuit's *Oveissi II* decision. *See id.* Additionally, the court determined that the Heideman defendants, in focusing on California law, had not sufficiently explained the contours of Israeli law as applied to their case and therefore ordered another round of supplemental briefing. *See id.* at 41–42.

### 5. *Botvin IV*: 2010–2011

Following the court's decision in *Botvin III*, the Heideman defendants retained experts to attempt to establish the Botvin Family's entitlement to judgment and damages under Israeli law. *See* Defs.' Mem. at 17. In July 2010, the Heideman defendants filed their fourth motion for default judgment. Pls.' Supp. Mot. for Default J., *Botvin v. Iran*, ECF. No. 26. The Botvin Family alleges that this motion "sought to reargue the previous decision and convince the Court to apply California law, and also made a half-hearted presentation under Israeli law." Compl. ¶ 81. The Heideman defendants instead characterize the motion as "providing the court with the analysis requested under Israeli law," "urg[ing] the court to reconsider its choice of law ruling," and "argu[ing] that California law or blended California and Israeli or D.C. law applied, particularly to the damages analysis." Defs.' Mem. at 17. The fourth motion reiterated much of the choice of law discussion from the previous motion, while also distinguishing the Botvin Family's case from *Oveissi II* and containing a discussion on Israeli law. *See* Supp. Mot. for Default J. at 12–21.

In March 2011, the court denied the Heideman defendants' fourth motion for default judgment. *See Botvin IV*, 772 F. Supp. 2d at 221. The court denied reconsideration of its choice of law ruling and again ruled that the plaintiffs had not presented the court with satisfactory evidence of defendants' liability under Israeli law. *See id.* at 223–32. Specifically, the court asked for additional briefing on whether Iran had expressly authorized or ratified the Ben Yehuda mall

bombing, a finding crucial for establishing vicarious liability, wrongful death, and emotional distress claims under Israeli law. *Id.* at 231. The Heideman defendants, in defending why they did not spill ink on describing the agency relationship between Iran and Hamas in their motion, argue that the court's request in *Botvin IV* was at odds with the court's language in *Botvin I*, where the court said that the findings in *Campuzano* was enough to "establish the defendants' guilt in perpetrating the attack in question." *See* 510 F. Supp. 2d at 103; Defs.' Mem. at 18.

### 6. *Botvin V*: 2011–2012

In September 2011, after consulting another expert on Israeli law, Defs.' Mem. at 18, the Heideman defendants filed their fifth and final motion for default judgment. Pls.' Supp. Mot. for Default J., *Botvin v. Iran*, ECF No. 30. In April 2012, the case was transferred to the undersigned. In July 2012, this Court entered default judgment against Iran and awarded compensatory damages to Yael's estate in the amount of $1,704,457. *See Botvin V*, 873 F. Supp. 2d at 241–42, 244. This Court did not award any emotional distress or solatium damages to the non-estate members of the Botvin Family because the Court did not find Israeli law supported such an award. *See id.* 244–46. On the denial of the non-estate plaintiffs' damages, this Court found that the submissions were "so inadequate in their discussion of" intentional infliction of emotional distress and solatium damages "that this Court has no choice but to deny plaintiffs any recovery." *Id.* at 244–45.

### 7. Second § 1605A Action: 2012–2013

In August 2012, approximately one month after the *Botvin V* decision, the Heideman defendants filed a new action seeking intentional infliction of emotional distress, solatium, and punitive damages for the Botvin Family (minus Yael's estate) under § 1605A ("Second § 1605A action"). *See* Compl., *Goldberg-Botvin v. Islamic Repub. of Iran*, 12-cv-1292 (RCL) ("*Goldberg-Botvin II*"), ECF No. 1. After Iran was properly served and failed to appear, the Clerk of the Court entered default in late January 2013. Entry of Default, *Goldberg-Botvin II*, ECF No. 12. The

Heideman defendants moved for default judgment in March 2013. Mot. for Default J., *Goldberg-Botvin II*, ECF No. 13. In April 2013, this Court granted default judgment and awarded $10 million in compensatory damages—"$5 million to Yael's mother, Julie, and $2.5 million to each of her sisters, Michal and Tamar"— as well as a total of $30.89 million in punitive damages. *See Goldberg-Botvin*, 938 F. Supp. 2d 1, 11 (D.D.C. 2013).

### 8. Recovery

By April 2013, the Botvin Family held judgments totaling more than $42 million in damages. But, as FSIA plaintiffs suing Iran are well aware, satisfaction of judgments against Iranian assets is extremely difficult: "The truth is that the prospects for recovery upon judgments entered in [such] cases are extremely remote." *In Re Islamic Repub. of Iran Terrorism Litig.*, 659 F. Supp. 2d at 37. Fortunately for the Botvin Family, their judgment has partially been satisfied. The Heideman defendants, on behalf of the Botvin Family, applied for and received an award from the U.S. Victims of State Sponsored Terrorism Fund ("U.S.V.S.S.T. Fund"), for approximately $2,772,785.80.[3] Defs.' Mem. at 19–20.

