UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ESTATE OF YAEL BOTVIN**, *et al.*, <br><br> *Plaintiffs,* <br><br> v. <br><br> **HEIDEMAN, NUDELMAN & KALIK, P.C.**, *et al.*, <br><br> *Defendants.* | Case No. 1:21-cv-3186-RCL |
| **HEIDEMAN, NUDELMAN & KALIK, P.C.**, *et al.*, <br><br> *Third-Party Plaintiffs,* <br><br> v. <br><br> **RUSSELL E. ELLIS**, *et al.*, <br><br> *Third-Party Defendants.* | |

## MEMORANDUM OPINION

This discovery dispute arises from a lawsuit alleging attorney malpractice in the litigation of terrorism-related claims against the government of Iran. Before the Court is a Joint Motion for a Protective Order filed by plaintiffs Julie Goldberg-Botvin, Tamara Botvin, and Michal Botvin, and third-party defendant Russell Ellis (collectively, "Movants" or "Deponents"). *See* Joint Mot. for Protective Order, ECF No. 52 ("Joint Mot."). Defendants Heideman, Nudelman & Kalik, P.C., Richard Heideman, Noel Nudelman, and Tracy Reichman Kalik, and the remaining third-party defendants The Perles Law Firm, P.C. and Steven R. Perles (collectively, "Non-movants") have noticed in-person depositions of the Deponents to take place in Washington, D.C. or, alternatively,

1

in Israel at the Deponents' expense. The requested protective order would direct the parties to conduct the depositions via videoconference. For the reasons that follow, the Motion will be **GRANTED**.

## I. BACKGROUND

This Court has previously explained much of the background on the plaintiffs' litigation against Iran arising from the tragic death of Yael Botvin in previous rulings. *See, e.g., Botvin v. Iran*, 873 F. Supp. 2d 232 (D.D.C. 2012); *Goldberg-Botvin v. Iran*, 938 F. Supp. 2d 1, 11 (D.D.C. 2013). The following summary focuses on only those facts that relate to the pending Motion.

### A. The Botvins' Malpractice Lawsuit

Yael Botvin, the daughter of plaintiff Julie Goldberg-Botvin and the sister of plaintiffs Tamar and Michal Botvin, died at the age of fourteen in a suicide bombing at the Ben Yehuda Street mall in Jerusalem in 1997. *See Botvin*, 873 F. Supp. 2d at 234. The Islamic Resistance Movement, widely known by its Arabic abbreviation Hamas, claimed responsibility for the incident. *Id.* at 235, 238. The plaintiffs, as well as third-party defendant Ellis, as executor of Yael Botvin's estate, hired the law firm of Heideman, Nudelman & Kalik — a defendant in the present lawsuit — to sue the Iranian government for aiding the Hamas attack. *Id.* at 234.

The road to judgment was anything but smooth, however. This Court denied the plaintiffs' motions for default judgment four times in a span of eight years before the plaintiffs' counsel substantiated their request with facts and legal support that met the heightened standard for default judgments under the Foreign Sovereign Immunities Act ("FSIA"). *See id.* They eventually obtained judgments worth about $42 million, including compensatory damages of roughly $11.7 million. *See Est. of Botvin ex rel. Ellis v. Heideman, Nudelman & Kalik, P.C.*, 115 F.4th 594, 597–98 (D.C. Cir. 2024).

2

In the meantime, other terrorism victims with FSIA judgments related to Iran-sponsored terrorism discovered that Iran's central bank, Bank Markazi, had stashed about $1.9 billion in a Citibank account located in the United States. Those victims initiated enforcement proceedings to claim the funds. *See Bank Markazi v. Peterson*, 578 U.S. 212, 219 (2016). In June 2012, they agreed to a pro-rata distribution of the account's proceeds, but their arrangement was limited to existing judgment creditors. Because the Botvins secured judgments only in July 2012 and April 2013, they were ineligible to participate in the Bank Markazi account settlement.

In December 2021, plaintiffs filed a complaint alleging that they lost out on the Bank Markazi funds due to their lawyers' malpractice, seeking the difference between their collection and what they would have collected from the Bank Markazi account. *See* Compl. ¶ 118, ECF No. 1. The plaintiffs, whose only recourse was the U.S. Victims of State Sponsored Terrorism Fund, recovered only $2.8 million of $11.7 million in compensatory judgments. The claimants to the Bank Markazi account, by contrast, more than doubled the plaintiffs' recovery rate, collecting a total of $1.9 billion against judgments worth $3.7 billion. Had the plaintiffs gotten in on the Bank Markazi account, they allege they would have recovered close to $6 million instead of $2.8 million. In September 2022, this Court granted the defendants' motion to dismiss and denied reconsideration. Order of Sept. 27, 2022, ECF No. 15; *see also* Mem. Op., ECF No. 14; Order of Dec. 12, 2022, ECF No. 20. The plaintiffs appealed, and the D.C. Circuit reversed. *See Est. of Botvin*, 115 F.4th at 595.