### C. *Peterson* Litigation and Settlement

In early September 2007, just weeks before the court's decision in *Botvin I*, this Court awarded more than $2.6 billion to family members of deceased servicemen and injured survivors of the 1983 suicide bombing attack on the U.S. Marine Barracks in Beirut, Lebanon who brought a § 1605(a)(7) action against Iran. *Peterson*, 515 F. Supp. 2d at 60. The Peterson plaintiffs engaged in several creative attempts to enforce their judgment in various jurisdictions, including

---

[3] This figure was calculated based on the Heideman defendants' motion to deposit funds, which states that the Botvin Family received 75 percent of the payment from U.S.V.S.S.T. Fund and the Heideman defendants received 25 percent. Mot., *Botvin v. Iran*, ECF No. 47, ¶ 4. The 25 percent figure is noted as being $693,200.49. *Id.* ¶ 7. Therefore, the portion received by the Botvin Family is estimated to be three times that amount, or $2,079,601, and the total amount is estimated to be $2,772,785.80. *See* Defs.' Mem. at 19–20 & n.13.

filing writs of execution in June 2008 to restrain the proceeds of a New York-based Citibank account held by Clearstream Banking, S.A. ("Clearstream"), a Luxembourg-based financial intermediary that collected proceeds on bonds held by Iran's central bank, Bank Markazi. *See Bank Markazi v. Peterson*, 578 U.S. 212, 222 (2016). In June 2010, the *Peterson* plaintiffs filed an action the district court for the Southern District of New York seeking to satisfy their judgments through the assets in the Clearstream account. *See* Defs.' Mem. at 22; *see generally Peterson v. Islamic Repub. of Iran*, No. 10-cv-4518 (BSJ) (GWG) (S.D.N.Y.).

In all, at least sixteen separate groups representing hundreds of plaintiffs holding judgments against Iran in excess of $3.7 billion sought to enforce their judgments against the Clearstream account, which only contained approximately $1.75 billion in bond assets. *See Bank Markazi*, 578 U.S. at 220–21 & n.5. In the spring of 2012, four years after discovering the Clearstream assets, the *Peterson* plaintiffs still faced several legal obstacles to recovery. *See id.* at 223.

However, two unexpected developments occurred in the summer of 2012 creating a path to the Clearstream assets. In June 2012, the attorneys for the *Peterson* plaintiffs and other claimants negotiated a private settlement agreement—the first of its kind—to distribute the Clearstream assets, should they ever be recovered, based on the pro rata share of each group's compensatory damages award. *See* Compl. ¶ 91; Defs.' Mem. at 22–23. Importantly, only plaintiffs that had successfully obtained a final judgment against Iran were permitted to join or intervene in the settlement. *See Bank Markazi*, 578 U.S. at 221 n.9. Additionally, in August 2012, Congress passed the Iran Threat Reduction and Syria Human Rights Act of 2012, Pub. L. No. 112-158, 126 Stat. 1258 (codified at 22 U.S.C. § 8772), expressly subjecting the Clearstream account to attachment and execution. *See* 22 U.S.C. § 8772.[4] In March 2013, the district court for the

---

[4] Section 8772(b) identified the Clearstream assets based on the associated case name and number:

Southern District of New York ordered that the Clearstream assets be turned over and distributed pursuant to § 8872. *See Bank Markazi*, 578 U.S. at 222. Bank Markazi challenged the validity of § 8872, and the Supreme Court upheld the statute three years later. *See id.* at 236. In 2016, with the legal hurdles to attachment and execution cleared by Congress and the courts, the plaintiffs included in the private settlement agreement finally received partial satisfaction of their judgments.

### D. Botvin Family's Current Lawsuit

In 2021, the Botvin Family filed the present action. They allege that the Heideman defendants were "reckless, careless, and negligent in their representation" of the Botvin Family during the FSIA litigation in a variety of ways, broadly categorized as filing missteps and poor strategic choices, resulting in a delay in securing judgments against Iran and thus an inability to participate in the *Peterson* settlement.[5] *See* Compl. ¶ 115. Plaintiffs claim that, had they been

---

"The financial assets described in this section are the financial assets that are identified in and the subject of proceedings in the United States District Court for the Southern District of New York in Peterson et al. v. Islamic Republic of Iran et al., Case No. 10 Civ. 4518 (BSJ) (GWG), that were restrained by restraining notices and levies secured by the plaintiffs in those proceedings, as modified by court order dated June 27, 2008, and extended by court orders dated June 23, 2009, May 10, 2010, and June 11, 2010, so long as such assets remain restrained by court order."