### B. The Discovery Dispute

Heideman, Nudelman & Kalik, P.C., and its partners, Richard Heideman, Noel Nudelman, and Tracy Reichman Kalik, have noticed depositions of plaintiffs Julie Goldberg-Botvin, Tamar Botvin, and Michal Botvin, as well as third-party defendant Russell Ellis, the executor of Yael

Botvin's estate, who brought the Iran litigation in its name. They seek in-person depositions, and prefer that the depositions occur in Washington, D.C.

The Deponents, all of whom live in Israel, argue that travel to the United States would pose an undue burden for health and financial reasons. Russell Ellis is ninety-five years old, and the fortune of longevity has not been without its challenges. Decl. of Russell Ellis ¶ 2, Joint Mot. for Protective Order, ECF No. 52-2 ("Ellis Decl."). Ellis requires a walker, and he suffers from an ongoing infection that requires medical treatment multiple times per week. *Id.* ¶ 4. Ellis experiences severe back pain, but he has been advised that his advanced age disqualifies him from undergoing surgery to address the pain. *Id.* He rarely leaves his apartment. *Id.* ¶ 6. In addition to his own ailments, Ellis's ninety-three-year-old wife suffered a heart attack requiring stent placement surgery shortly before the filing of the instant motion, and her doctors advise that she cannot safely be left alone. *Id.* ¶ 5. Ellis estimates that economy airfare to the United States from Israel would cost him between $1,500 and $2,300 and that a first-class fare would be twice as much. *Id.* ¶ 7.

The Non-movants also seek to depose Julie Goldberg-Botvin and her living daughters. Goldberg-Botvin is seventy-seven years old and provides in-home medical care to her eighty-three-year-old husband, who is diabetic. Decl. of Julie Goldberg-Botvin ¶¶ 3–5, Joint Mot. for Protective Order, ECF No. 52-1 ("Goldberg-Botvin Decl."). Her daughter Michal is a nurse with four children, and her daughter Tamar is a social worker. *Id.* ¶¶ 6–7. She estimates that the total cost for them to travel between the United States and Israel would exceed $10,000. *Id.* ¶ 9. Goldberg-Botvin also declares that she and her daughters know little about the underlying litigation apart from the decision to bring suit in the first place. *Id.* ¶ 10.

Heideman, Nudelman & Kalik, P.C. and its partners have proposed, as an alternative, that defense counsel fly to Israel for the depositions, albeit with plaintiffs footing the travel costs. Defs.' Opp. at 2, ECF No. 53.

### C. Procedural Posture

On February 10, 2025, Heideman Law Group, P.C., Tracy Reichman Kalik, Noel Nudelman, and Heideman, Nudelman & Kalik, P.C., filed a third-party complaint seeking contribution from Edward McAllister, the Perles Law Firm, Steven Perles, and Russell Ellis for their alleged roles in the representation of the Botvins. *See* Third Party Compl., ECF No. 35. The Non-movants subsequently indicated their intent to depose Ellis and the Botvins in person. *See* Meet & Confer Statement of Defs. at 4, ECF No. 37; Meet & Confer Statement of Pls. at 5–7, ECF No. 38. On May 8, 2025, the Deponents moved for a protective order to require those depositions to take place via videoconference. *See* Joint Mot. The defendants and non-moving third-party defendants opposed on May 22, Defs.' Opp.; Third-Party Defs.' Opp, ECF No. 54, and the Deponents replied later that day, Reply, ECF No. 55. The Court heard brief presentations on the Motion at the July 7, 2025 status conference. The Motion is now ripe for review.

## II.   LEGAL STANDARDS

### A. Protective Orders

District courts enjoy authority, upon finding good cause, to enter an order "to protect a party from annoyance, embarrassment, oppression, or," as the Deponents assert here, "undue burden or expense" in responding to a discovery request. Fed. R. Civ. P. 26(c)(1). "[T]he party seeking a protective order . . . bears the burden of proving its necessity" and "must articulate specific facts showing clearly defined and serious injury resulting from the discovery sought." *United States v. One Gulfstream G-V Jet Aircraft Displaying Tail No. VPCES*, 304 F.R.D. 10, 12

5

(D.D.C. 2014) (first alteration in original) (quoting *Avirgan v. Hull*, 118 F.R.D. 252, 254 (D.D.C. 1987)).