[5] In the interest of completeness, the Court reproduces all of the Botvin Family's allegations included in their first claim for relief:

The defendants were reckless, careless, and negligent in their representation of the Plaintiffs in that they failed to pursue enforcement of Plaintiffs' claim in a timely and diligent manner; filed but failed prosecute for 25 months, and allowed to be dismissed, an action under the New Law, 28 U.S.C. § 1605A, and did not file another action under the New Law that they did prosecute for four-and-a-half years after the New Law's enactment; persisted in pursuing a claim under the Old Law, despite the limitations of the Old Law that made most of Plaintiffs' claim non-viable; persisted in filing half-baked and insufficient papers, and irrelevant and deficient motions, resulting in a delay of many years in Plaintiffs obtaining their judgment, for no valid reason at all and not due to any reasonable strategy or professional judgment call; failed to diligently obtain a judgment for Plaintiffs so that they could pursue enforcement of such a judgment against Iranian assets in the United States, including the Peterson/Citibank assets; failed to intervene in the *Peterson* case or otherwise try to obtain some of the Clearstream assets for Plaintiffs; failed to inform Plaintiffs of their lack of diligence or the damage that resulted to them by virtue thereof; failed to inform Plaintiffs that they had a conflict of interest with respect to their representation of other plaintiffs whose claims they were pursuing against the Clearstream assets; failed to inform Plaintiffs that they were acting outside their competence zone; failed to properly conduct due diligence; failed to inform Plaintiffs that they should seek advice of other counsel; failed to comply with applicable statutes, laws, rules and regulations; failed to have efficient and sufficient personnel; failed to comport themselves

included in the settlement, they would have recovered "$5,913,443.53, plus a prorated share of the interest that accumulated on the Peterson/Citibank assets." *Id.* ¶ 118.

In response, the Heideman defendants filed a motion to dismiss. They argue that the Botvin Family has failed to state a claim upon which relief may be granted due to the absence of proximate causation between the Heideman defendants' actions and their alleged injury, among other arguments.[6] *See* Defs.' Mot. to Dismiss, ECF No. 5, at 34–43; Defs.' Mem., ECF No. 5-1, at 34–43. The Botvin Family opposed. Pls.' Opp'n, ECF No. 12. The Heideman defendants subsequently replied. Defs.' Reply, ECF No. 13. The Heideman defendants' motion is now ripe for review.

## II.    LEGAL STANDARDS

### A.  Motion to Dismiss Under Rule 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). While Federal Rule of Civil Procedure 8(a)(2), which sets forth the pleading standard for federal complaints, does not require "detailed factual allegations," a complaint must present more than "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Id.* Taken together, the facts alleged in the complaint must be sufficient to raise a plausible claim and to permit "the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

---

reasonably and prudently; failed to warn plaintiff of the dangers and perils; and the defendants were otherwise reckless, careless and negligent.

Compl. ¶ 115.

[6] The Heideman defendants also argue, in the alternative, that the complaint must be dismissed because (1) the defendants are entitled to judgmental immunity, *see* Defs.' Mem. at 28–33; Defs.' Reply at 6–11, and (2) the Botvin Family failed to join necessary parties, *see* Defs.' Mem. at 34–43; Defs.' Reply at 17–19. Because the Court will grant the Heideman defendants' motion to dismiss based on lack of proximate cause, the Court will not address the alternative arguments.

In deciding a motion to dismiss, the Court "must accept as true all of the factual allegations contained in the complaint." *Atherton v. D.C. Off. of Mayor*, 567 F.3d 672, 681 (D.C. Cir. 2009) (citing *Erickson v. Pardus*, 551 U.S. 89, 93 (2007)). "Factual allegations, although assumed to be true, must still 'be enough to raise a right to relief above the speculative level.'" *Hettinga v. United States*, 677 F.3d 471, 476 (D.C. Cir. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). For this reason, "'naked assertion[s]' devoid of 'further factual enhancement'" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

## B. Legal Malpractice

The substantive law of the District of Columbia governs the standard for legal malpractice cases heard by this Court. *See Bain v. Gary, Williams, Parenti, Watson & Gary, P.L.*, 53 F. Supp. 3d 144, 147 (D.D.C. 2014). Under D.C. law, a plaintiff alleging legal malpractice "must show that (1) the defendant was employed as the plaintiff's attorney, (2) the defendant breached a reasonable duty, and (3) that breach resulted in, and was the proximate cause of, the plaintiff's loss or damages." *Seed Co., Ltd. v. Westerman, Hattori, Daniels & Adrian, LLP*, 961 F.3d 1190, 1196 (D.C. Cir. 2020) (citing *Martin v. Ross*, 6 A.3d 860, 862 (D.C. 2010)).