### B. Location and Methods of Deposition

Resolving disputes over the location of a deposition strikes at the heart of a district court's discretion to supervise discovery. *Id.* ("Ultimately, when a dispute arises about the location of a deposition, the final determination is within the discretion of the trial court." (citing *Paleteria La Michoacana, Inc. v. Productos Lacteos Tocumbo S.A. de C.V.*, 292 F.R.D. 19, 22 (D.D.C. 2013))). Under Federal Rule of Civil Procedure 30, such discretion extends to ordering, upon motion, that the deposition occur by an alternative method, including "by telephone or other remote means." Fed. R. Civ. P. 30(b)(4).

### III. DISCUSSION

This case lies at the intersection of conflicting principles regarding the location and method of depositions, and how those principles have evolved in the Zoom era. Having considered both parties' arguments, and for the reasons that follow, the Court finds that the Deponents have met their burden of demonstrating good cause for the protective order.

### A. Presumptions Regarding Location of Depositions

The parties present competing perspectives on how district courts handle disputes about where and how depositions should occur. The Non-movants assert that the Deponents' status as parties to the litigation — the Botvins as plaintiffs, and Ellis as the executor of Yael Botvin's estate and third-party defendant — renders them "subject to the default rule that they are to appear for their depositions in person in the jurisdiction in which they brought their claim." Defs.' Opp. at 4; *see also Guy v. Vilsack*, 293 F.R.D. 8, 13 (D.D.C. 2013) ("A party that chooses to initiate litigation and invoke the legal protections of the forum should expect to appear for deposition in that jurisdiction." (citations omitted)). The Non-movants maintain that the Deponents are entitled

to an alternate venue for their depositions only if they provide facts that demonstrate "undue hardship." *Cobell v. Norton*, 213 F.R.D. 43, 47 (D.D.C. 2003).

The Deponents tell a different story, pointing to a presumption that "a party *seeking* discovery," here, the Non-movants, "must go where the desired witnesses are normally located," absent "special circumstances." *One Gulfstream*, 304 F.R.D. at 12 (emphasis added) (quoting *Farquhar v. Shelden*, 116 F.R.D. 70, 72 (E.D. Mich. 1987)).

The parties' arguments concerning these presumptions are not especially convincing. Chiefly, as the parties acknowledged at the status conference, none of the cases they cite bind this Court. Neither in their briefing nor during the July 7 status conference did either side identify binding D.C. Circuit precedent on whether the Court can order remote depositions of a party residing abroad. Thus, the parties concede, as they must, that their cited authority is persuasive at best.

Nor is the Court convinced that the Deponents' status as a party bears the weight the Non-movants place on it. Although it is true that the Non-movants did not choose to be sued by Israeli plaintiffs in U.S. court, it is beyond dispute that they agreed to represent those plaintiffs as clients in the previous case, including through Ellis, even though they have been residents of Israel for decades. *See, e.g.*, Engagement Agreement at 1, Ex. A to Third Party Compl., ECF No. 35-1. What the Non-movants call the "default rule" that parties "are to appear for their depositions in person in the jurisdiction in which they brought their claim" is an awkward fit for legal malpractice suits brought by dissatisfied foreign clients, like the present case.

On the other hand, the Deponents' favored presumption is off base too. *Farquhar v. Shelden*, the source of the Deponents' presumption against travel to the United States, involved precisely the opposite arrangement of parties from the facts of this case. In *Farquhar*, the

7

*defendant* was the party located overseas (in the Netherlands), and the *plaintiffs* noticed his deposition to take place in the United States. 116 F.R.D. at 72. Ultimately, the court ordered the plaintiffs to travel to the Netherlands to depose the defendant *and* ordered that the defendant "advance to plaintiff the cost for the deposition." *Id.* In any event, that 1987 ruling preceded the advent of low-cost and abundant videoconferencing technology.

Ultimately, though the parties point to competing presumptions regarding the proper locations of deposition, all sides essentially agree that, whether phrased as an "undue burden" or "special circumstances" inquiry, the propriety of granting the protective order turns on the particular facts offered by the Deponents. This is consistent with the Court's Rule 26 authority to enter protective orders upon a finding of "good cause," including to prevent "undue burden or expense." Fed. R. Civ. P. 26(c)(1). Thus, the Court will focus on whether the Deponents have demonstrated good cause for granting the motion.