The Heideman defendants' motion to dismiss contests the third element of legal malpractice, causation.[7] Causation is established by the plaintiff "present[ing] evidence from which a reasonable juror could find that there was a direct and substantial causal relationship between the defendant's breach of the standard of care and the plaintiff's injuries and that the injuries were foreseeable." *Convit v. Wilson*, 980 A.2d 1104, 1125 (D.C. 2009) (quoting *District of Columbia v. Zuckerberg*, 880 A.2d 276, 281 (D.C. 2005)). This first requires the plaintiff to

---

[7] Because the Heideman defendants do not contest that the Botvin Family's claim meets the first two elements of a legal malpractice claim, the Court will treat these arguments as conceded. *See Wannall v. Honeywell, Inc.*, 775 F.3d 425, 428 (D.C. Cir. 2014) ("[I]f a party files an opposition to a motion and therein addresses only some of the movant's arguments, the court may treat the unaddressed arguments as conceded.").

establish that the attorney's misconduct was a "but for" cause of the plaintiff's harm.  *See*

*Pietrangelo v. Wilmer Cutler Pickering Hale & Dorr, LLP*, 68 A.3d 697, 710 (D.C. 2013).  Second,

the plaintiff must show that her injury was a foreseeable result of the attorney's alleged

misconduct.  *See Convit*, 980 A.2d at 1125.  Importantly here, "an intervening act not reasonably

foreseeable (sometimes referred to as a 'superseding cause') breaks the chain of causation and

relieves the wrongdoer of liability."  *Seed Co., Ltd.*, 961 F.3d at 1196–97 (citing *Dalo v. Kivitz*,

596 A.2d 35, 42 (D.C. 1991)).  "'Proximate cause is generally a factual issue to be resolved by the

jury,' however, it becomes a question of law 'when the evidence . . . will not support a rational

finding of proximate cause.'" *Majeska v. Dist. of Columbia*, 812 A.2d 948, 950 (D.C. 2002)

(quoting *Wash. Metro. Area Transit Auth. v. Davis*, 606 A.2d 165, 170 (D.C. 1992)).

## III.   DISCUSSION

### A.   The Botvin Family Plausibly Pleaded That the Heideman Defendants' Actions Were an Actual Cause of the Plaintiffs' Alleged Injury

The Botvin Family claims that, had they obtained default judgment against Iran earlier,

they would have had the opportunity to participate in the *Peterson* settlement, and, had they been

included in the settlement, they would have recovered "$5,913,443.53, plus a prorated share of the

interest that accumulated on the Peterson/Citibank assets."  Compl. ¶ 118.  The Heideman

defendants argue that it is "pure speculation" that the Botvin Family could have participated in the

settlement. *See* Defs.' Mem. at 34.

Accepting the allegations in the Botvin Family's well-pleaded complaint as true, certain

actions and decisions by the Heideman defendants undoubtedly delayed the Botvin Family's

judgments.  By the Court's estimate, the Heideman defendants' error in first filing a motion for

entry of default with the Court instead of the clerk, contrary to the clear instructions in Fed. R. Civ.

P. 55(a), alone delayed the Botvin Family's final judgment by a year.[8]  Additionally, the Heideman

defendants filed multiple deficient submissions with the Court, despite warnings on two occasions

that "judges are not like pigs, hunting for truffles buried in briefs." *Botvin V*, 873 F. Supp. 2 at

245 (quoting *Potter v. Dist. of Columbia*, 558 F.3d 542, 553 (D.C. Cir. 2009) (Williams, J.,

concurring)); *Botvin II*, 604 F. Supp. 2d at 24 (same).  As the Heideman defendants know,

"[p]roviding the Court with the appropriate reference points in any new filings, will greatly assist

with the management of this massive body of litigation and avoid delay in providing appropriate

redress to the plaintiffs." *In Re Islamic Repub. of Iran Terrorism Litig.*, 659 F. Supp. at 104.

Furthermore, the Botvin Family adequately pleads that the Heideman defendants' choice

of law arguments were deficient.  The Heideman defendants advocated for the application of

California law in successive submissions even after the Circuit's reversal of *Oveissi I* and the

court's clear preference for Israeli law.[9]  And even when the Heideman defendants turned their

attention to Israeli law, their argument was "so inadequate . . . that this Court ha[d] no choice but

to deny plaintiffs any recovery." *See Botvin V*, 873 F. Supp. 2d at 245.  These missteps cost the

plaintiffs years in litigation time, not including the additional five-and-half years the Botvin Family

"lost" waiting for the court to rule on different motions. *See* Defs.' Mem. 33 n. 20.