### B. Undue Burden

To obtain a protective order against unduly burdensome or costly discovery, the movant must show that the burden or expense of the proposed discovery is unreasonable in light of the benefits to be reaped. *See Mannina v. District of Columbia*, 334 F.R.D. 336, 339 (D.D.C. 2020). Here, the Deponents present two grounds for finding an undue burden: health risks, and the financial costs and practical encumbrances of traveling between Israel and the United States. Joint Mot. for Protective Order at 2, ECF No. 52. The defendants, however, have offered to take the depositions in Israel so long as the Deponents foot the bill. Thus, although the parties' briefing focuses on whether conducting the depositions *in the United States* would be unduly burdensome as opposed to a deposition in Israel or via Zoom, that question is largely beside the point. Rather,

the issue is whether the burden on the Deponents of paying defense counsel's travel expenses is outweighed by the benefits of a live, in-person deposition in Israel.

Consequently, though the parties spill much ink on Ellis and Golberg-Botvin's health concerns, those considerations take a backseat to the costs of traveling to Israel and the tradeoffs of remote depositions. The parties estimate that the costs of travel would be on the order of approximately $10,000. The Court acknowledges at the outset that the plaintiffs in this case have already collected $2.7 million in their judgment, and they do not represent that such costs would be unbearable. But, they maintain, the costs are unduly burdensome because they are unnecessary in light of Zoom technology. Even the Non-movants implicitly recognize that the costs are substantial, given that they refuse to foot it themselves — to the point of litigating the issue. On the facts of this case, where the travel required is so distant, and exacerbated by the widespread cancellation of flights from the United States to Israel in light of the unrest on the Middle East, imposing such costs in the face of cost-free videoconferencing technology seems at odds with the command to both "the court *and* the parties" to interpret and apply the FRCPs "to secure the just, speedy, and *inexpensive* determination." Fed. R. Civ. P. 1 (emphases added).

The Non-movants maintain that videoconference depositions carry their own drawbacks. They insist that the divergent time zones between Israel and Washington will require coordination. Defs.' Opp. at 8. But so does international travel. That is especially so with respect to travel to Israel now, which the parties acknowledged during the status conference, has become more complex as many international airlines have ceased flying between the United States and Israel in light of the current unrest in the Middle East. The Non-movants also contend that the depositions will be hard to take virtually because they expect questioning to be "document heavy." *Id.* The Defendants have not substantiated why that would be the case. Although it is facially plausible

9

that the attorney files from more than eight years of litigation are voluminous, the Court strains to see why the bulk of those files would provide a basis for questioning the Deponents — especially the Botvins, who were merely lay clients in these cases. And in any event, videoconferencing technology includes methods for presenting documents on the screen to permit questioning.

In the end, "dispute[s] . . . about the location of a deposition" fall "within the discretion of the Court." *One Gulfstream*, 304 F.R.D. at 12. The Federal Rules plainly allow the Court to order that discovery occur by a "method other than the one selected by the party seeking" it. Fed. R. Civ. P. 26(c)(1)(C). Courts have routinely found that videoconferencing is an "acceptable alternative," *e.g., One Gulfstream*, 304 F.R.D. at 14, and it is clear that Rule 30's authorization to order that a deposition be taken "by telephone or other remote means" gives this Court "the power to order a deposition by videoconference," *id.* at 12. Here, remote depositions will avoid thousands of dollars in costs, to say nothing of allowing two elderly deponents to take depositions from the convenience of their homes.

This opinion should not be construed to suggest live, in-person deposition testimony never offers advantages over videoconferencing, nor should it be read as endorsing a notion that financial burdens can always justify remote depositions. To the contrary, such considerations will always be the province of a district court's sound discretion based on the circumstances of each individual case. Furthermore, as the issue is not presented here, the Court takes no position at this time on whether any of the Deponents will be required to travel to Washington, D.C. to participate in trial.

On the current facts, however, the Court finds that any benefits from requiring the noticed depositions to take place in person are decisively outweighed by their costs. Although Courts may vary with respect to the circumstances under which remote depositions are appropriate, it is beyond dispute that they "have become a standard tool in litigation since the onset of the COVID-19

pandemic and are sufficiently effective" for discovery purposes. *Rogers v. Bedford*, 2023 WL 6143545, at *2 (D. Md. Sept. 20, 2023). Such is the case here.

### IV.    CONCLUSION

Based on the reasoning above, this Court will **GRANT** the motion for a protective order. The parties are ordered to meet and confer and propose a discovery and pretrial schedule no later than July 17, 2025. The discovery schedule will include dates for the depositions of Russell Ellis, Julie Goldberg-Botvin, Tamar Botvin, and Michal Botvin, and such depositions shall occur no later than August 29, 2025.

A separate order will issue.

Date: 7/10/25

Royce C. Lamberth
United States District Judge