---

[8] The Botvin Family claims that the Heideman defendants wasted "more than a year (from June 2005 – September 2006)" due to their error. *See* Compl. ¶ 37. However, it appears that the Heideman defendants could have filed an application for entry of default was in late August 2005, sixty days after Iran had been properly served and failed to respond. Thus, the error likely cost the Botvin Family approximately one year.

[9] The Heideman defendants correctly note that the Botvin Family's claim in its opposition, that the Heideman defendants "failed to inform the court of the *Oveissi* [*II*] decision, and certainly did not seek to submit additional briefing in light of the *Oveissi* [*II* decision]," Pls.' Opp'n at 30, was not included in the complaint and thus is not considered by the Court. *See* Defs.' Reply at 10–11; *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 100 (D.D.C. 2005). That said, the Circuit has previously "emphasized that counsel are required to inform the courts of outside developments that might affect the outcome of litigation." *Gray Panthets v. Schweiker*, 716 F.2d 23, 33 (D.C. Cir. 1983).

In all, the more than eight years spent between when the Botvin Family's retainer of the Heideman defendants and their final judgments could plausibly have prevented the Botvin Family from participating in the *Peterson* settlement.

**B.  The Legal Malpractice Claim Must Be Dismissed Because the Botvin Family Cannot Establish Proximate Causation**

However, despite the Botvin Family adequately pleading but-for causation, they have failed to adequately plead proximate causation.  Even taken in the light most favorable to the Botvin Family, the privately negotiated *Peterson* settlement, congressional action, and Supreme Court's ruling on the recovery of the assets was far too unforeseeable for a finding of proximate causation.

To find for the Botvin Family, this Court would have to determine that the Heideman defendants should have been aware that: (1) a substantial cache of U.S.-based Iranian assets would be located; (2) other plaintiffs also seeking to execute their judgments against Iran would devise a novel privately-negotiated settlement agreement; (3) a delay in securing a judgment would cripple the Botvin Family's effort to participate in the settlement; (4) the judge overseeing the settlement agreement would allow the Botvin Family to participate in the settlement; (5) Congress would pass an "unusual statute," *Bank Markazi*, 578 U.S. at 215, removing the legal barriers to securing the assets; (6) the statute would be upheld on appeal; and (7) the Botvin Family would ultimately have recovered more than they did from the U.S.V.S.S.T. Fund.  "Such compound speculation is insufficient as a matter of law to support a claim" for legal malpractice, and therefore the Court must dismiss the Botvin Family's claim. *See Pietrangelo*, 68 A.3d at 710.

**1. The *Rubin*, *Bland*, and *Wultz* Cases Do Not Support a Finding of Foreseeability**

The Botvin Family cites the inclusion of three groups of plaintiffs in the *Peterson* settlement in an attempt to show that their alleged injury—the inability to participate in the

settlement due to delays in securing their judgments—was foreseeable to the Heideman defendants. All three involve factual or procedural scenarios quite distinct from the *Botvin* litigation and therefore do not suffice to meet the Botvin Family's burden to establish proximate causation.

The *Rubin* plaintiffs obtained their judgment against Iran under a completely different legal regime. The Botvin Family claims that, rather than waiting a year to the file complaint, the Heideman defendants could have filed the complaint much more quickly because the *Rubin* case "arising out of the same events had already reached final judgment" at the time that the Botvin Family retained the Heideman defendants. *See* Compl. ¶¶ 25–27. *Rubin v. Islamic Republic of Iran*, No. 01-cv-1655 (RMU), was consolidated with another case and tried in *Campuzano v. Islamic Republic of Iran*, 281 F. Supp. 2d 258 (D.D.C. 2003), where the district court found Iran liable for the Ben Yehuda Street mall attack. *Id.* at 269–72. The *Campuzano* court, writing pre-*Cicippio-Puleo*, expressly noted that § 1605(a)(7) and the Flatow Amendment "create[ed] a cause of action for victims of terrorism." 281 F. Supp. 2d at 269. In contrast, when the Botvin Family retained the Heideman defendants, this previously straightforward cause of action was no longer available. *Cicippio-Puleo* had been decided just one month prior to the beginning of the attorney-client relationship, completely changing the FSIA landscape. Thus, as the Heideman defendants correctly point out, comparing the *Botvin* litigation, which occurred after *Cicippio-Puleo*, to the pre-decision case *Campuzano* is akin to "compar[ing] apples and oranges." *See* Defs.' Mem. at 10 n.5.[10] As D.C. law makes clear, "uncertainty, at the time of the underlying litigation, about

---

[10] Similarly, the Botvin Family's invocation of *Salzman v. Islamic Rep. of Iran* as another example of a faster complaint-to-final judgment process, is inapposite. *See* Compl. ¶ 31. Again, the Heideman defendants correctly point out that *Salzman* was filed under 28 U.S.C. § 1605A, Congress's response to *Cicippio-Puleo* to guarantee a federal cause of action for FSIA claimants, not the pass-through statute § 1605(a)(7). *See* Defs.' Mem. at 10 n.5; *Salzman v. Islamic Republic of Iran*, No. 17-cv-2475 (RDM), 2019 WL 4673761 (D.D.C. Sept. 25, 2019). Additionally, *Salzman*

whether [the] court would recognize" a particular claim reasonably made against a backdrop of unsettled law "significantly (if not fatally) undermines any" legal malpractice claim. *Flax v. Schertler*, 935 A.2d 1091, 1107–08 (D.C. 2007).

That the *Rubin* plaintiffs served a writ of execution against the Clearstream assets in 2008 did not make the Botvin Family's harm more foreseeable. The Botvin Family claims that in October 2008, when the *Rubin* plaintiffs delivered their writ of execution staking a claim to the Clearstream assets, possible participation in the settlement was foreseeable to the Heideman defendants. *See* Compl. ¶ 74; Pls.' Opp'n at 36–37. However, this action by the *Rubin* plaintiffs shows only that U.S.-based Iranian assets had been identified by similarly situated plaintiffs, not that such assets would actually be recoverable. As this Court remarked in September 2009, "Iran faces more than nine billion dollars in liability in the form of court judgments for money damages. Despite plaintiffs' best efforts to execute these court judgments, virtually all have gone unsatisfied." *In Re Islamic Repub. of Iran Terrorism Litig.*, 659 F. Supp. 2d. at 36. This was because "a number of practical, legal, and political obstacles ha[d] made it all but impossible for plaintiffs in these FSIA terrorism cases to enforce their default judgments against Iran." *Id.* at 49. The *Rubin* plaintiffs were only be able to partially satisfy their judgment after a confluence of factors, including a privately negotiated settlement, an intervening act of Congress, and a favorable Supreme Court decision.

Similarly, the *Bland* case does not support the Botvin Family's argument as to foreseeability. The Botvin Family faults the Heideman defendants for the way their case was handled by pointing to *Bland v. Islamic Rep. of Iran*, No. 1:05–cv–2124 (RCL), where the

---

was filed nine years after the passage of § 1605A, when both advocates and courts had a clearer understanding of § 1605A. *See* Defs.' Mem. at 10 n.5.

Heideman defendants represented the *Bland* plaintiffs in their case against Iran and facilitated their participation in the *Peterson* settlement. *See* Compl. ¶¶ 76, 87, 92; Pls.' Opp'n at 21–25. Yet, as the Heideman defendants point out, there are "key differences" between the *Botvin* and *Bland* litigation, namely, that "[i]n the *Bland* case, judgment on all liability issues had already been entered in 2006, the case was converted by motion to one under § 1605A in 2008, and judgment was entered in 2011." Defs.' Mem. at 37 n.22.

The fact that this Court granted the motion to convert in the *Bland* case while the *Botvin* court denied a similar motion to convert further illustrates the lack of foreseeability. The Botvin Family argues both that the Heideman defendants' decision to petition the court to convert "ma[de] no sense,"[11] Compl. ¶ 67, and that the Heideman defendants were "diligent in their representation of their clients in the *Bland* case" where a motion to convert was filed, *see* Pls.' Opp'n at 21. Neither argument helps the Botvin Family. The Heideman defendants compellingly point to inconsistencies between courts in this District in treating motions to convert. *See* Defs' Mem. at 31–32; *In Re Islamic Repub. of Iran Terrorism Litig.*, 659 F. Supp. 2d. at 96–98. That fact underscores the difficulty in establishing foreseeability for the Botvin Family's legal malpractice claim because, when evaluating whether a case would have been successful absent an attorney's malpractice, the court views the state of the law governing the underlying lawsuit at the time of that original lawsuit. *See Encyclopaedia Britannica, Inc. v. Dickstein Shapiro LLP*, 128 F. Supp. 3d 103, 110 (D.D.C. 2015), *aff'd*, 653 F. App'x 764 (D.C. Cir. 2016). This stems from the

---

[11] Specifically, the Botvin Family argues that the Heideman defendants' March 2008 to petition the court to convert the § 1605(a)(7) claim into a § 1605A was not sensible because it "ignore[d] the teachings of" *Simon v. Rep. of Iraq* that "in order to claim the benefits of § 1605A, the plaintiff must file a new action under that new provision." *See* Compl. ¶ 67; 529 F.3d 1187 (D.C. Cir. 2008). However, as the Heideman defendants astutely point out, they did not have the benefit of *Simon*'s teachings in March 2008 because the decision was not issued until June 2008, three months beyond the statutory window provided in the 2008 NDAA to file § 1605A claims. *See* Defs.' Mot. at 31 n.19; *In Re Islamic Repub. of Iran Terrorism Litig.*, 659 F. Supp. 2d at 108 ("Indeed, the leading decision on this matter, *Simon v. Iraq*, was not decided until June 2008, nearly three months after the 60 day window of opportunity had passed for most plaintiffs.").

principle that an attorney's conduct should be judged at the time of his representation and "an attorney is not expected, much less required, to accurately predict developments in the law." *Biomet Inc. v. Finnegan Henderson LLP*, 967 A.2d 662, 668 (D.C. 2009). Therefore, in 2005, the Heideman defendants could not have known that their strategic decision to draft "the *Botvin I* complaint to avoid relying exclusively on § 1605(a)(7) or the Flatow amendment" in the wake of *Cicippio-Puleo* would foreclose their ability to take advantage of a newly-enacted law in 2008. *See* Defs.' Mem. at 15. Nor could the Heideman defendants have predicted how the court would rule on their motion to convert. Thus, the *Bland* case does not support the Botvin Family's claim.

The Botvin Family also faults the Heideman defendants for failing to intervene in the *Peterson* case and settlement, as the Heideman defendants did in the case of *Wultz v. Islamic Republic of Iran*, No. 08-cv-146 (RCL). The *Wultz* plaintiffs brought an action against Iran in 2008 arising out of a terrorist bombing at a restaurant in Israel in 2006, securing a judgment against Iran in May 2012, *see* 864 F. Supp. 2d 24 (D.D.C. 2012), two months before the Court's decision to award compensatory damages to Yael's estate in *Botvin V*. In February 2013, the *Wultz* plaintiffs, represented by at least one of the Heideman defendants, moved to intervene in the *Peterson* case pending in New York. *See* Compl. ¶¶ 98–100. By May 2013, the *Wultz* plaintiffs had been included in the *Peterson* settlement. *See id.* ¶¶ 99–100. The Botvin Family claims that, had the Heideman defendants similarly moved to intervene in the *Peterson* case "either after the July 3, 2012 judgment was entered on behalf of the ESTATE OF YAEL BOTVIN, or after April 4, 2013 judgment on behalf of JULIE BOTVIN, MICHAL BOTVIN, or TAMAR BOTVIN," the Botvin Family could also have participated in the settlement. *See id.* ¶ 102.

There are several reasons to doubt whether the Botvin Family could have intervened as the *Wultz* plaintiffs did. The Heideman defendants compellingly cite to language from the judge

presiding over the New York *Peterson* litigation strongly suggesting that the Botvin Family would

not have been able to join the settlement after the *Wultz* plaintiffs. *See* Defs.' Mem. at 38–39 &

n.24. When granting the *Wultz* plaintiffs' motion to intervene, the presiding judge stated:

> This conclusion should not give undue encouragement to other nonparty judgment
> creditors, however; the Intervenors here have threaded a very narrow needle. The
> Intervenors assert a good-faith position that they could not have moved to intervene
> any earlier. They filed for intervention prior to any merits decision or entry of
> judgment. Given these unique facts, it is highly unlikely that any other proposed
> parties could intervene in this action.

*Peterson v. Islamic Repub. of Iran*, 290 F.R.D. 54, 58 (S.D.N.Y. 2013).

It is very doubtful that the Botvin Family could have participated in the *Peterson*

settlement, even if the Heideman defendants tried, making this "at best an issue of pure guess-

work requiring the impermissible use of both hindsight and speculation as to different legal results

a court might reach." *See Rocha v. Brown & Gould, LLP*, 101 F. Supp. 3d 52, 77 (D.D.C. 2015).

Even if the presiding judge had allowed the Botvin Family to intervene, they very likely

would have recovered less from the settlement than they did from the U.S.V.S.S.T. Fund. As the

Heideman defendants note, this Court awarded more than $32 million in compensatory damages

to the *Wultz* plaintiffs, *see Wultz*, 864 F. Supp. 2d at 43, yet the *Wultz* plaintiffs only recovered $1

million as part of the settlement. *See* Defs.' Mem. at 38. The Botvin Family obtained judgments

totaling approximately $11.7 million in compensatory damages. While it is impossible to know

what the Botvin Family's share of the *Peterson* settlement would have been, given that the Botvin

Family sought to intervene *after* the *Wultz* plaintiffs with a claim representing approximately *one-*

*third* of the *Wultz* plaintiffs' compensatory damages award, it is very likely that the Botvin Family

would have received far less than the *Wultz* plaintiffs' $1 million. Instead, the Botvin Family

secured more than $2.7 million from the U.S.V.S.S.T. Fund. And, as the Heideman defendants

point out, the Botvin Family would not have been permitted to satisfy their judgments from both

the *Peterson* settlement and the U.S.V.S.S.T. Fund.  *See* Defs' Mem. at 19 n.12; 34 U.S.C. § 20144(e)(2)(B)(iii) ("[a] United States person, who is a judgment creditor in the proceedings captioned *Peterson v. Islamic Republic of Iran*, No. 10 Civ. 4518 (S.D.N.Y.) . . . shall have the right to elect to participate in the [U.S.V.S.S.T.] Fund and, to the extent any such person exercises such right, shall irrevocably assign to the Fund all rights, title, and interest to such person's claims to the assets.").  Therefore, the Botvin Family cannot show that they would have been better off participating in the settlement.

### 2. It is Purely Speculative Whether the Botvin Family Would Have Fared Better Had the Heideman Defendants Pursued the First § 1605A Claim

Finally, the Botvin Family is highly critical of the Heideman defendants' 2008 decision to abandon the First § 1605A claim.  Specifically, the Botvin Family insists that they would have obtained a more expedient and complete damages award had the Heideman defendants prosecuted the First § 1605A claim instead of abandoning it, continuing with the § 1605(a)(7) claim, and then filing the Second § 1605A claim.  *See* Compl. ¶ 115.  This allegation rests on speculation of the kind that does not make for a well-pleaded complaint.

As the Heideman defendants explain, at the beginning of 2008, they anticipated that "all progress that had been made to date in that action—including service on Iran (which took almost six months), entry of default, and a finding establishing Iran's guilt in perpetrating the attack that killed Yael Botvin" would lead to default judgment being "awarded after just one more round of briefing."  *See* Defs.' Reply at 10.  Since pursuing the First § 1605A claim "would have required the attorneys to essentially start over," the Heideman defendants believed that continuing with the § 1605(a)(7) claim was "the most expedient route to secure and maximize a monetary award for the Botvin Family."  Defs.' Mem. at 33.

Though the Heideman defendants were incorrect in their estimation—judgment for all plaintiffs was awarded after not one but three additional rounds of briefing and a separate action— it is not at all clear that pursuing the First § 1605A claim would have led to a significantly different result. At the time of the passage of the 2008 NDAA, there was "a good deal of confusion regarding how parties should avail themselves of the benefits of the new statute." *In Re Islamic Repub. of Iran Terrorism Litig.*, 659 F. Supp. 2d. at 67. The Botvin Family asks this Court to speculate that, had the Heideman defendants litigated the First § 1605A claim differently, the court would have granted judgment for the plaintiffs sooner, and that judge would have agreed with— or exceeded—this Court's measure of damages. A complaint that requires such speculation does not state a plausible claim for relief.[12]

## IV.   CONCLUSION

While the Heideman defendants may be correct that "with the benefit of 14 years of litigation on § 1605A claims," Defs.' Mem. at 30, they are better positioned to litigate these actions today than they were when they were making decisions during the *Botvin* litigation, the Botvin Family plausibly pleads that some of the Heideman defendants' actions may have fallen short of the "exercise that degree of reasonable care and skill expected of lawyers acting under similar circumstances." *Morrison v. MacNamara*, 407 A.2d 555, 561 (D.C. 1979). Nevertheless, the Botvin Family cannot meet their burden to show that the Heideman defendants' actions were the proximate cause of their inability to participate in the *Peterson* settlement.

---

[12] The Botvin Family's complaint also seeks two declaratory judgments from this Court: (1) that the Heideman defendants are not entitled to any legal fees from the Botvin Family, *see* Compl. ¶ 121, and (2) that the Botvin Family is not obliged to pay expenses for the Israeli law experts, deposition videotaping, or service, *id.* ¶¶ 124–27. Because the Court finds that the Botvin Family has not plausibly stated a claim for legal malpractice, and both requests for declaratory judgment are premised on the malpractice claim, the Court agrees with the Heideman defendants that "the failure to state a claim for malpractice is fatal to the declaratory judgment claims." Defs.' Mem. at 43 n.26. Moreover, it is well-established in this District that attorneys are "entitled to all expenses associated with the litigation that [they] would normally expect to pass on to fee paying clients." *McAllister v. Dist. of Columbia*, 21 F. Supp. 3d 94, 106 (D.D.C. 2014).

Therefore, this Court will **GRANT** the defendants' motion to dismiss.   Because the plaintiffs have not stated a claim upon which relief may be granted, the Court will **DISMISS WITH PREJUDICE** the plaintiffs' lawsuit.   A separate Order consistent with this Memorandum Opinion shall issue this date.

Date: September **27**, 2022

Royce C. Lamberth
United States District Judge